**EXHIBIT B**

AGREEMENT OF LEASE

# AI 229 WEST 43rd STREET PROPERTY OWNER, LLC
### LANDLORD

### AND

### GUITAR CENTER STORES, INC.,

### TENANT

Premises At:
229 West 43rd Street
New York, New York

Dated as of: December 11, 2013

00295140.10

# TABLE OF CONTENTS

**Page**

ARTICLE 1 DEMISE, PREMISES, RENT ................................................................8
ARTICLE 2 USE AND OCCUPANCY ..................................................................10
ARTICLE 3 TERM ....................................................................................................13
ARTICLE 4 ALTERATIONS; NON-INTERFERING USES ..............................14
ARTICLE 5 CONDITION OF THE PREMISES; LANDLORD'S WORK............20
ARTICLE 6 REPAIRS; FLOOR LOAD................................................................20
ARTICLE 7 REAL ESTATE TAXES, OPERATING EXPENSES AND ADDITIONAL
         RENT ......................................................................................................22
ARTICLE 8 LEGAL REQUIREMENTS................................................................30
ARTICLE 9 SUBORDINATION AND NON-DISTURBANCE; ESTOPPEL
         CERTIFICATES....................................................................................32
ARTICLE 10 SERVICES ........................................................................................33
ARTICLE 11................................................................................................................39
INSURANCE...............................................................................................................39
ARTICLE 12 DESTRUCTION OF THE PREMISES; PROPERTY LOSS OR
         DAMAGE ..............................................................................................41
ARTICLE 13 EMINENT DOMAIN ......................................................................43
ARTICLE `4 ASSIGNMENT, SUBLETTING, MORTGAGE, ETC..................45
ARTICLE 15 ACCESS TO PREMISES; BASE BUILDING UPGRADE WORK ...................54
ARTICLE 16 CERTIFICATE OF OCCUPANCY ..............................................55
ARTICLE 17 DEFAULT ........................................................................................55
ARTICLE 18 REMEDIES AND DAMAGES. ....................................................58
ARTICLE 19 FEES AND EXPENSES ................................................................60
ARTICLE 20 NO REPRESENTATIONS BY LANDLORD ..............................61
ARTICLE 21 END OF TERM ................................................................................61
ARTICLE 22 QUIET ENJOYMENT ....................................................................62
ARTICLE 23 NO WAIVER; NON-LIABILITY ..................................................63
ARTICLE 24 WAIVERS ........................................................................................64
ARTICLE 25 INABILITY TO PERFORM ..........................................................65
ARTICLE 26 BILLS AND NOTICES ..................................................................65
ARTICLE 27 RULES AND REGULATIONS ......................................................67
ARTICLE 28 BROKER ..........................................................................................69
ARTICLE 29 INDEMNITY ....................................................................................70
ARTICLE 30 INTENTIONALLY OMITTED ......................................................71
ARTICLE 31 LANDLORD'S CONTRIBUTION ................................................71
ARTICLE 32 INTENTIONALLY DELETED ......................................................72
ARTICLE 33 OFAC LIST REPRESENTATIONS ..............................................72
ARTICLE 34 INTENTIONALLY OMITTED ......................................................72
ARTICLE 35 INTENTIONALLY OMITTED ......................................................72
ARTICLE 36 MISCELLANEOUS. ......................................................................72
ARTICLE 37 RENEWAL OPTION ......................................................................78
ARTICLE 38 SIGNAGE ........................................................................................80

00295140.10

<u>Exhibits</u>

| | |
|---|---|
| Exhibit A | Floor Plan of Premises |
| Exhibit B: | Building Rules and Regulations |
| Exhibit C: | Alteration Rules and Regulations |
| Exhibit D: | Work Letter |
| Exhibit E: | Fixed Rent |
| Exhibit F: | List of Exclusives |
| Exhibit G: | Tenant's Sign Envelope |
| Exhibit H: | Intentionally Omitted |
| Exhibit I: | Form of Non-Disturbance Agreement |
| Exhibit J: | Landlord's Current Rate Sheet |

00295140.10

This **AGREEMENT OF LEASE** (this "Lease"), is made as of the 11th day of December, 2013, ("Effective Date") by and between **AI 229 WEST 43RD STREET PROPERTY OWNER, LLC**, a Delaware limited liability company, having an office and place of business c/o 229 West 43rd Street, 10th Floor, New York, New York 10036 ("Landlord") and **GUITAR CENTER STORES, INC.**, a Delaware corporation, having an address at 5795 Lindero Canyon Road, Westlake Village, California 91362 ("Tenant").

## W̲I̲T̲N̲E̲S̲S̲E̲T̲H̲:

WHEREAS, Landlord desires to lease to Tenant, and Tenant desires to hire from Landlord, the Premises (as hereinafter defined).

NOW, THEREFORE, the parties hereto, for themselves, their legal representatives, successors and assigns, hereby covenant and agree as follows:

The following terms, wherever used in this Lease (unless the context requires otherwise), shall have the respective meanings set forth below (or as specified in the Sections of this Lease set forth below) after such terms:

Additional Rent:  Tenant's Tax Payment, Tenant's Operating Payment, and any and all other sums, other than Fixed Rent, payable by Tenant under this Lease or otherwise in connection with the use and occupancy of the Premises.

Affiliate:  with respect to any Person, any other Person that, directly or indirectly, through one or more intermediaries, Controls, is Controlled by, or is under common Control with, such first Person.

Alteration Threshold:  as defined in Section 4.1(a).

Alterations or Tenant's Alterations:  alterations, installations, improvements, additions and other physical changes made by or on behalf of Tenant or a Tenant Party in or about the Premises, including, without limitation, Tenant's Initial Alterations, Material Alterations, and Decorative Alterations.

Applicable Rate:  a rate equal to the lesser of (i) the rate announced by Bank of America, N.A. or its successor from time to time as its prime or base rate, and (ii) the maximum applicable legal rate, if any.

Assessed Valuation:  as defined in Section 7.1(c).

Base Building Restoration:  as defined in Section 12.2(a).

Base Operating Expenses:  the Operating Expenses for the Base Operating Year.

Base Operating Year:  Calendar Year 2014.

Base Tax Amount:  The amount of Taxes payable during the Base Tax Year.

Base Tax Year:  calendar year 2014 (i.e., the second half of the tax fiscal year of July 1, 2013 to June 30, 2014 and the first half for the tax fiscal year of July 1, 2014 to June 30, 2015).

BID:  as defined in Section 7.1(f).

BID Surcharge:  as defined in Section 7.1(f).

Brokers:  as defined in Section 28.1.

Building:  all the buildings, equipment and other improvements and appurtenances of every kind and description (but excluding Tenant's Property) now or hereafter erected, constructed or placed upon the Land and any and all alterations, renewals, replacements, additions and substitutions thereto.

Building Systems:  the mechanical, electrical, steam and gas systems and the Building HVAC System and the elevator, plumbing, sanitary, fire protection, sprinkler and life-safety systems of the Building (but not the portions of such systems, or the distribution facilities appurtenant thereto, located within and exclusively serving the Premises or the premises of any other tenant in the Building).

Business Days:  all days, excluding Saturdays, Sundays and Holidays.

Commencement Date:  the date which is the latest to occur of (i) the Effective Date; (ii) delivery of the Premises to Tenant with Landlord's Work having been Substantially Completed).

Common Areas:  the core and shell of the Building, including, without limitation, the Lobby, the roof of the Building (other than portions of the roof used exclusively by Landlord, Tenant, or other tenants of the Building), elevators, mechanical rooms, electrical closets, janitorial and telecommunication closets, elevator lobbies and corridors and other areas, if any, shared by two (2) or more occupants on multi-tenant floors, the Building Systems and the public portions of the Building.

Common Elements:  as defined in Section 7.1 of the Declaration.

Control:  either (a) the ownership, directly or indirectly, of at least fifty percent (50%) of the voting stock of a corporation, or in the case of any Person which is not a corporation, the ownership, directly or indirectly, of at least fifty percent (50%) of the beneficial ownership interests in such Person, or (b) in the case of any Person, irrespective of stock ownership or other beneficial ownership, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person.

Conversion:  as defined in Section 36.5.

CPI:  the Consumer Price Index for All Urban Consumers, New York, N.Y. — Northern New Jersey — Long Island, 1982-84=100; provided, however, that if the CPI or any successor index shall cease to be published, Landlord and Tenant shall agree, in writing, on a substitute therefor.

2

CPI Fraction:  as of each January 1st during the Term (an "Adjustment Date"), a fraction (a) the numerator of which is the CPI for the CPI Month immediately preceding such Adjustment Date and (b) the denominator of which is the CPI for the CPI Month immediately preceding the Effective Date.

CPI Month:  a particular calendar month for the determination of the CPI Fraction.

Declaration:  as defined in Section 36.5.

Decorative Alterations:  as defined in Section 4.1(a).

Default Rate:  a rate equal to the lesser of (i) the rate announced by Bank of America, N.A. or its successor from time to time as its prime or base rate, plus two percent (2%), and (ii) the maximum applicable legal rate, if any.

Deficiency:  as defined in Section 18.2(a)(ii).

Effective Date:  the date written in on the first page of this Lease.

Environmental Law:  any present or future federal, state or local law, statute, regulation, or ordinance, and any judicial or administrative order or judgment thereunder, and judicial opinions or orders, pertaining to, health, industrial hygiene, Hazardous Substances, the environment or natural resources, including, but not limited to, each of the following, as enacted as of the date hereof or as hereafter amended:  the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. §§ 9601 et seq.; the Resource Conservation and Recovery Act of 1976, 42 U.S.C. §§ 6901 et seq.; the Toxic Substance Control Act, 15 U.S.C. §§ 2601 et seq.; the Water Pollution Control Act (also known as the Clean Water Act), 33 U.S.C. §§ 1251 et seq.; the Clean Air Act, 42 U.S.C. §§ 7401 et seq.; and the Hazardous Materials Transportation Act, 49 U.S.C. §§ 1801 et seq.; the Occupational Safety and Health Act, 29 U.S.C. § 651 et eq.; and the Oil Pollution Control Act 33 U.S.C.A. § 2701 et seq.

Event of Default:  as defined in Article 17.1.

Existing Mortgage:  collectively, the mortgages described on the Mortgage Schedule annexed hereto as Schedule A, as the same may be amended from time to time.

Expiration Date:  the last day of the month in which occurs the fifteenth (15th) anniversary of the Commencement Date, as such Expiration Date may be extended pursuant to Article 36, or such earlier date upon which the Term may expire or be terminated pursuant to any of the conditions of limitation or other provisions of this Lease or pursuant to law.

Federal Bankruptcy Code:  Title 11 of the United States Code, as amended or superseded from time to time.

First Class Building:  Class A building as recognized by the Real Estate Advisory Board of New York, Inc. (or any successor thereto) ("REBNY") located in midtown Manhattan of comparable size, quality and character to the Building.

3

Fixed Rent:  as defined in Section 1.1(a).

Force Majeure:  any delays resulting from any causes beyond Landlord's or Tenant's reasonable control, as the case may be, including, without limitation, governmental regulation, governmental restriction, strike, labor dispute, riot, inability to obtain materials, acts of God, war, terrorist acts, fire or other casualty and other like circumstances.  Under no circumstances shall the non-payment of money or a failure attributable to a lack of funds be deemed to be (or to have caused) an event of Force Majeure.

Freight Business Hours:  as defined in Section 10.4(a).

Governmental Authority:  any of The United States of America, The State of New York, The City of New York, any political subdivision thereof and any agency, department, commission, board, bureau or instrumentality of any of the foregoing, now existing or hereafter created, having jurisdiction over the Real Property or any portion thereof or the curbs, sidewalks, and areas adjacent thereto.

Hazardous Substances:  any material, waste or substance which is:  (i) included within the definitions of "hazardous substances," "hazardous materials," "toxic substances," or "solid waste" in or pursuant to any Environmental Law, or subject to regulation under any Environmental Law; (ii) listed in the United States Department of Transportation Optional Hazardous Materials Table, 49 C.F.R. § 172.101, as enacted as of the date hereof or as hereafter amended, or in the United States Environmental Protection Agency List of Hazardous Substances and Reportable Quantities, 40 C.F.R. Part 302, as enacted as of the date hereof or as hereafter amended; or (iii) explosive, flammable, radioactive, friable asbestos, a polychlorinated biphenyl, petroleum or a petroleum product or waste oil or any other item that requires special disposal by the Environmental Protection Agency.

Holdover Amount:  as defined in Section 21.2(a).

Holidays:  the days observed, without duplication, by either The State of New York, the Federal Government, the contract from time to time in effect between Locals 32B and 32J of the Building Service Employees Union AFL-CIO (or any successor thereto) and the Real Estate Advisory Board of New York, Inc. (or any successor thereto) or on which First Class Buildings are now or hereafter closed.

HVAC:  heating, ventilation and air-conditioning.

ICIP:  the Industrial and Commercial Incentive Program of the City of New York (Rules of City of New York, Tit. 19, Ch.14)

Indemnified Party Notice:  as defined in Section 29.1(c).

Land:  the land upon which the Building is located.

Landlord:  AI 229 West 43rd Street Property Owner, LLC, a Delaware limited liability company.

4

Landlord Delay:  any delay that Tenant may encounter in commencing or performing Tenant's Initial Alterations and which is solely attributable to Landlord or Landlord's employees, agents, contractors, subcontractors, suppliers or representatives.

Landlord Exculpated Parties:  as defined in Section 36.1(b).

Landlord Party:  any of Landlord, any Affiliate of Landlord, Landlord's managing and leasing agents for the Building, each Mortgagee and Superior Lessor, and each of their respective direct and indirect partners, officers, shareholders, directors, members, trustees, beneficiaries, employees, principals, contractors, licensees, agents and representatives.

Landlord Repairs:  as defined in Section 6.1(a).

Landlord's Contribution:  an amount calculated pursuant to Section 31.1(a).

Landlord's Estimate:  as defined in Section 7.3(b).

Landlord's Statement:  as defined in Section 7.1(g).

Landlord's Work:  as defined in the Work Letter.

Late Payment:  as defined in Section 19.2.

Legal Requirements:  all present and future laws, rules, orders, ordinances, regulations, statutes, requirements, codes, executive orders, and any judicial interpretations thereof, extraordinary as well as ordinary, of all Governmental Authorities, including the provisions of the Governmental Documents and including the Americans with Disabilities Act (42 U.S.C. § 12, 101 et seq.) ("ADA"), New York City Local Law 58 of 1987, any requirements of the New York City Landmarks Preservation Commission, the Code (as defined in the Work Letter) and any law of like import, and all rules, regulations and government orders with respect thereto and any of the foregoing relating to environmental matters, energy conservation, hazardous materials, public health and safety matters, and of the New York Board of Underwriters, the New York Fire Insurance Rating Organization or any other fire rating organizations or insurance entities performing similar functions, in each case, affecting the Real Property, the Premises or the maintenance, use or occupation thereof, or any street or sidewalk comprising a part of or in front thereof or any vault in or under the Real Property.

Lobby:  the ground floor lobby of the Building.

Material Alterations:  as defined in Section 4.1(a).

Mortgage:  any mortgage or deed of trust indenture which may now or hereafter affect the Retail Unit, the Building or any Superior Lease and the leasehold interest created thereby, and all renewals, extensions, supplements, amendments, modifications, consolidations and replacements thereof or thereto, substitutions therefor, and advances made thereunder.

Mortgagee:  any mortgagee, trustee or other holder of the mortgagee's interest under a Mortgage, and any interest in the loan evidenced thereby. .

5

Non-Standard Alterations: as defined in Section 4.4(a).

Offer Notice:  as defined in Section 14.3(a).

Original Tenant:  Guitar Center Stores, Inc. or any Permitted Transferee.

Operating Expenses:  as defined in Section 7.1(e).

Operating Records:  as defined in Section 7.5(b).

Operating Requirement:  as defined in Section 2.2(h).

Operating Year:   shall mean each twelve (12) month period occurring immediately following the Base Operating Year.

Partial Year Fraction:  in the case of a calendar year only a fraction of which falls within the Term, the fractional representation that the portion of the Term in such calendar year bears to such calendar year.

Permitted Transferees:  as defined in Section 14.2(a).

Permitted Use:  the retail sale, rental, instruction, and repair of (both new and previously-owned) guitars; amplifiers; keyboards; drums and percussion; band and orchestra instruments; live sound (public address systems and equipment); DJ equipment; stage, theater, DJ and special effects lighting; computer hardware and software for (any and all) performing, recording, editing, and instruction of music, video, and other entertainment applications; other musical instruments and related products; music books and sheet music; accessories and items related to any of the foregoing; lessons, rehearsal studios; and/or items which are a technological evolution of the foregoing (the foregoing, the "Guitar Center Use"), and for any other legal retail purpose. Subject to the limitations provided for therein, Tenant shall be granted the exclusive use set forth on Exhibit F annexed hereto.

Person:   any individual, corporation, partnership, limited liability company, limited liability partnership, joint venture, estate, trust, unincorporated association, business trust, tenancy-in-common or other entity or any Governmental Authority.

Premises:  shall mean the specific demised store area of approximately 646 square feet on the ground floor, 1,040 square feet in the cellar and 26,433 square feet on the sub-cellar of the Retail Unit, for a total of approximately 28,119 square feet with existing interior ceiling heights. The Premises are designated on the floor plan attached hereto as Exhibit A for the sole purpose of more specifically locating said area.

Real Property:  collectively, the Building, the Land, and the Appurtenances.

Rent:  collectively, Fixed Rent and Additional Rent.

Rent Commencement Date:  upon the *earlier* of: (1) the date Tenant has opened for business for the Permitted Use, or (2) two hundred forty (240) days after the completion of all of

6

the following: (a) delivery of possession of the Premises to Tenant with Landlord's Work Substantially Complete and compliant with all applicable Legal Requirements, (b) Tenant's receipt of a Subordination, Non-Disturbance and Attornment Agreement ("SNDA"), in favor of Tenant, executed by Landlord and Landlord's mortgagee and substantially in the form attached hereto as Exhibit I; the earlier of (1) and (2) is hereinafter known as the "Rent Commencement Date".

Retail Space: the space in the Building used as retail space as and to the extent permitted pursuant to the terms of any tenant's lease (or otherwise designated as retail space by Landlord in its sole discretion).

Retail Unit: as defined in Section 3.1(a) of the Declaration.

Substantial Completion, substantial completion, Substantially Complete or substantially complete shall mean that Landlord's Work, Tenant's Initial Alterations or any other item of work (as the case may be) shall be fully complete and, where applicable, operational in accordance with the terms of this Lease and all Legal Requirements, except for minor so-called "punch list" items which do not, either individually or in the aggregate, materially interfere with Tenant's use and occupancy of the Premises.

Successor Landlord: as defined in Section 9.3(a).

Superior Lease: any ground or underlying lease of the Real Property or any part thereof heretofore or hereafter made by Landlord, as tenant, and all renewals, extensions, supplements, amendments and modifications thereof.

Superior Lessor: a lessor under a Superior Lease.

Tax Year: as defined in Section 7.1(d).

Taxes: as defined in Section 7.1(a).

Telecommunications Equipment: as defined in Section 4.9(b).

Tenant Party: any of Tenant, any Affiliate of Tenant, any subtenant or any other occupant of the Premises, and each of their respective direct or indirect partners, officers, shareholders, directors, members, trustees, beneficiaries, employees, principals, contractors, licensees, agents and representatives.

Tenant's Communications Equipment: as defined in Section 4.9(b).

Tenant Delay: any delay that Landlord may encounter in commencing or performing Landlord's Work which is primarily caused by Tenant or Tenant's employees, agents, contractors, subcontractors, suppliers or representatives including a breach by Tenant of any of the terms, covenants or conditions on Tenant's part to be observed or performed.

Tenant's Initial Alterations: as defined in the Work Letter.

7

Tenant's Operating Payment:  as defined in Section 7.3(a).

Tenant's Plans:  as defined in Section 4.2.

Tenant's Property:  Tenant's movable fixtures and movable partitions, equipment, inventory, computer systems, telephone and other communication equipment, furniture, trade fixtures, furnishings and other items of personal property (excluding property which is built into the Premises and custom-fitted furniture or cabinetry), which are removable without material damage to the Premises or Building.

Tenant's Share of Operating Expenses:  as defined in Section 7.1(b).

Tenant's Share of Taxes:  as defined in Section 7.1(b).

Tenant's Statement:  as defined in Section 7.5(b).

Tenant's Tax Payment:  as defined in Section 7.2(a).

Term:  the term of this Lease, which shall commence on the Commencement Date and shall expire on the Expiration Date.

Transaction Expenses:  as defined in Section 14.9(a).

Transaction Profits:  as defined in Section 14.9(a).

Unavoidable Delays:  as defined in Article 25.

Work Letter:  the work letter attached hereto as Exhibit D and made a part hereof.

## ARTICLE 1

### DEMISE, PREMISES, RENT

**Section 1.1**     Landlord hereby leases to Tenant, and Tenant hereby hires from Landlord, the Premises, for the Term, at an annual rent ("Fixed Rent") as set forth on Exhibit E attached hereto and made a part hereof together with all Additional Rent provided for herein. Tenant agrees to pay to Landlord Fixed Rent and Additional Rent, without offset, notice, demand, abatement, or deduction whatsoever (except as permitted or otherwise provided for in this Lease), in lawful money of the United States, and all Fixed Rent shall be payable in equal monthly installments in advance, from and after the Rent Commencement Date and on the first (1st) day of each calendar month thereafter during the Term.  All Additional Rent shall be due and payable thirty (30) days after receipt of an invoice therefor from Landlord and as otherwise set forth above.  All Fixed Rent and Additional Rent shall be payable by ACH transfer of immediately available funds to the following account or such other account as Landlord may from time to time direct:

**Account Name:**           **AI 229 W.43rd St. Property Owners, LLC**

8

| | |
|---|---|
| **Account Number:** | **0107775901** |
| **ABA Number:** | **026008866** |
| **SWIFT Number:** | **POALUS33** |
| **Bank Name:** | **Bank Hapoalim B.M. New York** |
| **Bank Address:** | **1177 Avenue of Americas, New York, NY 10036** |

**Section 1.2**    Notwithstanding anything to the contrary contained herein, if the Rent Commencement Date shall occur on a date other than the first (1st) day of any calendar month, then the first monthly installment of Fixed Rent which becomes due on the Rent Commencement Date, prorated to the end of said calendar month, shall be payable on the Rent Commencement Date.

**Section 1.3**    Landlord reasonably estimates, without representation or warranty, that the Commencement Date shall occur on or about February 1, 2014 (such date, the "Anticipated Delivery Date"). If the Commencement Date shall fail to occur on or before the Anticipated Delivery Date, as extended by reason of Force Majeure and the same is not by reason of a Tenant Delay, said failure shall not affect the validity of this Lease, or the obligations of Tenant hereunder, or extend the term hereof, but in such case, Tenant, as its sole and exclusive remedy therefor (except as may be otherwise provided in this Section 1.3), shall be entitled to a credit against the first payment of Minimum Rent due hereunder equal to two (2) day's Fixed Rent and Operating Expenses for the number of days between the Anticipated Delivery Date and the Commencement Date (such payment, the "Delivery Damages"). In the event that the Commencement Date shall fail to occur thirty (30) days after the Anticipate Delivery Date, and the same is not by reason of a Tenant Delay (such date, the "Outside Delivery Date"), Tenant shall have the additional right within thirty (30) days after the Outside Delivery Date, as its sole and exclusive remedy therefor, to terminate this Lease by giving notice of termination to Landlord. If Tenant timely delivers the aforesaid termination notice, this Lease shall terminate effective as of the thirtieth (30th) day next following the date of such termination notice, unless the Commencement Date shall occur within thirty (30) days after Tenant gives such termination notice, in which case Tenant's termination notice shall be void and this Lease shall continue in full force and effect. Failure by Tenant to exercise such right to cancel this Lease within such thirty (30) day period shall constitute a waiver of such right; time being of the essence with respect thereto, but Tenant shall still be entitled to the Delivery Damages as aforesaid.

**Section 1.4**    Notwithstanding the foregoing, in addition to the rights set forth above, in the event that the Commencement Date shall fail to occur twelve (12) months after the Anticipated Delivery Date, and the same is not by reason of a Tenant Delay (the "Second Outside Delivery Date"), Tenant shall have the additional right within thirty (30) days after the Second Outside Delivery Date, as its sole and exclusive remedy therefor, to terminate this Lease by giving notice of termination to Landlord. If Tenant timely delivers the aforesaid termination notice, this Lease shall terminate effective as of the thirtieth (30th) day next following the date of such termination notice, unless the Commencement Date shall occur within thirty (30) days after Tenant gives such termination notice, in which case Tenant's termination notice shall be void

9

and this Lease shall continue in full force and effect. Failure by Tenant to exercise such right to cancel this Lease within such thirty (30) day period shall constitute a waiver of such right; time being of the essence with respect thereto.

ARTICLE 2

USE AND OCCUPANCY

**Section 2.1**    (a)    The Premises shall be used and occupied solely for the Permitted Use consistent with retail space in a First Class Building and for no other use or purpose whatsoever.

(b)    If any governmental license, approval or permit shall be required for the proper and lawful conduct of Tenant's business in the Premises, or any part thereof, then Tenant, at its expense, shall duly procure and thereafter maintain such license or permit and submit a copy to Landlord (and Landlord shall reasonably cooperate with Tenant at Tenant's sole cost and expense in connection therewith). Tenant shall at all times comply with the terms and conditions of each such license or permit, but in no event shall failure to procure and maintain same by Tenant affect Tenant's obligations hereunder.

**Section 2.2**    (a)    Tenant shall not use or permit the Premises or any part thereof to be used (i) for the business of printing or other manufacturing of any kind, except for the use of office equipment in connection with the normal operation of the Premises for a Permitted Use and except as otherwise set forth herein, (ii) as a retail branch of a bank or savings and loan association, or as a retail loan company, (iii) as a retail stock broker's or dealer's office, (iv) [intentionally omitted] (v), for the distribution, by mail-order or otherwise, of merchandise, (vi) [intentionally omitted] (v) [intentionally deleted], (vi) a restaurant or bar or for the sale of food or beverages, (vii) as a news or cigar stand, (viii) as an employment agency, labor union office, school, physician's or dentist's office, or dance studio, (ix) as a barber shop or beauty salon, (x) for the display, exhibition and sale of pornographic material or goods, (xi) by the United States Government, the City or State of New York, any other Governmental Authority, any foreign government, the United Nations or any agency or department of any of the foregoing, any Person having sovereign or diplomatic immunity or any person not subject to the jurisdiction of the state and Federal courts located in the State of New York, (xii) for the conduct of an auction, (xiii) for the sale or licensing of lottery tickets or similar chances or devices or for the conduct or licensing of off-track or other wagering operations or activities at or from the Premises, or (xiv) bazaar or flea market type use. Tenant agrees that the Premises may not be used in a manner or for any purpose which would violate the existing exclusive uses set forth in Exhibit F annexed hereto and incorporated herein.

(b)    So long as (A) no Event of Default exists hereunder and (B) this Lease shall be in full force and effect, then Landlord shall not enter into a lease of any other space in the Retail Unit for the Guitar Center Use. Notwithstanding the foregoing, Landlord shall have the right to lease, or permit the use of other space in the Retail Unit whose use included the Guitar Center Use, provided that such use is incidental to the operation of the tenant's business. Such incidental use shall be defined as the lesser of: (i) five hundred (500) rentable square feet; or (ii) ten percent (10%) of such tenant's retail floor area. Landlord agrees that all leases entered

10

into subsequent to the Effective Date will include a restriction against the tenant's violation of this covenant. This covenant shall not apply to leases in effect as of the Commencement Date of this Lease or renewals thereof. Notwithstanding anything to the contrary, Landlord shall have the ability to lease a portion of the Retail Unit for theater use and for the rehearsal of plays being presented within such theater. Theater use shall not be deemed a violation of this exclusive covenant.

(c)     Tenant shall not suffer or permit the Premises or any part thereof to be used in any manner, or anything to be done therein, or suffer or permit anything to be brought into or kept therein, which would in any way (i) violate any grant, lease or mortgage to which this Lease is subordinate to the extent applicable to the Premises, (ii) violate any Legal Requirements (subject to the right to contest such Legal Requirements as provided in Section 8.2 hereof), (iii) make unobtainable from reputable insurance companies authorized to do business in New York State at standard rates any fire insurance with extended coverage, or liability, elevator or boiler or other insurance carried by Landlord in connection with the Building, (iv) cause, or in Landlord's reasonable opinion be likely to cause, physical damage to the Building or any part thereof, (v) constitute a public or private nuisance, (vi) impair the appearance of the Building, (vii) discharge objectionable fumes, vapors or odors into the Building air-conditioning system or into Building flues or vents not designated to receive such fumes, vapors, or odors, or otherwise discharge same, in such manner as may reasonably be anticipated to adversely affect other tenants or occupants of the Building or as may adversely affect space outside of the Premises, (viii) impair or interfere with any of the building services or the proper and economic heating, cleaning, air-conditioning or other servicing of the Building or the Premises, or impair or interfere with the use of any of the other areas of the Building by any other tenants or occupants of the Building, or (ix) result in the leakage of fluid or the growth of mold or the creation of any other condition which causes, or in Landlord's reasonable opinion would be likely to cause, an internal air quality problem in the Premises or the Building. The provisions of this Section 2.2(b), and the application thereof, shall not be deemed to be limited in any way to or by the provisions of Rules and Regulations referred to in Article 27.

(d)     Tenant shall not conduct any "going-out-of-business", auction, distress, fire or bankruptcy or similar sale in the Premises, other than grand opening, seasonal, promotional or other special sales as are incident to the normal operation of Tenant's business. Landlord agrees that Tenant shall be allowed to conduct a grand opening advertising and promotional program in accordance with Legal Requirements and the provisions of Section 2.2(e) hereof, provided, however, all advertising and promotional materials shall be consistent with the size, type and quality of the materials used by national retailers in the Times Square area.

(e)     As soon as practicable after any exterior or interior glass (including mirrors) is broken or cracked, including any so-called "bulls eye" break in the glass replace such glass with glass of the same kind and quality, and repair or replace the frames for such glass if necessary or desirable in Landlord's reasonable judgment, and if Tenant fails to do so promptly after notice from Landlord, Landlord may perform such work on Tenant's behalf, and Tenant shall pay all costs and expenses incurred by Landlord in so doing, as provided in Section 19.1.

(f)     Tenant shall not (i) place or maintain any merchandise or other articles in the concourse or in any other area outside of the Premises, or on the sidewalks, corridors or other

11

common areas of the Building, nor (ii) receive or ship articles of any kind outside the designated loading areas for the Premises (other than through Tenant's storefront entrance), nor (iii) permit the parking of vehicles so as to interfere with the use of any driveway, corridor, foot walk, parking area or other common area of the Building. In connection with Tenant's grand opening, Tenant may allow greeters to stand and patrons to form a queue on the portion of the sidewalk adjacent to Tenant's storefront entrance (the "Sidewalk Use Area"), so long as Tenant (i) obtains and maintains all necessary permits and license in connection with the foregoing and (ii) complies with all Legal Requirements in connection therewith.    Tenant shall use all commercially reasonable efforts to confine the queue of patrons within the Sidewalk Use Area, including queuing the maximum number of patrons within the Premises and within the Sidewalk Use Area. So long as it is possible to confine the queue of patrons within the Premises and Sidewalk Use Area, Tenant shall not intentionally organize any queue of patrons or permit any greeters to congregate or queue outside of the Sidewalk Use Area. In the event it is not possible for Tenant to maintain the patron queue within the Premises and Sidewalk Use Area, queuing patrons of Tenant will be allowed outside the Sidewalk Use Area only under supervision of Tenant's professionally trained security personnel. In the event the patrons are queued outside the Premises, professionally trained security personnel must be stationed at the start of the line and additional security person(s) shall patrol the line. Tenant shall set up portable extensions to create an orderly queue, and patrons shall line up where marked. If queuing outside of the Sidewalk Use Area as provided above, awaiting patrons are to be queued, as and where designated by Landlord, as to not block other retail entrances, building entrances or egresses of both the Building and the adjacent buildings.

(g)    Intentionally Omitted

(h)    Without limiting the generality of any other provision of this Lease, the name of Tenant's business conducted in the Premises, shall initially be "Guitar Center" and thereafter any other trade name so long as such trade name is not derogatory in nature to any other tenant in the Building and is otherwise first-class and in good taste.

(i)    Tenant agrees to complete Tenant's Initial Alterations and open the Premises for business to the public fully fixtured, stocked and staffed on or before Rent Commencement Date for at least one (1) day during the Term, in all or substantially all of the Premises for the Permitted Use under the trade name specified in subdivision (g), hereinafter the "Opening Requirement". Other than New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving, Christmas Eve and Christmas Day on which Holidays Tenant may, but shall not be obligated to operate its business, Tenant may operate its business from at least 11:00A.M. to 11:00P.M. seven (7) days per week during the Term; provided, however, that Tenant shall not open earlier than 8:00 A.M. or close later than the time permitted by law without Landlord's prior written consent.

**Section 2.3**    Tenant shall have the non-exclusive right to use in common with others, subject to the Building Rules and Regulations set forth on Exhibit B hereto and the other applicable provisions of this Lease, (i) freight elevators servicing the Premises and the loading docks of the Building for their intended uses only with respect to the delivery of goods and materials to the Premises, and (ii) the Common Areas applicable to the Retail Space for their

12

intended uses and (iii) subject to the provisions of <u>Section 10.3</u> hereof with respect to the Loading Dock.

**Section 2.4**    Tenant shall not use, play or operate or permit to be used, played or operated any loudspeaker, sound making or sound reproducing device in the Premises, except in such manner and under such conditions so that no sound shall be unreasonably heard outside of the Premises, and observe, comply with and adopt such reasonable means and precautions as Landlord may from time to time request in such connection. However, Landlord acknowledges that noises and/or vibrations may emanate from the Premises in connection with Tenant's operations and demonstration of musical instruments and equipment.    Such noises and/or vibrations shall not be construed as a violation of this Lease provided they do not constitute a nuisance, violate any Legal Requirements or violate the Approved Sound Attenuation Plan (as defined below).    As a portion of Tenant's Initial Alteration Plans (as defined in Exhibit D), Tenant shall provide drawings and specifications for Landlord's review and approval depicting Tenant's proposed sound attenuation treatment for the entire Premises subject to the provisions of Article 4 hereof.  The final plans and specifications for sound attenuation treatment for the entire Premises as approved by Landlord shall be referred to as the "<u>Approved Sound Attenuation Plan</u>".  With respect to attenuation of airborne sound and structure borne noise due to Tenant's use of the Premises for the Permitted Use hereunder and any other sound emanating from the Premises by Tenant in connection with Tenant's Permitted Use, Tenant hereby agrees, as a part of Tenant's Initial Alterations to construct the Premises in accordance with the Approved Sound Attenuation Plan.  Notwithstanding anything contained herein to the contrary, the parties agree that during the Lease Term, Tenant shall comply with the Approved Sound Attenuation Plan in connection with the Permitted Use.  In the event that Landlord elects to modify or increase the sound attenuation properties of the Approved Sound Attenuation Plan, Landlord may make the necessary repairs and alterations, as determined in its sole, but reasonable, discretion (but which, with respect to work in the Premises, are reasonably acceptable to Tenant and which are performed in compliance with the terms of this Lease and in a manner so as not to unreasonably interfere with Tenant's business), to the Premises or other areas of the Building to effectuate the same (the "<u>Attenuation Repairs</u>").  Landlord shall make the Attenuation Repairs at its sole cost and expense and in accordance with the terms of this Lease.  A major Attenuation Repair affecting a substantial portion of the Premises may only be performed by Landlord once during the Lease Term.  Minor Attenuation Repairs affecting particular small portions of the Premises (e.g., closing and insulating a gap or seal around a pipe or duct) may be performed by Landlord from time-to-time during the Lease Term.

ARTICLE 3

<u>TERM</u>

**Section 3.1**    The Term shall commence on the Commencement Date and shall, unless sooner terminated, expire on the Expiration Date; provided however, unless the termination is due to a Tenant default, if the Term expires during Tenant's "Peak Retail Period" (which is from October 1 to January 30, inclusive), then the Term shall be extended to expire on January 31st (the "<u>Expiration Date</u>").

13

**Section 3.2**    The provisions of this Article 3 and the Work Letter are intended to constitute "an express provision to the contrary" within the meaning of Section 223-a of the New York Real Property Law or any successor law or ordinance, and Tenant hereby waives any right to rescind this Lease which Tenant might otherwise have thereunder.

**Section 3.3**    Promptly after the occurrence of the Commencement Date, Landlord and Tenant agree to join with each other in the execution of a written agreement in which the Commencement Date for the Premises, the Rent Commencement Date and the Expiration Date shall be stated, but the failure by either party to so execute or deliver such agreement shall not in any way reduce the respective obligations or rights of Landlord or Tenant under this Lease.

ARTICLE 4

ALTERATIONS; NON-INTERFERING USES

**Section 4.1**    (a)    Except as otherwise provided in this Article 4, Tenant shall not make any Alterations without Landlord's prior consent in each instance, which consent shall not be unreasonably withheld, conditioned or delayed.  Landlord's consent shall not be required for any Alterations that are (i) decorative or cosmetic Alterations (and which are not Material Alterations) such as painting, wall coverings and floor coverings or the installation of movable fixtures and ordinary office business equipment (collectively, "Decorative Alterations"), or (ii) are not Material Alterations and do not for any one project cost in excess of Two Hundred Fifty Thousand Dollars ($250,000), such $250,000 floor to be increased each year after the Rent Commencement Date by the CPI Fraction (the "Alteration Threshold"), provided that with respect to any such Alteration, such Alteration complies with all Legal Requirements.  The Alteration Threshold shall be increased annually on January 1st of each year during the Term by the CPI Fraction. For purposes of this Article 4, "Material Alterations" means Alterations which (i) affect the outside appearance of the Building or the structural integrity of the Building, including the structural elements of the walls, floors, ceiling or columns of the Building, (ii) would physically affect any components of the exterior of the Building, (iii) adversely affect the Building Systems or adversely affect the building services, (iv) would adversely affect the provision of services to other Building tenants or (v) would include work which requires the removal of a portion of the floor slab in any portion of the Premises, or access to, or penetration of the floor slab adjacent to, any space occupied by any other tenant or occupant of the Building (other than Tenant's subtenants).  With respect to Alterations that require that a governmental permit be filed in connection therewith, Tenant shall submit any such filing to Landlord prior to such filing with the appropriate Governmental Authority.

(b)    If Tenant intends to perform Alterations for which Tenant believes Landlord's consent is not required hereunder (other than Decorative Alterations), Tenant shall be required to give Landlord prior notice of such intention and belief and reasonable information concerning the nature of such proposed Alterations, and Tenant shall be permitted to perform such Alterations so long as (i) such Alterations shall be performed only by a general contractor reasonably approved by Landlord as provided in Section 4.3, (ii) the performance of such Alterations do not affect areas outside of the Premises, (iii) such Alterations do not violate the certificate of occupancy then in effect for the Building, (iv) if such Alterations require a filing with a Governmental Authority or require the consent of such Governmental Authority, Tenant

14

shall have provided Landlord with plans and specifications for such Alterations as required by
Section 4.2 (and if such Alterations do not require a filing with a Governmental Authority or
require the consent of such Governmental Authority then Tenant shall provide such information
and drawing as are customarily prepared in accordance with good construction practices), and (v)
Tenant otherwise complies with the requirements of this Article 4.

Section 4.2    Prior to making any Alterations (other than Decorative Alterations or
Alterations not requiring a filing with a Governmental Authority or requiring the consent of such
Governmental Authority in which case such information and drawing as are customarily
prepared in accordance with good construction practices), Tenant shall (a) submit to Landlord
detailed plans and specifications therefor in form reasonably satisfactory to Landlord which shall
comply with all Legal Requirements ("Tenant's Plans") prepared and certified by a registered
architect or licensed engineer, to the extent necessary for such governmental filing or consent, (b)
at its expense, obtain and deliver to Landlord true copies of all required permits, approvals and
certificates, (including permits, approvals and certificates required or contemplated by any
Governmental Document), and (c) demonstrate that Tenant carries all required insurance as well
as worker's compensation insurance (covering all persons to be employed by Tenant and all
contractors and subcontractors supplying materials or performing work in connection with such
Alterations) and Commercial General Liability in minimum limits of $5,000,000 Combined
Single Limit, which can be secured with the combination of a Commercial General Liability and
Umbrella Liability coverages and with such coverages primary and non-contributory and
Builder's Risk coverage (issued on a completed value basis).  All insurance under the preceding
clause (c) shall be in such form, with such companies, for such periods and in such amounts and
types of coverage as would be required by prudent landlords of buildings located in The City of
New York that are similar to the Building, or as required by the terms of any Superior Lease or
any Mortgage, naming Landlord and its employees and agents, and any Superior Lease or any
Mortgage naming Landlord and its employees and agents, and any Superior Lessor and any
Mortgagee as additional insureds, provided that the names of such additional insureds are
provided to Tenant in writing.  On or before the Commencement Date, Tenant shall furnish
Landlord with certificates evidencing the aforesaid insurance coverage (including evidence of
waivers of subrogation), and renewal certificates shall be furnished to Landlord at least thirty (30)
days (or ten (10) days' in the case of termination for non-payment of premium) prior to the
expiration date of each policy for which a certificate was theretofore furnished.  All Alterations
including, but not limited to, Decorative Alterations shall be performed by Tenant, at Tenant's
sole cost and expense, (A) in a good and workmanlike manner, (B) in compliance with all Legal
Requirements and with the Alteration Rules and Regulations attached hereto as Exhibit C
(provided that in the event of any conflict between the provisions of this Lease (including
without limitation Exhibit D) and the provisions of Exhibit C, the provisions of this Lease shall
prevail), (C) except for Decorative Alterations, in accordance in all material respects with the
plans and specifications previously approved by Landlord (as such plans and specifications may
be revised from time to time in accordance herewith), and (D) if such Alterations are projected
by Tenant to cost in excess of the Alteration Threshold, or if such Alterations constitute Material
Alterations, under the supervision of a licensed architect or engineer.  Tenant shall promptly
commence all Alterations after receipt of all consents and permits required hereunder and shall
diligently prosecute same to completion.    Tenant shall promptly reimburse Landlord, as
Additional Rent within thirty (30) days after demand, for any and all reasonable, actual out-of-
pocket costs and expenses incurred by Landlord in connection with the review of Tenant's plans

15

and specifications for any such Alteration by any architect, engineer or other consultant retained by Landlord (in accordance with construction practices consistent with construction practices in other First Class Buildings and consistent with the practices of prudent owners of First Class Buildings) or the review by any Superior Lessor or Mortgagee or any third party architect, engineer or other consultant retained by any of them; provided, however, Tenant shall not be required to reimburse Landlord more than $5,000 (in the aggregate) in connection with Landlord's review of Tenant's Plans for Tenant's Initial Alterations (the "Initial Work Review Fee Cap").

**Section 4.3**  Except as otherwise provided herein, Tenant shall not make any Alterations (other than Decorative Alterations) employing, hiring or retaining Persons other than a general contractor, architects and/or engineers ("Construction Professionals") approved by Landlord in accordance with this Section 4.3. Promptly following Tenant's request, Landlord will provide Tenant with the most current list of Construction Professionals approved by Landlord. Following Tenant's engagement of a general contractor for the Initial Alterations approved by Landlord in accordance with this Section 4.3, Tenant or Tenant's general contractor shall submit to Landlord the names of any and all subcontractors proposed to be engaged by the general contractor to perform the work for the Initial Alterations. Landlord's consent shall not be required with respect to Tenant's subcontractors, however, all subcontractors must be licensed in New York State reputable, and carry insurance as required pursuant to the terms of this Lease. Landlord will not unreasonably withhold, condition or delay its approval of Construction Professionals to be employed by Tenant for the performance of Alterations; provided, however, (i) such general contractor, architects and/or engineers shall be duly licensed in the State of New York, carry insurance in form and amounts required hereunder and otherwise comply with the provisions of this Lease and (ii) that with respect to contractors or engineers in the life safety system, elevators, fire alarm system and building management system trades, Landlord may designate the contractor and engineer to be used by Tenant, provided that the charges of such contractors, architects and engineers shall be reasonable and competitive with the charges of contractors, architects and engineers providing similar services to other First Class Buildings. Tenant, at its expense, shall be required to use either Landlord's expeditor, Jerome S. Gillman Consulting Architect PC or Jam Consultants, Inc. for all filings, governmental permits and approvals; provided commercially reasonable fees and rates are charged.

**Section 4.4**  (a)    Except as otherwise provided in this Section 4.4, all Alterations, made to or upon the Premises, whether or not at the expense of Tenant, shall become part of the Premises and, upon the expiration or earlier termination of the Term, shall become the property of Landlord and remain upon and be surrendered with the Premises as a part thereof upon the Expiration Date or earlier termination of the Term. Landlord may condition its approval of any Alterations (other than Tenant's Initial Alterations) by requiring Tenant to agree in writing to remove such Alterations at the end of the Term as set forth in this Section 4.4 (any such Alterations which Landlord so requires Tenant to agree to remove, "Non-Standard Alterations"). If Landlord fails to so identify any Non-Standard Alteration which must be removed at the end of the Term, Tenant shall have no obligation to remove the same at the end of the Term. On the Expiration Date (i) Tenant shall have removed Tenant's Property from the Premises, and (ii) unless Landlord notifies Tenant no later than thirty (30) days prior to the Expiration Date that any or all of the Non-Standard Alterations then in the Premises shall not be removed from the Premises (unless the Expiration Date is earlier than the anticipated or expected Expiration Date

16

as a result of an Event of Default, condemnation or casualty, then within a reasonable time), Tenant shall have removed the Non-Standard Alterations from the Premises, at Tenant's sole cost and expense in accordance with the provisions of this Article 4. Tenant shall repair and restore in a good and worker-like manner any damage to the Premises and the Building caused by such removal of Tenant's Property and any Non-Standard Alterations in accordance with the provisions of this Article 4. Any of the Non-Standard Alterations or Tenant's Property not so removed by Tenant at or prior to the Expiration Date shall be deemed abandoned and may, at the election of Landlord, either be retained as Landlord's property or be removed from the Premises by Landlord, and Tenant shall (unless Landlord shall have directed Tenant not to remove such items) reimburse Landlord, as Additional Rent within thirty (30) days after demand, for Landlord's reasonable, actual out-of-pocket costs incurred in connection with such removal and restoration. Tenant shall have the right to remove its signs, identification marks, trade fixtures, trade equipment, audio visual equipment, shelving and furniture from the Premises, provided that Tenant promptly repairs any damage to the Premises and/or the Building caused by such removal. The term "trade fixtures" as used in this Lease shall include, but not be limited to, removable decorations, mirrors, decorative hardware and decorative lighting fixtures, merchandise, signs and personal property (including, but not limited to, counters, shelving and showcases). The covenants and agreements set forth in this Section 4.4 shall survive the expiration or earlier termination of this Lease. Notwithstanding anything to the contrary set forth herein, Tenant shall not be required to remove Tenant's Initial Improvements at the expiration or earlier termination of this Lease. Landlord and Tenant agree that Tenant may, upon notice to Landlord given at least 90 days prior to the Expiration Date, request that Landlord be responsible for performing the removal work associated with any of the Non-Standard Alterations which are required to be removed by Tenant at Tenant's sole cost and expense. Landlord and Tenant shall reasonably promptly retain a 3rd party contractor reasonably acceptable to Landlord and Tenant to provide an estimate of the cost to remove the same and repair any associated damage to the Premises. Within 30 days following Tenant's receipt of the estimate, Tenant shall pay to Landlord such estimated cost. Upon such payment to Landlord, Tenant shall have no obligation to remove such Non-Standard Alterations.

(b)    Landlord shall provide a written response to any notice setting forth a request for approval of Tenant's Plans (provided such Plans so submitted are black line plans on full size paper and scale; electronic submissions, half-size sets, 11x17 plans and the like being insufficient) for any Alterations for which Landlord's approval is herein required, provided Tenant's Plans comply in all material respects with the requirements of Section 4.2, within twenty (20) days with respect to any initial request (and within ten (10) days with respect to any subsequent request with respect to the same matter). Landlord's failure to respond within five (5) Business Days after a second (2nd) notice from Tenant to Landlord stating in bold, capitalized letters that Landlord's failure to respond within such five (5) Business Day Period shall be deemed an approval. In the event that Landlord shall not approve any such request, the notice of such non-approval shall state the reasons for such non-approval. Tenant shall pay, as Additional Rent, Landlord's actual out-of-pocket review and approval costs and other costs and expenses payable to any Governmental Authority in connection with any Alterations (subject to the Initial Work Review Fee Cap).

(c)    Upon completion of any Alterations, Tenant, at its expense, shall promptly obtain certificates of final approval of such Alterations as may be required by any Governmental

17

Authority (including any new or amended certificate of occupancy required by any Governmental Authority) and shall furnish Landlord with copies thereof, together with copies of the final plans and specifications (other than for Decorative Alterations) prepared by or on behalf of Tenant in connection with such Alterations prepared on an AutoCAD Computer Assisted Drafting and Design System or another format reasonably acceptable to Landlord. Without limiting the generality of the foregoing, Tenant shall deliver to Landlord (i) proof of the issuance of any required approvals, permits and sign-offs for the Alterations by all Governmental Authorities having jurisdiction thereover with reasonable promptness (but in no event later than sixty (60) days following the completion of such Alterations, unless Tenant shall be contesting in good faith payment of amounts which such contractors, subcontractors or material suppliers claim to be due, which contest shall in any event be subject to the terms of <u>Section 4.5</u> hereof) and (ii) final lien waivers issued by all contractors providing services or materials in connection with any Alterations costing in excess of Ten Thousand Dollars ($10,000) (but in no event later than sixty (60) days following the completion of such Alterations unless Tenant shall be contesting in good faith payment of amounts which such contractors claim to be due, which contest shall in any event be subject to the terms of Section 4.5 hereof.

**Section 4.5**    (a)    If, because of any act or omission of a Tenant Party, its suppliers or subcontractors, any mechanic's lien, U.C.C. financing statement or other lien, charge or order for the payment of money shall be filed against Landlord, or against all or any portion of the Premises, the Building or the Real Property, Tenant shall, at its own cost and expense, cause the same to be discharged of record, by bonding or otherwise, within thirty (30) days after Tenant has received notice thereof, and Tenant shall, in accordance with <u>Article 29</u>, indemnify, defend and save Landlord harmless against and from all costs, expenses, liabilities, suits, penalties, claims and demands (including reasonable attorneys' fees and disbursements) resulting therefrom.

(b)    Notice is hereby given that Landlord shall not be liable for any labor or materials furnished or to be furnished to Tenant upon credit, and that no mechanic's or other lien for any such labor or materials shall attach to or affect the reversion or other estate or interest of Landlord in and to the Premises.

**Section 4.6**    Tenant shall not directly or indirectly, engage any third-party contractor, mechanic or laborer in the Premises, even if such Person is an Approved Contractor, whether in connection with any Alteration or otherwise, or use any materials in connection with such Alteration in a manner which creates any actual interference with the operation of the Building or performance of Landlord's Work or the work of any other tenant or increase the cost of any of the foregoing. Tenant shall immediately stop the performance of any Alteration, or the use of any materials in connection with such Alteration or use of any third party contractor, mechanic or laborer if Landlord notifies Tenant that continuing such Alteration or employing such third party contractor, mechanic or laborer would create any actual interference with the operation of the Building or performance of Landlord's Work or the work of any other tenant. Tenant shall use commercially reasonable efforts to avoid any such labor disharmony and Landlord will comply with all applicable obligations set forth in the Declaration to use trade union labor in the Building and/or to avoid labor disharmony.

**Section 4.7**   All work to be performed by Tenant shall be done in a manner which will not interfere with or disturb other tenants or occupants of the Building.  Tenant, at its sole cost and expense shall provide and pay for all water, sewer, electricity, heat and any other utility used by Tenant or its agents during the performance of Alterations, including, but not limited to, Tenant's Initial Alterations.

**Section 4.8**   Intentionally Deleted.

**Section 4.9**   (a)   Tenant shall not solicit other tenants or occupants in the Building to use any communications service, including without limitation any wired or wireless Internet service that passes through, is transmitted through or emanates from the Premises.  Tenant acknowledges that Landlord has granted and may grant licenses and other rights to various parties to provide communications services to the tenants of the Building.

(b)   Tenant agrees that Tenant's communications equipment and the communications equipment of Tenant's service providers and contractors located in the Premises or installed in the Building to service the Premises including, without limitation, any antennas, switches, or other equipment (collectively, "Tenant's Communications Equipment") shall be of a type and, if applicable, a frequency which will not cause radio frequency, electromagnetic or other interference to any other party or any equipment of any other party including, without limitation, Landlord, other tenants or occupants of the Building.  In the event that Tenant's Telecommunications Equipment (x) initially installed causes any such interference with telecommunications equipment of Landlord or other tenants subsequently installed, then Tenant, at Landlord's request, will make reasonable efforts to minimize such interference, or (y) causes any interference with telecommunications equipment of Landlord or any other tenants previously installed (including, for these purposes, any subsequent modification or alteration of Tenant's Communications Equipment), then upon receipt of notice from Landlord of such interference, Tenant will take all steps reasonably necessary to correct and eliminate the interference.  In the case of clause (y) above, if the interference is not eliminated within 24 hours (or a shorter period to the extent commercially reasonable and appropriate), then, upon request from Landlord, Tenant shall shut down the elements of Tenant's Communications Equipment causing such interference pending resolution of the interference, with the exception of intermittent testing upon prior notice to and with the approval of Landlord, which approval shall not be unreasonably withheld.

**Section 4.10** Landlord's review and approval of Tenant's plans and specifications and consent to the performance of the work described therein shall not be deemed an agreement by Landlord that such plans, specifications and work conform with applicable law and insurance requirements, nor shall it be deemed a waiver by Landlord of compliance by Tenant with any provisions of this Lease, nor shall it impose upon Landlord any liability or obligation with respect to such work, including without limitation, its completeness, design sufficiency or the performance thereof, however, except as set forth above, it shall constitute compliance with the other terms of this Lease.

00295140.10

ARTICLE 5

CONDITION OF THE PREMISES; LANDLORD'S WORK

**Section 5.1**    Landlord shall perform or has heretofore performed, at Landlord's expense, the work described on Exhibit "D" ("Landlord's Work"). Landlord shall have the right to enter the Premises subsequent to the Commencement Date to complete "punchlist" items of Landlord's Work, upon reasonable notice to Tenant and in a manner so as not to materially adversely interfere with the progress of Tenant's Initial Alterations. Except for the performance of Landlord's Work and the making of any Landlord's Contribution as set forth in Article 31, Landlord shall have no obligation to perform any work, supply any materials, incur any expenses or make any installations in order to prepare the Premises for Tenant's occupancy. In addition to the warranties set forth in Section 36.9(c) hereof, Landlord warrants and represents that on the Delivery Date (i) the Premises shall comply with all Legal Requirements given the actual condition of the Premises at such time, (ii) the electrical, plumbing and fire sprinklers serving the Premises shall be in good working order, (iii) the Premises shall be structurally sound, dried in (free from leaks and moisture accumulation), and (iv) to Landlord's knowledge, the Premises is free from patent and latent defects and in broom-clean condition.

**Section 5.2**    If Landlord shall actually be delayed in Substantially Completing Landlord's Work as a result of (i) any failure by Tenant to comply with any deadlines set forth in Article 4 or any request by Tenant that Landlord delay in proceeding with any segment or part of Landlord's Work; (ii) Tenant's failure to respond to any request by Landlord in connection with the performance of Landlord's Work within ten (10) Business Days with respect to any initial request by Landlord (and five (5) Business Days with respect to any subsequent request by Landlord with respect to the same matter), including any delay in Tenant's response to any request by Landlord as to the selection of materials or finishes to be made by Tenant or any coordination request; or (iii) any omission, negligence or willful misconduct of Tenant, or its officers, agents, servants or contractors, and to the extent not caused by Landlord or Landlord's officers, agents, servants or contractors (each of the foregoing being hereinafter referred to as a "Tenant Delay"), then the Substantial Completion of Landlord's Work shall be deemed to occur on the date on which Substantial Completion would have occurred but for such Tenant Delay.

ARTICLE 6

REPAIRS; FLOOR LOAD

**Section 6.1**    (a)    Landlord, at Landlord's expense, shall maintain, and repair or cause to be maintained or repaired (i) the structural portions of the Building including the foundation, (ii) the roof of the Building (except for any damage to the roof caused by Tenant's HVAC System or the installation, operation or maintenance thereof), (iii) the common areas of the Building including the exterior of the Building (other than the storefronts), (iv) those Building Systems that are providing services to the Premises, and (v) any portion of the Premises if required due to latent defects in Landlord's Work or, subject to the waiver of subrogation provisions herein, by the negligence or willful misconduct of Landlord or any Landlord Party (except as otherwise set forth herein) all to maintain the Building as a First Class Building (collectively, "Landlord Repairs"). Tenant, at Tenant's expense, shall keep the Premises and the

20

fixtures, systems, equipment and appurtenances therein and the storefront and Tenant's signage in good condition and make all repairs and replacements thereto. Tenant, at Tenant's expense, shall repair and keep in good working order those portions of the Building Systems located within and exclusively serving the Premises, from the point of connection on each floor of the Premises. By way of example only, Tenant shall be responsible for the maintenance and repair of (i) the plumbing and sanitary systems and installations serving the Premises from the points of connection to (but not including) the main vertical risers and stacks of the Building, and (ii) the sprinkler system serving the Premises from the point of connection to (but not including) the tamper and flow valves. In no event may Tenant have access to or the right to use, modify or repair Building telephone or electrical closets (provided that Tenant may have access to such closets so long as a representative of Landlord is present).

(b)    Notwithstanding anything to the contrary set forth in Section 6.1(a) hereof but subject to Section 11.6 hereof, all damage or injury to the Building Systems, the Building (including Building structure and spalling of structural concrete) or the Premises caused by or resulting from the negligence, willful misconduct, breach of contract or violation of law of, or from Alterations made by, Tenant or any Tenant Party or from Tenant's wet operations and/or Tenant's traffic of carts, hand trucks or similar activities, shall be repaired at Tenant's expense (i) by Tenant, subject to Article 4 hereof, to the reasonable satisfaction of Landlord (if the required repairs are non-structural and do not affect any Building System) or (ii) by Landlord (if the required repairs are structural or affect any Building System), in which event Tenant shall reimburse Landlord on demand for all out-of-pocket costs and expenses actually incurred by Landlord in connection therewith. All of such repairs shall be of quality or class equal to the original work or construction. If Tenant fails after thirty (30) days' notice to commence, and thereafter to proceed with due diligence to complete repairs required to be made by Tenant, the same may be made by Landlord upon not less than five (5) Business Days' prior written notice to Tenant at the sole cost and expense of Tenant. Tenant shall pay to Landlord the costs and expenses thereof incurred by Landlord as Additional Rent within thirty (30) days after rendition of a bill or statement therefor setting forth a description of the repairs performed and attaching invoices therefor.

**Section 6.2**    Tenant shall not place a load upon any floor of the Premises exceeding the floor load per square foot which such floor was designed to carry (unless Tenant has installed suitable reinforcement, subject to the provisions of Article 4). If any safe, heavy equipment, business machines, freight, bulky matter or fixtures to be moved into or out of the Building requires special handling, Tenant shall give Landlord reasonable prior notice thereof and shall employ only persons holding a Master Rigger's license to do such work. Landlord represents and warrants to Tenant that the floor load of the Premises shall be as set forth on Schedule 1 attached to the Work Letter.

**Section 6.3**    Except as may be expressly provided in this Lease, there shall be no allowance to Tenant for a diminution of rental value and no liability on the part of Landlord by reason of inconvenience, annoyance or injury to business arising from Landlord making, or failing to make, any repairs, alterations, additions or improvements in or to any portion of the Building or the Premises, or in or to fixtures, appurtenances or equipment thereof. Landlord shall use commercially reasonable efforts to minimize interference with Tenant's access to and use and occupancy of the Premises in making any repairs, alterations, additions or improvements

21

and shall perform all work and repairs diligently and in a workerlike manner and in compliance with Legal Requirements.  Nothing in this Section 6.3 shall limit Tenant's right to bring any action or proceeding against Landlord based upon any liability which may be imposed upon Landlord by law for Landlord's negligence in the operation or maintenance of the Building or for the breach by Landlord of any express covenant in this Lease on Landlord's part to be observed and performed.

**Section 6.4**   If at any time during the Term, Tenant ceases using any wiring or cabling installed by or on behalf of Tenant in any portion of the Premises or in any other portions of the Building (other than a cessation that is temporary and where Tenant intends to resume using such wiring or cables within a reasonable period of time after such cessation and other than any cessation thereof on the Expiration Date), and, subject to the applicable requirements of this Lease, shall remove such unused wiring and cabling at Tenant's sole cost and expense, to the extent required pursuant to Legal Requirements.

ARTICLE 7

REAL ESTATE TAXES, OPERATING EXPENSES AND ADDITIONAL RENT

**Section 7.1**   Certain Definitions.  For the purposes of this Article 7, the following terms shall have the meanings set forth below:

(a)   "Taxes" means (i) all real estate taxes and assessments (special or otherwise) and any other governmental levies, impositions or charges of a similar or dissimilar nature, whether general, special, ordinary, extraordinary, foreseen or unforeseen, which may be assessed, levied or imposed upon all or any part of the Retail Unit, whether or not the same constitute one or more tax lots, (ii) all Bid Surcharges and (iii) any reasonable expenses (including reasonable attorney's fees and disbursements in protesting or contesting any of the foregoing or the assessed valuation of all or any part of the Retail Unit), but "Taxes" shall not include any succession, gains, recording, income, franchise, transfer, inheritance, capital stock, excise, excess profits, occupancy or rent (except as permitted pursuant to the second sentence of this Section 7.1(a)), gift, estate, foreign ownership or control, mortgage recording, payroll or stamp tax.  If by law Taxes may be divided and paid in annual installments, then for purposes of this Article 7, (x) such Taxes shall be deemed to have been so divided and to be payable in the maximum number of annual installments permitted by law and (y) there shall be deemed included in Taxes for each Tax Year the annual installment of such Taxes becoming payable during such Tax Year on such annual installment and on all installments thereafter becoming due to the extent required by law, all as if such Taxes had been so divided.  If, because of any change in the taxation of real estate after the Effective Date, any other tax or assessment (howsoever denominated), including, without limitation, any franchise, income, profits, sales, use, occupancy, gross receipts or rental tax, is imposed upon Landlord or the owner of the Retail Unit, or the occupancy, rents or income therefrom, in express substitution for any of the foregoing Taxes (as evidenced by either the terms of the legislation imposing such tax or assessment, the legislative history thereof or other documents or evidence which reasonably demonstrate that such tax or assessment was intended to serve as a real estate tax or fulfill substantially the same function as existing real estate taxes), such other tax or assessment, to the extent expressly substituted therefor, shall be deemed part of Taxes computed as if Landlord's sole asset were the Retail Unit.

22

(b)    "Tenant's Share of Taxes" means 11.4% and "Tenant's Share of Operating Expenses" means 11.4%, based upon twenty eight thousand one hundred nineteen (28,119) square feet in the Premises and two hundred forty-six thousand and thirty-two (246,532) square feet in the Retail Unit. Tenant's Share of Taxes and Tenant's Share of Operating Expenses shall not be increased or decreased during the Term, other than to reflect (i) the incorporation of additional space into the Premises, (ii) the incorporation of additional space into the Retail Unit other than for a de minimis amount, (iii) the removal of any space from the Premises, or (iv) the removal of any space from the Retail Unit, other than for a de minimis amount.

(c)    "Assessed Valuation" means the amount for which the Retail Unit is assessed pursuant to applicable provisions of The New York City Charter and of the Administration Code of the City of New York for the purpose of imposition of Taxes.

(d)    "Tax Year" shall mean each period from July 1 through June 30 (or such other fiscal period as may hereafter be adopted by the City of New York as the fiscal year for any tax, levy or charge included in Taxes), any part or all of which occurs during the Term.

(e)    "Operating Expenses" shall mean the aggregate of all costs and expenses (and taxes thereon which are not otherwise includable in Taxes) paid or incurred by or on behalf of Landlord (whether directly or through independent contractors and to the extent any of the same constitutes an Operating Expense, whether or not any of same shall be designated herein as being at Landlord's cost or expense), in respect of the following items relating to the operation, maintenance, management, repair, replacement of the Building Systems that provide services to the Building; the security of the Retail Unit; fire and life safety; maintenance and repair of structural portions of the Retail Unit including without limitation the roof of the Building, the sidewalks, adjacent to the Building, which shall be determined in accordance with generally accepted accounting practices consistently applied used for the retail component in First Class Office Buildings, including (A) premiums, taxes and fees for all commercial general liability and umbrella liability insurance, boiler and machinery insurance, environmental liability insurance, and property and casualty insurance, including, but not limited to, "all risk" property (building and business income), flood and earthquake insurance, (B) the cost of electricity, gas, oil, steam, water, air conditioning and other fuel and utilities with respect to the Building Systems and other services that are servicing or provided to the Building, but not for the exclusive use of any tenant in the Building, (C) attorneys' fees and disbursements, accounting fees and disbursements or other legal and accounting fees relating to the operation, maintenance, cleaning, management, repair, replacement or security of the Real Property to the extent not obligated to be directly reimbursed or paid by other tenants of the Building (i.e., other than pursuant to provisions similar to this Section 7.1), (D) auditing, management fees and other professional fees and expenses and Impositions, (E) sewer and water rents, rates and charges which may be assessed, levied or imposed upon all or any part of the Retail Unit, (F) reasonable management office rent to the extent related to the operations of the Building and otherwise equitably prorated, and (G) common charges applicable to the Retail Unit pursuant to the Condominium Documents, but specifically excluding (or deducting, as applicable) from Operating Expenses all:

(1)    Taxes;

(2)    leasing costs;

(3)    salaries, wages, fringe benefits and other compensation of Landlord's employees above the grade of property manager and the immediate supervisors of such property managers;

(4)    depreciation and amortization;

(5)    interest on, amortization of and any other charges in respect of mortgages and other debts;

(6)    actual out-of-pocket costs and expenses of negotiating and closing any financing or refinancing of the Property;

(7)    amounts paid to Landlord or to Affiliates of Landlord (except for the payment of management fees as provided for herein) for any services in the Building to the extent such amounts exceed the cost of such services rendered by other unaffiliated third parties on a competitive basis;

(8)    profits, franchise, gains, estate, income, succession, gift, corporation, unincorporated business and gross receipts taxes imposed upon Landlord;

(9)    any expenses which are not paid or incurred in respect of the Real Property but rather in respect of other real property owned by Landlord, provided that with respect to any expenses attributable in part to the Real Property and in part to other real property owned or managed by a Landlord Party (including salaries, fringe benefits and other compensation of a Landlord Party's personnel who provide services to both the Real Property and other properties), Operating Expenses shall include only such portion thereof as are apportioned by Landlord to the Real Property on a fair and equitable basis;

(10)    costs incurred with respect to a sale or transfer of all or any portion of the Real Property or any interest therein or in any Person of whatever tier owning an interest therein;

(11)    costs incurred in connection with the acquisition or sale of air rights, transferable development rights, easements or other real property interests;

(12)    amounts otherwise includable in Operating Expenses but reimbursed to Landlord directly by Tenant or other tenants (other than through provisions similar in substance to this Section 7.1);

(13)    the cost of items of a capital nature, except for such capital items which (i) are required in order for the Building to comply with Legal Requirements enacted after the date of this Lease, or (ii) result in reducing Operating Expenses (as, for example, a labor-saving improvement), provided that the amount of any such capital expenses attributable to any calendar year that may be included in Operating Expenses for such calendar year shall not exceed the actual savings realized for such calendar year as a result of such expenditures by Landlord, which actual savings shall be as reasonably determined by Landlord, and provided,

24

further, that any portion of any such capital expense which would otherwise have been included as an Operating Expense in any calendar year but was not because such capital expense was in excess of the actual savings anticipated for such calendar year, may be included in Operating Expenses in any future calendar year, if and to the extent that the capital expense for such capital item for such future calendar year is less than the actual savings anticipated for such future calendar year.  In determining the capital expense amount with respect to clauses (i) and (ii) above that are to be included in each year as an Operating Expense, the cost of any such capital improvement shall be included in Operating Expenses for the Operating Year in which such improvement was made, amortized on a straight-line basis over the lessor period of ten years of the useful life thereof, and the annual amortization of such capital improvement, together with interest on the unamortized balance of such cost at the Applicable Rate, shall be included in Operating Expenses;

(14)    attorney's fees and disbursements incurred by Landlord in connection with the negotiation of any tenant lease, Superior Lease or Mortgages or costs related to the enforcement of lease obligations or to landlord/tenant disputes;

(15)    costs of abatement, remediation or removal of asbestos or Hazardous Substances in the Building or any part thereof;

(16)    rent paid or payable under Superior Leases;

(17)    the cost of any repair, replacement or restoration or other work occasioned by fire, windstorm or other casualty insured under a standard "all risk" policy of insurance (regardless of whether Landlord has in fact maintained such insurance) or the exercise by government authorities of the right of eminent domain (whether taking is total or partial) or condemnation;

(18)    costs incurred due to the negligence or misconduct of Landlord or any Landlord Party;

(19)    expenses for the preparation of space for any tenant or prospective tenant of the Building, or expenses in connection with services or other benefits which are not offered to Tenant or for which Tenant is charged for directly but which are provided to another tenant or occupant of Building;

(20)    costs to cure defects in Landlord's Work, defects in design or the materials used in the same, or to cure defects in the original construction of the Retail Space to the extent the same is required to be performed by Landlord pursuant to the terms of this Lease; and

(21)    costs incurred to cure Landlord's default under this Lease.

(f)    "BID Surcharge" shall mean any payments due and owing by Landlord to any Business Improvement District ("BID") organization which has jurisdiction over any area which includes the Building.

(g)    "Landlord's Statement" shall mean a written notice from Landlord to Tenant containing: (i) the Operating Expenses payable for any calendar year and Tenant's Operating Payment, (ii) any other amounts paid or payable for any calendar year by Tenant to Landlord as Additional Rent or otherwise, (iii) Taxes and Tenant's Tax Payment, and (iv) for the Base Operating Year, the Operating Expenses for such year. Each Landlord's Statement shall be prepared by Landlord using accounting practices consistent with accounting practices used for the retail component in First Class Office Buildings.

**Section 7.2**    Taxes. (a)    Tenant shall pay, as Additional Rent for each Tax Year, all or any portion of which shall be within the Term, an amount ("Tenant's Tax Payment") equal to the product of (1) the amount, if any, by which Taxes for such Tax Year exceed the Base Tax Amount multiplied by (2) Tenant's Share of Taxes. The first (1st) installment of Tenant's Tax Payment, for each Tax Year shall be due and payable by Tenant on the later to occur of (A) the first day of the calendar month immediately after receipt of a demand from Landlord or (B) thirty (30) days after receipt of demand from Landlord, based upon the most recent Landlord's Statement, which demand shall be accompanied by a copy of the tax bill. Tenant's Tax Payment shall be payable in the same installments as Taxes are from time to time payable to The City of New York, each such installment to be payable by Tenant to Landlord within thirty (30) days before the applicable installment is payable by Landlord to The City of New York. If at any time after the date hereof, Taxes are required to be paid (either to the appropriate taxing authorities or as escrow payments to any Mortgagee or Superior Lessor), in full or in monthly, quarterly or other installments on any date or dates other than as presently required, then upon notice thereof from Landlord, Tenant's Tax Payment shall correspondingly be accelerated or revised so that said Tenant's Tax Payment is due at least thirty (30) days prior to the date payment is due to the taxing authorities, any Mortgagee or Superior Lessor. If applicable, for any Tax Year, whether during or after such Tax Year, Landlord shall, with reasonable promptness, furnish a revised Landlord's Statement for such Tax Year. If a Landlord's Statement is furnished to Tenant after the commencement of a Tax Year in respect of which such Landlord's Statement is rendered, Tenant shall, on the later to occur of (I) the first day of the calendar month after receipt of such Landlord's Statement or (II) within thirty (30) days after receipt of such Landlord's Statement, pay to Landlord the amount of any underpayment of Tenant's Tax Payment, with respect to such Tax Year or, in the event of an overpayment equal to less than one (1) month's installment thereof, Landlord shall either pay to Tenant or, at Landlord's election, credit against subsequent payments of Rent; provided however, if any overpayment is more than one month's Base Rent and Tenant's Tax Payment, Landlord shall pay to Tenant the amount of the overpayment that is in excess of one month's Base Rent and Tenant's Tax Payment. Any overpayment due from Landlord to Tenant shall be paid to Tenant within thirty (30) days.

(b)    If the real estate tax fiscal year of The City of New York shall be changed at any time after the Effective Date, any Taxes for such fiscal year, a part of which is included within a particular Tax Year and a part of which is not so included, shall be apportioned on the basis of the number of days in such fiscal year included in the particular Tax Year for the purpose of making computations under this Section 7.2. If the imposition of allocation of Taxes is delayed for any reason, Tenant shall nevertheless continue to pay Tenant's Tax Payment then in effect subject to retroactive adjustment at such time as Taxes are imposed or allocated.

26

(c)     If at any time Taxes are required to be paid (either to the appropriate taxing authorities or as escrow payments to any Mortgagee or Superior Lessor), in full or in monthly, quarterly or other installments on any date or dates, then upon notice thereof from Landlord, Tenant's Tax Payment shall be correspondingly accelerated or revised so that said Tenant's Tax Payment is due at least ten (10) Business Days prior to the date payment is due to the taxing authorities or any Mortgagee or Superior Lessor.

(d)     Tenant's Tax Payment shall be made as provided in this <u>Section 7.2</u> regardless of the fact that Tenant may be exempt, in whole or in part, from the payment of any taxes by reason of Tenant's diplomatic or other tax exempt status.

(e)     If after the Effective Date, The City of New York shall enact a tax in substitution for the New York City Commercial Rent or Occupancy Tax ("<u>CROT</u>") in effect on the Effective Date, and such substitute tax shall be payable in the first instance by Landlord, then (provided Tenant shall otherwise be obligated to make payments of CROT hereunder) Tenant shall reimburse Landlord, as Additional Rent within thirty (30) days after demand, for the amount of such tax payable by Landlord in respect of this Lease.

(f)     In the case of a Tax Year only a fraction of which falls within the Term, Tenant's Tax Payment, as applicable, with respect to such Tax Year shall be apportioned in the ratio of the number of days in such Tax Year occurring within the Term to the total number of days in such Tax Year.  If the Initial Commencement Date shall occur on a date other than June 1 or December 1, and there shall be a Tenant's Tax Payment, as applicable, payable with respect to the period commencing on the Commencement Date, such Tenant's Tax Payment shall not become due until Landlord shall have furnished Landlord's Statement with respect thereto.  In no event shall Fixed Rent ever be reduced by operation of this <u>Section 7.2</u> and the rights and obligations of Landlord and Tenant under the provisions of this <u>Section 7.2</u> with respect to any Additional Rent shall survive the expiration or earlier termination of this Lease.

**Section 7.3**    <u>Tenant's Operating Payment</u>. (a)     Tenant shall pay, in accordance with this Section 7.3, as Additional Rent, for each calendar year (all or any part of which falls within the Term), an amount equal to the product of (x) the amount, if any, by which Operating Expenses for such calendar year exceed the Base Operating Expenses multiplied by (y) Tenant's Share of Operating Expenses ("<u>Tenant's Operating Payment</u>").  Any Operating Expenses payable hereunder by Tenant shall be paid by Tenant in accordance with <u>Section 7.3(b)</u> below.

(b)     Landlord will furnish to Tenant, with respect to the Base Operating Year, a written statement setting forth Landlord's estimate of Operating Expenses for the Base Operating Year.  Landlord will also furnish to Tenant, with respect to each Operating Year, a written statement setting forth Landlord's estimate of Tenant's Operating Payment for such Operating Year ("<u>Landlord's Estimate</u>").  Landlord shall endeavor to provide Landlord's Estimate to Tenant before the commencement of any Operating Year.  Other than with respect to the Base Operating Year, Tenant shall pay to Landlord on the first day of each month during such Operating Year an amount equal to one-twelfth (1/12th) of Landlord's Estimate, which shall be credited toward Tenant's Operating Payment for such Operating Year.  If, however, Landlord shall furnish a Landlord's Estimate subsequent to the commencement of any Operating Year, then (i) until the first day of the month following the month in which such Landlord's

27

Estimate is furnished to Tenant (the "Proration Date"), Tenant shall pay to Landlord on the first day of each month an amount equal to the monthly sum payable by Tenant to Landlord under this Section 7.3 in respect of the last month of the preceding Operating Year; (ii) simultaneously with the delivery of Landlord's Estimate, Landlord shall give notice to Tenant stating whether the installments of Tenant's Operating Payment made or to be made on or before the Proration Date for such Operating Year were greater or less than the installments of Tenant's Operating Payment to be made for such period in accordance with such estimate, and if such notice from Landlord shall indicate (A) a deficiency, Tenant shall pay the amount thereof within thirty (30) days after demand therefore, or (B) an overpayment, Landlord shall, at its option, either pay to Tenant or apply a credit in the amount thereof against the next installments of Additional Rent under this Lease; provided however, if any overpayment is more than one month's Base Rent and Operating Expenses, Landlord shall pay to Tenant the amount of the overpayment that is in excess of one month's Base Rent and Operating Expenses, and (iii) on the first day of the month following the month in which Landlord's Estimate is furnished to Tenant, and monthly thereafter throughout the remainder of such Operating Year, Tenant shall pay to Landlord an amount equal to one-twelfth (1/12th) of Tenant's Operating Payment shown on such Landlord's Estimate. Landlord may, at any time or from time to time (but no more than twice per Operating Year) furnish to Tenant a revised Landlord's Estimate of Tenant's Operating Payment for such Operating Year, and in such case, Tenant's Operating Payment for such Operating Year shall be adjusted and paid or credited within thirty (30) days substantially in the same manner as provided in the immediately preceding sentence.

(c)     Within two hundred seventy (270) days after the end of the Base Operating Year and each Operating Year, Landlord shall furnish to Tenant a Landlord's Statement with respect to Operating Expenses. Each such year-end Landlord's Statement for any Operating Year which includes Operating Expenses shall be accompanied by a computation of Operating Expenses for the Building, from which Landlord shall make the computation of Operating Expenses hereunder. If any Landlord's Statement shall provide for payments of Tenant's Operating Payment that differ from the amount of Tenant's Operating Payment paid by Tenant for the preceding Operating Year, then in the case of (x) an overpayment, Landlord shall, at its option, either pay to Tenant or apply a credit in the amount thereof against the next installments of Additional Rent, the amount of such overpayment; provided however, if any overpayment is more than one month's Base Rent and Operating Expenses, Landlord shall pay to Tenant the amount of the overpayment that is in excess of one month's Base Rent and Operating Expenses, and (y) a deficiency, Tenant shall pay the amount thereof within thirty (30) days of demand therefor.

(d)     In the case of an Operating Year only a fraction of which falls within the Term, Tenant's Operating Payment shall be equal to that amount by which (i) Operating Expenses for such Operating Year multiplied by the Partial Year Fraction exceed (ii) Base Operating Expenses multiplied by the Partial Year Fraction. In the event of a termination of this Lease, any Additional Rent shall be paid or adjusted within thirty (30) days after submission of a Landlord's Statement. In no event shall Fixed Rent ever be reduced by operation of this Section 7.3 and the rights and obligations of Landlord and Tenant under the provisions of this Article 7 with respect to any Additional Rent shall survive the expiration or earlier termination of this Lease.

00295140.10

(e)     In determining the amount of Operating Expenses for any Operating Year and the Base Operating Year, if less than hundred percent (100%) of the RSF of the Retail Space shall have been occupied by tenant(s) at any time during any such Operating Year or the Base Operating Year, then, in such event, Operating Expenses shall be determined for any such Operating Year or the Base Operating Year to be an amount equal to the Operating Expenses which would normally be expected to be incurred had such occupancy been one hundred percent (100%).

**Section 7.4**    Actual Reimbursement.  The computations of Additional Rent under this Article 7 are intended to constitute an actual reimbursement to Landlord for Tenant's payments with respect to Taxes, as applicable, over a base amount of Taxes, as applicable, and other costs and expenses paid by Landlord with respect to the Retail Unit as to which Tenant has agreed to reimburse Landlord under this Lease; it being acknowledged, however, that with respect to any amounts otherwise includable in Operating Expenses which, because of a required allocation or for other reasons, are incapable of precise calculation, the amount includable in Operating Expenses shall be based on Landlord's estimate thereof in accordance with this Lease.

**Section 7.5**    Landlord's Statement. (a)    Landlord's failure to render a Landlord's Statement with respect to any payment period shall not prejudice Landlord's right to thereafter render a Landlord's Statement with respect thereto or with respect to any subsequent payment period, nor shall the rendering of a Landlord's Statement prejudice Landlord's right to thereafter render a corrected Landlord's Statement for that payment period.  Nothing herein contained shall restrict Landlord from issuing a Landlord's Statement at any time there is an increase in Taxes or Operating Expenses during any payment period or any time thereafter; provided that in no event may a Landlord's Statement be issued more than two (2) years after the end of the applicable year and in the last year of the Term (as the same be extended), not more than twelve (12) months after the expiration thereof.

**Section 7.6**    (a)    In the event that Tenant disputes the Landlord's Statement or Landlord's calculation of Operating Expenses, Taxes, Base Operating Expenses or the Base Tax Amount, as applicable, then Tenant may send a notice ("Tenant's Statement") to Landlord specifying in reasonable detail the basis for Tenant's disagreement and the amount of Tenant's Operating Payment, Tenant's Tax Payment and/or any other Additional Rent payable under this Article 7, as applicable, Tenant claims is properly due to Landlord, or the proper amount of Base Operating Expenses, or the Base Tax Amount, as applicable, and requesting to examine Landlord's books and records relating to Operating Expenses, Taxes, Base Operating Expenses, the Base Tax Amount and/or other Additional Rent in connection with any such dispute, provided that (i) with respect to Operating Expenses or Taxes, Tenant delivers Tenant's Statement no later than twenty four (24) months after the date on which Landlord shall have delivered the Landlord's Statement to Tenant, as described in Section 7.3(c) hereof (except during the last year of the Term where such statement shall be given within twelve (12) months). If Tenant shall not give such Tenant's Statement within such twenty four (24) month period, then Landlord's Statement shall be conclusive and binding upon Tenant and Tenant shall be deemed to have waived any further rights to pursue such dispute.  Tenant shall have the right to examine Landlord's books and records relating to Operating Expenses or Taxes, as applicable, and/or other Additional Rent; provided that (i) Tenant shall have delivered such Tenant's Statement within twenty four (24) months (except during the last year of the Term where such statement

shall be given within twelve (12) months after the date on which Landlord shall have delivered such Landlord's Statement to Tenant, and (ii) Tenant shall comply with any confidentiality requirements reasonably imposed by Landlord. Tenant covenants and agrees that Tenant will not employ, in connection with such examination, any Person who is to be compensated, in whole or in part, on a contingency fee basis. If Tenant sends a Tenant's Statement, Tenant may elect to have Tenant's employee or certified public accountant examine, at Landlord's office or at such other location in the Borough of Manhattan as Landlord may reasonably designate, such of Landlord's books and records as are relevant to the Landlord's Statement in question (the "Operating Records"), which shall include the books and records relating to Taxes, Operating Expenses and/or other Additional Rent for the two (2) calendar years preceding the calendar year in question and the calendar year in question but not with respect to any prior years.

(b)        Notwithstanding the foregoing provisions of this Section 7.5(c), Tenant, pending the resolution of any contest pursuant to the terms hereof shall continue to pay all sums as determined to be due in the first instance by Landlord's Statement. Upon the resolution of such contest, suitable adjustment shall be made in accordance therewith within thirty (30) days of such resolution, and the amount of the overpayment, if any, shall be paid by Landlord to Tenant; provided however, if any overpayment is more than one month's Base Rent and Operating Expenses, Landlord shall pay to Tenant the amount of the overpayment that is in excess of one month's Base Rent and Operating Expenses, it being agreed that such obligation shall survive the Expiration Date. Tenant's payment of any Tenant's Operating Payment or Tenant's Tax Payment shall not preclude Tenant from later disputing the correctness of any Landlord's Statement if done in accordance with and within the time frames so set forth in this Section 7.5. Notwithstanding anything to the contrary contained herein, Tenant shall pay all fees and expenses relating to such contest (other than Landlord's own legal fees and the cost of the auditor), unless it is finally determined that Landlord overstated Tenant's Operating Payment by more than five percent (5%) for such year.

ARTICLE 8

LEGAL REQUIREMENTS

Section 8.1        (a)        Subject to the provisions of Section 8.1(b), Tenant, at its sole expense, shall comply with all Legal Requirements applicable to the Premises or the use and occupancy thereof and Tenant shall make all repairs or Alterations required thereby, whether structural or non-structural, ordinary or extraordinary, in which event such repair or Alteration shall be performed by Tenant upon and subject to the terms of Article 4 hereof. Notwithstanding anything to the contrary set forth in the preceding sentence, Tenant shall not be required to make any structural Alterations in order so to comply with Legal Requirements unless such Alterations shall be necessitated or occasioned, in whole or in part, by the acts, omissions, or negligence of Tenant or any person claiming through or under Tenant, or any of their servants, employees, contractors, agents, visitors or licensees, or by the manner of use or occupancy of the Premises by Tenant or by any such person (in contradistinction to the mere use of the Premises for retail use). For the purposes of this Section 8.1, the installation and maintenance of a sprinkler system or part thereof or any work pertaining to such sprinkler system or any Alterations required to comply with Local Law #5 of 1973, #16 of 1984, #58 of 1987 and the Americans With Disabilities Act and any successor laws of like import shall be deemed to be a non-structural

30

Alteration.  Further, Tenant shall not be required to make any Alterations to comply with Legal Requirements where such compliance arises solely due to Landlord's material breach of any warranty or representation expressly set forth in this Lease.

       (b)     Landlord agrees, to the extent that non-compliance by Landlord affects the use of the Premises for its normal business operations or imposes any material liability to Tenant, to comply with all Legal Requirements with which Tenant is not required to comply pursuant to the provisions of the previous sentence and Landlord shall make all repairs or alterations required thereby; provided, however, Landlord shall not be required to so comply unless and until Landlord shall have received notice of the necessity therefor from Tenant.

      **Section 8.2**    Tenant shall not do or permit to be done any act or thing upon the Premises or the Building by any Tenant Party which will invalidate or be in conflict with any reasonable requirements of Landlord's insurance policies and shall not do or permit anything to be done in or upon the Premises, or use the Premises in a manner, or bring or keep anything therein, which shall increase the rates for casualty or liability insurance applicable to the Building, provided, however, that Tenant's use of the Premises for the Permitted Use shall not violate the terms of this Section 8.1(b).  If, as a result of any act or omission by Tenant or by reason of Tenant's failure to comply with the provisions of this Article 8, the insurance rates for the Building shall be increased, then Tenant shall, after notice from Landlord, desist from doing or permitting to be done any such act or thing and shall reimburse Landlord, as Additional Rent, for the increased insurance premiums thereafter paid by Landlord as a result of such act, omission or failure by Tenant, and shall make such reimbursement within thirty (30) days after demand by Landlord.

      **Section 8.3**    Intentionally Omitted.

      **Section 8.4**    Tenant shall not cause or permit any Hazardous Substances to be used, transported, stored, released, removed and/or disposed of, handled, produced or installed in, on or from the Premises or the Building other than in connection with (i) materials and supplies typically and lawfully used in connection with the performance of Alterations of the type being undertaken by Tenant as part of the Tenant's Initial Alterations and (ii) the use, operation, and maintenance of the Premises for the Permitted Use,  provided in each case that the same are used, handled, removed, disposed of and stored in compliance with all applicable Environmental Laws and all other Legal Requirements.

      **Section 8.5**    In accordance with Article 29 of this Lease, Tenant shall indemnify and hold Landlord harmless from and against any loss, liability, damages and costs and expenses (including without limitation, reasonable attorneys' fees and disbursements) that Landlord may at any time suffer solely by reason of Tenant using, transporting, storing, releasing, handling, producing or installing any Hazardous Substances in, on or from the Premises or any portion of the Real Property.  In accordance with Article 29 of this Lease, Landlord shall indemnify and hold Tenant harmless from and against any loss, liability, damages and costs and expenses (including without limitation, reasonable attorneys' fees and disbursements) that Tenant may at any time suffer solely by reason of any Hazardous Substances located in the Premises which were not introduced by Tenant, its agents, contractors, employees, invitees or any party under Tenant's control.  The provisions of this Section 8.5 shall survive the Expiration Date.

**Section 8.6**    Tenant will not clean, nor require, permit, suffer or allow any window in the Premises to be cleaned, from the outside in violation of Section 202 of the New York Labor Law or of the rules of the New York City Board of Standards and Appeals or of any other board or body having or asserting jurisdiction.

ARTICLE 9

SUBORDINATION AND NON-DISTURBANCE; ESTOPPEL CERTIFICATES

**Section 9.1**    This Lease is subject and subordinate in all respects to the terms, covenants, conditions and provisions of all Mortgages and Superior Leases and all rights of the Mortgagees and Superior Lessors thereunder, and no further instrument of subordination shall be required; provided that Landlord shall obtain and deliver to Tenant within sixty (60) days following the full execution and delivery of this Lease (i) a non-disturbance agreement for the benefit of Tenant from the Condominium Board substantially in the form annexed to the this Lease as Exhibit I thereof, and (ii) non-disturbance agreement for the benefit of Tenant from all existing Mortgagees substantially in form as annexed hereto as Exhibit I.  Landlord agrees to its commercially reasonable and diligent efforts to obtain the non-disturbance agreements described in this Section 9.1.

**Section 9.2**    Tenant shall reasonably expeditiously execute and deliver any commercially reasonable instrument that Landlord or any Superior Lessor or Mortgagee may request to evidence such subordination.

**Section 9.3**    (a)    In the event of any act or omission of Landlord which would give Tenant the right, immediately or after lapse of a period of time, to cancel or terminate this Lease (other than pursuant to Articles 12 or 13), or to claim a partial or total eviction, Tenant shall give each Mortgagee and Superior Lessor whose name and address shall previously have been furnished to Tenant in writing, notice of such act or omission.  If Landlord fails to cure such act or omission within the time provided for in this Lease, then each such Mortgagee or Superior Lessor shall have a reasonable period of time after receipt of such notice within which to cure such act or omission or if such act or omission cannot be cured within that time, then such additional reasonable period of time as may be necessary to cure such default, in which event this Lease shall not be terminated and Tenant shall not exercise any other rights or remedies under this Lease or otherwise while such remedies are being so diligently pursued.

(b)    Tenant shall use its best efforts to cooperate in connection with reasonably requested modifications to this Lease, upon request of a Mortgagee, provided that such Lease modification shall not decrease Landlord's obligations or decrease Tenant's rights under this Lease (except to a *de minimis* extent) or increase Tenant's monetary obligations under this Lease (to any extent) or non-monetary obligations under this Lease (except to a *de minimis* extent).

**Section 9.4**    (A)    Tenant agrees, at any time and from time to time, as requested by Landlord, upon not less than twenty (20) days' prior notice, to execute and deliver to the other a written statement executed and acknowledged by an appropriate individual representing such party (a) stating that this Lease is then in full force and effect and has not been modified (or if modified, setting forth all modifications), (b) setting forth the then Fixed Rent and Additional

32

Rent, (c) setting forth the date to which the Fixed Rent and Additional Rent have been paid, (d) stating whether or not, to the best knowledge of Tenant, the Landlord is in default under this Lease, and if so, setting forth the specific nature of all such defaults, (e) stating the amount of the security deposit, if any, held by Landlord under this Lease, (f) stating whether there are any subleases affecting the Premises, (g) stating the address of the person to which all notices and communication under this Lease shall be sent, (h) stating each applicable Commencement Date, the Rent Commencement Date and the Expiration Date, (i) stating whether or not there are any amounts of Landlord's Contribution not yet advanced to Tenant, (j) stating whether or not there are any items of Landlord's Work which have not been completed, and if so, describing in a reasonable manner such work, and (k) as to any other matters reasonably requested by Landlord. The parties acknowledge that any statement delivered pursuant to this Section 9.4 may be relied upon by any purchaser or owner of the Real Property or the Building, or of Landlord's interest (directly or indirectly) in the Real Property or the Building or any Superior Lease, or by any Mortgagee or Superior Lessor, or by any purchaser of the interest of any Mortgagee or Superior Lessor (directly or indirectly) in the Real Property or the Building.

ARTICLE 10

SERVICES

**Section 10.1**    Intentionally Omitted.

**Section 10.2**    Electricity.

(a)    Landlord will provide electricity to Tenant on a submetered basis. Tenant may utilize all existing electricity submeters serving the Premises. Landlord, at Landlord's cost and expense, shall install any additional submeters or make any necessary upgrades to the existing submeters as necessary to meter Tenant's electricity service. Landlord reserves the right to calibrate such meter at Tenant's expense to assure accuracy of such submeter(s). Tenant shall, at its expense, properly and continuously maintain and repair the submeters and cause any and all required replacement of the meters and other necessary equipment. Where more than one submeter measures the amount of usage, usage through each meter shall be totalized and billed conjunctively. Tenant shall pay to Landlord, from time to time, upon demand, for the electricity consumed in the Premises, as determined by such submeter or submeters, the actual cost to Landlord of purchasing electricity for the Premises plus all applicable taxes thereon. In addition, Tenant shall also pay to Landlord as an administrative fee a sum equal to four (4%) percent of such actual cost to Landlord of purchasing electricity for the Premises. Except as expressly set forth in this Lease, notwithstanding anything to the contrary contained herein, Landlord shall not in any way be liable or responsible to Tenant for any loss, damage or expense which Tenant may sustain or incur as a result of the unavailability of or interruption in the supply of electricity to the Premises or a change in the quantity or character or nature of such current and such change, interruption or unavailability shall not constitute an actual or constructive eviction, in whole or in part, or entitle Tenant to any abatement or diminution of rent or relieve Tenant from any of its obligations under this Lease, or impose any liability upon Landlord or any Landlord Party, by reason of inconvenience or annoyance to Tenant, or injury to or interruption of Tenant's business, or otherwise.

33

(b)     Landlord reserves the right to discontinue furnishing electricity to Tenant in the Premises at any time upon not less than thirty (30) days' notice to Tenant, provided that an alternate source of electrical service is readily available to Tenant; and provided further that such discontinuance may not take place until electric service is being supplied by such an alternate source. If Landlord, at Landlord's option, exercises such right of discontinuance as provided herein, this Lease shall continue in full force and effect and shall be unaffected thereby, except that, from and after the effective date of such discontinuance, (i) Tenant shall arrange to obtain electricity directly from the public utility company supplying electricity to the Building, (ii) all meters, equipment and other facilities which may be required for Tenant to obtain electricity directly from such public utility company shall be installed by Landlord, at Landlord's expense, provided that if such discontinuance is required by Legal Requirements, then Tenant shall reimburse Landlord fifty (50%) percent of the actual cost within 30 days following demand, as Additional Rent, without set-off or deduction, and (iii) any such installation shall be maintained by Tenant, at its expense, and shall be subject to such conditions as Landlord and/or the public utility company may require, and Landlord shall not be liable to Tenant therefor and the same shall not be deemed to be a lessening or diminution of services within the meaning of any law, rule or regulation now or hereafter enacted, promulgated or issued.

(c)     At all times during the Term, Tenant shall comply with all present and future general rules, regulations, terms and conditions applicable to service equipment, wiring and requirements in accordance with the regulations of the public utility company supplying electricity to the Building.

**Section 10.3**   Heat, Ventilation and Air Conditioning.

(a)     Landlord shall deliver the HVAC system in "as-is" condition. Landlord shall not provide HVAC to the Premises. Tenant acknowledges that Tenant is solely responsible for providing HVAC to the Premises including, without limitation, the design and engineering of the HVAC system with respect to the Premises and Tenant shall maintain a service contract with respect to the same.

(b)     Landlord shall not be required to furnish Building HVAC System services.

(c)     Landlord shall make available to the Premises 76 tons per annum of condenser water ["Condenser Water Usage"] for Tenant's supplemental air conditioning unit use at Landlord's standard charge per ton ((which is $750 per ton as of the date of this Lease)) for such condenser water (such charge shall be Additional Rent under this Lease), which charge may change from time to time, and Tenant agrees to accept and pay for such Condenser Water Usage during the term of this Lease.

**Section 10.4**   Elevators; Loading Dock. (a) Subject to the terms of this Section 10.4, Landlord shall provide freight elevator facilities to the Premises on a non-exclusive, first-come, first-served basis, on Business Days from 8:00 A.M. to 4:45 P.M. ("Freight Business Hours"). Such elevator service shall be subject to such rules and regulations as Landlord may reasonably promulgate from time to time with respect thereto in accordance with Article 27. Subject to the terms of this Lease, Landlord shall have the right to temporarily change the operation or manner of operation of any of the freight elevators in the Building and/or to temporarily discontinue the

34

use of the freight elevator for the purpose of repairing, cleaning, renovating and/or maintaining such cars and in the event of an emergency. There are presently existing two (2) freight elevators serving the Premises, the main Building freight elevator and a hydraulic freight elevator. The hydraulic freight elevator may used by Tenant, on a non-exclusive basis, during all of Tenant's regular business hours without additional cost or charge.

(b)    Landlord shall make the main Building freight elevator available to Tenant during other than Freight Business Hours, upon not less than twenty-four (24) hours' prior request by Tenant (subject to Building requirements and any prior reservations made by other tenants and occupants of the Building), and Tenant shall pay, as Additional Rent within thirty (30) days after demand therefor, the charges for such use at Landlord's then current rates for the Building. Tenant shall not use the main Building freight elevator during Freight Business Hours for moving out of the Premises. Notwithstanding anything contained herein to the contrary, all deliveries to and from Tenant shall be via the 44th street loading dock (the "Loading Dock").

(c)    Tenant shall have the use of the Loading Dock during Freight Business Hours. If Tenant shall use the loading dock at times other than the foregoing hours during Business Days, Tenant shall pay Landlord as Additional Rent within thirty (30) days after demand Landlord's then current rates for such use. Landlord's current rates (as of the date of this Lease) are set forth on Exhibit J annexed hereto. Notwithstanding the foregoing, with the respect to Tenant's use of the Loading Dock and main Building freight elevator during the Limited Overtime Hours (as defined below), such use shall be billed to Tenant at Landlord's then current straight-time rate, plus a 4% administration fee. With respect to Tenant's use of the Loading Dock and main Building freight elevator after Freight Business Hours and outside of the of the Limited Overtime Hours, Tenant's use of the Loading Dock and freight elevator shall be billed to Tenant at the then current overtime rate or holiday overtime rate, as applicable, plus a 4% administration fee. In the event that the Freight Business Hours are increased on a Building wide basis, then Tenant shall have the use of the main Building freight elevator and Loading Dock as provided herein during such extended Freight Business Hours and the Limited Overtime Hours shall be adjusted to exclude such extended Freight Business Hours. As used herein "Limited Overtime Hours" shall mean (i) 4:45pm to 8pm on all Mondays through Fridays (excluding Holidays), (ii) all Saturdays from 10am to 7pm (excluding Holidays) and (iii) all Sundays from 10am to 6pm (excluding Holidays).

**Section 10.5**    Cleaning. Tenant, at Tenant's expense, shall cause the Premises to be cleaned and kept in a clean and neat condition at all times. Landlord shall, at Tenant's cost and expense (provided that such cost and expense is reasonable and competitive), provide window cleaning services and exterior metal cleaning service.

**Section 10.6**    Refuse and Rubbish Removal. Tenant, at Tenant's own, shall utilize the services of the carting service selected by Landlord, at its own expense, to service the Building to provide refuse and rubbish removal service from the Premises. Tenant shall remove such refuse and rubbish from the Premises and take it to the Loading Dock during Freight Business Hours. Such refuse and rubbish shall not be placed or stored outside the Premises at any time, and shall only be moved from the Premises to the Loading Dock at the designated time period. All refuse and rubbish shall be bagged and securely tied.

00295140.10

**Section 10.7**   Water.   Landlord shall furnish cold water in reasonable quantities to the Premises.  Tenant's consumption of water shall be measured by water meter(s) or submeter(s) existing in the Premises as of the date hereof.  Landlord, at Tenant's sole cost and expense, shall maintain, repair and cause any and all replacement of the meters.  Tenant shall pay to Landlord, as Additional Rent, within thirty (30) days after demand therefor, for the cost of such water (such charge to be equal to the costs incurred by Landlord with respect to such usage).

**Section 10.8**   No Warranty of Landlord.   Except as expressly set forth in the Lease, Landlord does not warrant that any of the services to be provided by Landlord to Tenant hereunder, or any other services which Landlord may supply, (a) will be adequate for Tenant's particular purposes or as to any other particular need of Tenant or (b) will be free from interruption.  Tenant acknowledges that any one or more such services may be interrupted or suspended by reason of Unavoidable Delays.  In addition, consistent with First Class Buildings, Landlord reserves the right to stop, interrupt or reduce service of the Building Systems by reason of Unavoidable Delays, or for repairs, additions, alterations, replacements, decorations or improvements which are, in the reasonable judgment of Landlord, necessary to be made, until said repairs, alterations, replacements or improvements shall have been completed.  Landlord shall endeavor to provide Tenant with such advance notice as is reasonable under the circumstances of any such stoppage, reduction or interruption.  Landlord shall use commercially reasonable efforts to begin and diligently prosecute to completion any repairs, replacements or improvements, including such repairs as may be required to machinery or equipment within the Building to provide restoration of any service provided by Landlord hereunder.  Except as expressly provided in this Lease (including Sections 6.4, 10.12, 10.13 and 15.4 hereof), any such interruption or discontinuance of service, or the exercise of such right by Landlord to suspend or interrupt such service shall not entitle Tenant to any compensation or to any abatement or diminution of Fixed Rent or Additional Rent.  Landlord shall use reasonable efforts to minimize interference with Tenant's access to and use and occupancy of the Premises in making any repairs, alterations, additions, replacements, decorations or improvements; provided, however, that Landlord shall have no obligation to employ contractors or labor at "overtime" or other premium pay rates or to incur any other "overtime" costs or additional expenses whatsoever, unless in the case of imminent danger to life or property, Tenant is forced to close its business as a result of such interruption or discontinuance of service or requested to do so by Tenant.  Tenant will reimburse Landlord, as Additional Rent within thirty (30) days of demand, for any actual out-of-pocket costs incurred by Landlord at Tenant's request in connection with such overtime or premium labor.  Landlord shall not be required to furnish any services except as expressly provided in this Lease.

**Section 10.9**   Access.   Except as provided in the Work Letter, Tenant shall have access to the Premises 24 hours per day, 7 days per week.

**Section 10.10** Class E System.   Landlord has provided a fire detection, smoke detection, elevator recall, alarm and voice communication, annunciation and floor warden communication system as a part of the Building Class E system for all base Building areas, inclusive of but not limited to, core toilets and core mechanical rooms, to the extent required by applicable Legal Requirements.  Landlord has provided panels in the core area and capacity adequate to connect Tenant supplied fire alarm speaker/strobe devices for normal occupancy of the space based upon use classification of the Premises as of the Effective Date. If Tenant shall utilize Landlord's

36

Class E system as the primary fire detection system within the Premises then Tenant shall reimburse Landlord for such costs associated with the maintenance of the Class E system allocated to the Tenant.  Tenant acknowledges that Tenant, at Tenant's cost, may be required to provide a separate fire alarm system with interface to the Base Building System. In such a case, Landlord shall, at Tenant's expense, connect Class E System installed in Tenant's Premises to the Building fire detection and/or prevention facilities. In the event that from and after the date of this Lease, Landlord installs a new Building fire alarm system to serve the Building, Tenant shall reimburse Landlord for all reasonable expenses incurred by Landlord in connecting Tenant's fire alarm system to such Building system.

Section 10.11 Steam.

(a)    Tenant may use the existing steam service serving the Premises, and, in connection therewith, may utilize the existing steam submeter to measure the amount of Tenant's usage. Landlord reserves the right to calibrate such meter at Tenant's expense to assure accuracy of such meter(s).  Landlord, at Tenant's sole cost and expense, shall, maintain, repair and shall cause any and all replacement of the meters and other necessary equipment.  Where more than one meter measures the amount of usage, usage through each meter shall be totalized and billed conjunctively.  Tenant shall pay to Landlord, from time to time, upon demand and within 30 days thereof, for the steam consumed in the Premises, as determined by such submeter or submeters, the actual cost to Landlord of purchasing steam for the Premises plus all applicable taxes thereon. In addition, Tenant shall also pay to Landlord as an administrative fee a sum equal to Tenant's allocable share of Landlord's reasonable out-of-pocket fees of reading the submeter(s) for the Premises and billing Tenant therefor.  Notwithstanding anything to the contrary contained herein, Landlord shall not in any way be liable or responsible to Tenant for any loss, damage or expense which Tenant may sustain or incur as a result of the unavailability of or interruption in the supply of steam to the Premises or a change in the quantity or character or nature of such current and such change, interruption or unavailability shall not constitute an actual or constructive eviction, in whole or in part, or entitle Tenant to any abatement or diminution of rent or relieve Tenant from any of its obligations under this Lease, or impose any liability upon Landlord or any Landlord Party, by reason of inconvenience or annoyance to Tenant, or injury to or interruption of Tenant's business, or otherwise, so long as such change, interruption or unavailability resulted from a cause beyond Landlord's reasonable control. Landlord shall make diligent efforts to mitigate the extent and duration of any such change, interruption or unavailability.

(b)    Landlord reserves the right to discontinue furnishing steam to Tenant in the Premises at any time upon not less than thirty (30) days' notice to Tenant, provided that an alternate source of steam is readily available to Tenant; and provided further that such discontinuance may not take place until steam service is being supplied by such an alternate source.  If Landlord, at Landlord's option, exercises such right of discontinuance as provided herein, this Lease shall continue in full force and effect and shall be unaffected thereby, except that, from and after the effective date of such discontinuance, (i) Tenant shall arrange to obtain steam directly from the public utility company supplying steam to the Building, (ii) all meters, equipment and other facilities which may be required for Tenant to obtain steam directly from such public utility company shall be installed by Landlord, at Landlord's expense provided that if such discontinuance is required by Legal Requirements, then Tenant shall reimburse Landlord

37

fifty (50%) percent of the actual cost within 30 days following demand, as Additional Rent, without set-off or deduction, and (iii) any such installation shall be maintained by Tenant, at its expense, and shall be subject to such conditions as Landlord and/or the public utility company may require, and Landlord shall not be liable to Tenant therefor and the same shall not be deemed to be a lessening or diminution of services within the meaning of any law, rule or regulation now or hereafter enacted, promulgated or issued.  At all times during the Term, Tenant shall comply with all present and future general rules, regulations, terms and conditions applicable to service equipment, wiring and requirements in accordance with the regulations of the public utility company supplying steam to the Building.

**Section 10.12** Landlord shall not be deemed in breach of this Lease unless Landlord fails within a reasonable time to perform an obligation required to be performed by Landlord in the Premises.  For purposes of this <u>Section 10.12</u>, a reasonable time shall in no event be less than ten (10) Business Days after receipt by Landlord of written notice specifying wherein such obligation of Landlord has not been performed; provided, however, that if the nature of Landlord's obligation is such that more than ten (10) Business Days after such notice are reasonably required for its performance, then Landlord shall not be in breach of this Lease if performance is commenced within such ten (10) Business Day period and thereafter diligently pursued to completion. Upon such failure Tenant shall have the option but not the obligation to cause such repair and be reimbursed as provided below.  Notwithstanding anything to the contrary contained herein, in the event of an emergency situation which effects the structural integrity of the Premises, Landlord shall use all commercially reasonable efforts to repair such damage within five (5) Business Days of Tenant's written notice of such event.  In the event of an emergency posing an imminent threat of personal injury or material property damage, and/or in the event that Landlord shall fail to perform any of Landlord's responsibilities within the applicable cure period, then Tenant shall have the right, upon notice to Landlord, but not the obligation to make the necessary and appropriate repairs, or to take the appropriate action on behalf of Landlord, and Landlord shall reimburse Tenant the full out-of-pocket actual reasonable cost of such repairs or action.  If Landlord shall fail to fully reimburse Tenant for such costs within thirty (30) days following reasonably substantiated demand, Tenant may, but shall not be required to deduct such amounts from any amounts owing or to become owing from Tenant to Landlord.  In the event of an emergency, Tenant shall give Landlord such notice of Tenant's intended actions as is practical under the circumstances, which notice may be oral.

**Section 10.13** Notwithstanding anything to the contrary contained in this Lease, if Tenant is unable to use the Premises for the ordinary conduct of Tenant's business due solely to an interruption of an Essential Service (as hereinafter defined) resulting from Landlord's performance of an improvement to the Building or any other intentional act of Landlord, other than as a result of Unavoidable Delays, necessary repairs or preventative maintenance (provided Landlord gives Tenant's reasonable prior notice of such work and uses its diligent efforts to expeditiously prosecute such work to completion so as to minimize interference with Tenant's business), any failure of any utility company serving the Building, casualty, condemnation, an act, omission of Tenant or Tenant Party, in response to an emergency or compliance with a Legal Requirement or requirements of the applicable utility company (compliance with which cannot be performed outside of Tenant's business hours) and such condition continues for 1 hour after (i) Tenant furnishes a notice to Landlord (the "<u>Abatement Notice</u>") stating that Tenant's inability to use the Premises is solely due to such condition and (ii) Tenant does not actually use or

38

occupy the Premises during such period for the ordinary conduct of its business, then Fixed Rent, Tenant's Tax Payment and Tenant's Operating Payment shall be abated on a per diem basis (pro-rated for any partial day based on the Tenant's standard operating hours for such day and the number of such operating hours during which Tenant was not operating its business at the Premises) for the period commencing on the date Tenant delivers the Abatement Notice to Landlord and ending on the earlier of (x) the date Tenant reoccupies any portion of the Premises, and (y) the date on which such condition is substantially remedied. "Essential Service" shall mean a service which Landlord is obligated under this Lease to provide to Tenant which if not provided shall (1) effectively deny access to the Premises, (2) threaten the health or safety of any occupants of the Premises or (3) prevent or materially and adversely restrict the usage of more than 10% of the Premises for the ordinary conduct of Tenant's business. Landlord shall use its reasonable efforts to notify Tenant of any interruption of an Essential Service which will occur during Tenant's business hours.

## ARTICLE 11

## INSURANCE

**Section 11.1**   Commercial General Liability Insurance.  Tenant shall maintain in full force and effect from the date upon which Tenant or its agents or contractors first enters the Premises or any portion thereof for any reason, throughout the Term and thereafter, so long as Tenant is in occupancy of any part of the Premises, a policy of commercial general liability and property damage insurance under which Landlord, Landlord's managing agent, and those Persons listed in Section 11.7 hereof (and such other Persons as Landlord may reasonably request by written notice to Tenant from time to time) are named as additional insureds and Tenant is named as insured with such coverages primary and non-contributory. Each such policy shall be issued by one or more insurers in a financial size category of not less than "X" and with general policy holders ratings of not less than "A-", as rated in the most current available "A.M.Best's" insurance reports, or the then equivalent thereof, and licensed to do business in the State of New York and authorized to issue such policies. Each policy of insurance procured by Tenant shall contain endorsements providing that (i) such policy shall be non-cancelable and non-amendable with respect to Landlord and Landlord's said designees without thirty (30) days' (or ten (10) days' in the case of termination for non-payment of premium) prior notice to Landlord and such designees, and (ii) Tenant shall be solely responsible for the payment of premiums therefor notwithstanding that Landlord or any such designee is or may be named as an insured. As of the Commencement Date, the minimum limits of liability of such insurance shall be Five Million Dollars ($5,000,000) combined single limit bodily injury and property damage, and such limit of liability may contain an aggregate applicable and dedicated specifically to the Premises. This limit of coverage can be secured with the combination of a Commercial General Liability and Umbrella Liability coverages.

**Section 11.2**   Fire and Other Insurance Requirements.  Tenant shall take out on or prior to the Commencement Date and keep in force during the Term: (a) "Special" perils ( also known as "all risk" insurance (which may include deductibles and exclusions to the extent such are commercially reasonable) in an amount sufficient to cover the cost of personal property, trade fixtures, furniture, furnishings, equipment and other Tenant's Property, Tenant's Alterations and any paneling or other wall finishes or coverings other than normal painting on a full replacement

39

cost basis; (b) Workers' Compensation Insurance, as required by law; (c) New York Disability Benefits Law Policy; (d) business interruption insurance in an amount equal to Fixed Rent and Additional Rent for a one (1) year period; (e) Plate Glass insurance (such exposure can be self – insured with the permission of Landlord); and (f) such other insurance in such amounts as Landlord and any Mortgagee reasonably requests from time to time; and (g) such other insurance in such amounts as Superior Lessor may reasonably require from time to time. Such policy shall be written by an insurer of the A.M. Best's financial size category and general policy holders rating specified in Section 11.1, authorized to do business in the State of New York and authorized to issue such policies.

**Section 11.3**  Certificates of Insurance.  On or before the Commencement Date, Tenant shall furnish Landlord with certificates evidencing the aforesaid insurance coverage (including evidence of waivers of subrogation), and renewal certificates shall be furnished to Landlord at least thirty (30) days (or ten (10) days' in the case of termination for non-payment of premium) prior to the expiration date of each policy for which a certificate was theretofore furnished.

**Section 11.4**  No Violation of Building Policies.  Tenant shall not intentionally or knowingly commit or permit any violation of the policies of fire, boiler, sprinkler, water damage or other insurance covering the Building and/or the fixtures, equipment and property therein carried by Landlord or do or permit anything to be done, or keep or permit anything to be kept, in the Premises, which in case of any of the foregoing, (i) would result in termination of any such policies, (ii) would adversely affect Landlord's right of recovery under any of such policies or (iii) would result in reputable and independent insurance companies refusing to insure the Building or the property of Landlord in amounts reasonably satisfactory to Landlord.

**Section 11.5**  Tenant to Pay Premium Increases.  Tenant shall not intentionally or knowingly cause or permit any action or condition that would (i) invalidate or conflict with Landlord's insurance policies, (ii) violate applicable rules, regulations and guidelines of the Fire Department, Fire Insurance Rating Organization or any other authority having jurisdiction over the Building, (iii) cause an increase in the premiums of insurance for the Building, or (iv) result in Landlord's insurance companies' refusing to insure the Building or any property therein in amounts and against risks as reasonably determined by Landlord.  If insurance premiums increase as a result of Tenant's failure to comply with the provisions of this Section 11.5, Tenant shall promptly cure such failure and shall reimburse Landlord for the increased insurance premiums paid by Landlord as a result of such failure by Tenant.  Notwithstanding the above, Tenant shall not be required to pay additional premiums in the event such premiums are required solely by reason of Tenant engaging in its Permitted Use.

**Section 11.6**  Waiver of Subrogation.  The parties hereto waive any and all rights of recovery against the other, and in the case of Landlord, against all Tenant Parties, and in the case of Tenant, against all Landlord Parties, for loss of or damage to the property of the waiving party to the extent such loss or damage is insured against under any insurance policy carried by Landlord or Tenant, or which would have been so insured had the other party carried the insurance required hereunder. In addition, Landlord and Tenant shall each procure an appropriate clause in, or endorsement on, any fire or extended coverage insurance.  In the event that either Landlord or Tenant shall be unable at any time to obtain one of the provisions referred to above in any of its insurance policies, Landlord or Tenant, as the case may be, shall be named as an

40

additional insured.  Tenant acknowledges that Landlord shall not carry insurance on and shall not be responsible for damage to, Tenant's Alterations to the extent of the waiver set forth above (if any) or Tenant's Property, and that Landlord shall not carry insurance against, or be responsible for, any loss suffered by Tenant due to, interruption of Tenant's business.

**Section 11.7**   Additional Insureds.   All insurance carried by Tenant pursuant to this Article 11 shall name Tenant as the insured and Landlord, Landlord's managing agent, any Superior Lessors, any Mortgagees (whose names shall have been furnished to Tenant), and such other Persons as Landlord may reasonably request in writing from time to time as additional insureds.  Such insurance shall provide primary coverage without contribution from any other insurance carried by or for the benefit of Landlord, Landlord's managing agent, or any Superior Lessors or Mortgagees named as additional insureds.

ARTICLE 12

DESTRUCTION OF THE PREMISES; PROPERTY LOSS OR DAMAGE

**Section 12.1**   Tenant shall give prompt notice to Landlord in case of fire or other casualty in the Premises.  If (a) a substantial portion of the Retail Unit is damaged or rendered untenantable (whether or not the Premises or a portion thereof shall be damaged) by fire or other cause such that the cost of repairing such damage would cost more than fifty percent (50%) of the replacement cost of the Retail Unit, or (b) if more than fifty percent (50%) of the Premises is damaged or be rendered untenantable by fire or other casualty, and in either case, either Mortgagee will not permit Landlord to apply the net proceeds of Landlord's insurance to the restoration of the Retail Unit or the Premises, as applicable, or the amount of insurance proceeds available to Landlord is insufficient to cover the costs of repairing the Retail Unit or the Premises, as applicable then and in any such event Landlord shall notify Tenant of such facts within forty-five (45) days after the occurrence such fire or other casualty and shall have the right to terminate this Lease by notice to Tenant given within ninety (90) days of the occurrence of such fire or other casualty.  If either (y) the Premises shall be damaged or rendered wholly or substantially untenantable (whether or not any other portions of the Retail Unit shall be damaged) or (z) the Retail Unit shall be damaged, such that Tenant's access to and use and enjoyment of the Premises shall be rendered inaccessible, whether or not the Premises shall be damaged, and in case of either (y) or (z) Landlord reasonably determines that the same cannot reasonably be expected to be restored or rendered tenantable under a normal working schedule within a period of eighteen (18) months after the occurrence of such damage or destruction, then Landlord shall promptly notify Tenant of such fact, and within thirty (30) days thereafter either party may terminate this Lease by notice to the other party.  If during the last eighteen (18) months of the Term (including any exercised renewal or extension thereof) the Retail Unit or the Premises shall be damaged by fire or casualty, and if such fire or casualty damage, cannot reasonably be expected to be repaired or restored within one hundred eighty (180) days from the time that repair or restoration work would commence or prior to the Expiration Date, whichever first occurs, then Landlord shall promptly notify Tenant of such fact, and within thirty (30) days thereafter either party shall have the right to terminate this Lease.  If either Landlord or Tenant shall give notice of termination pursuant to this Section 12.1, the Term shall expire by lapse of time upon the date which is thirty (30) days after such notice is given and Tenant shall vacate the Premises and surrender the same to Landlord.  Upon the termination of this Lease under the

41

00295140.10

conditions provided for in this <u>Section 12.1</u>, Tenant's liability for rent and all other obligations hereunder (except to the extent expressly stated to survive) shall cease as of the date of such termination, subject, however, to abatement thereof between the date of such casualty and the date of such termination pursuant to <u>Section 12.3</u> below.  Tenant hereby expressly waives the provisions of Section 227 of the Real Property Law or any like law which may hereafter be enacted and agrees that the foregoing provisions of this Article shall govern and control in lieu thereof, this <u>Article 12</u> being an express agreement governing any case of damage or destruction of the Premises by fire or other casualty.  Notwithstanding anything to the contrary contained herein, in the event Landlord terminates the Lease pursuant to the terms of clause (a) of the second (2nd) grammatical sentence this <u>Section 12.1</u> and the Premises are not damaged as a result of such casualty, to the extent Tenant is not compensated by insurance for the loss of its leasehold improvements or leasehold interest (and Tenant can provide evidence to Landlord that Tenant has diligently prosecuted to completion the availability of any such proceeds), Landlord shall reimburse Tenant the then (as of the termination date of the Lease) unamortized (based on a straight-line amortization over the initial 15 year term of this Lease) cost of Tenant's Initial Alterations (less the costs of Landlord's Work and amount of Landlord's Contribution), provided Tenant provides Landlord with reasonable documentation of such costs and expenses, including copies of paid bills and invoices.

**Section 12.2**   (a)      If the Premises or the Retail Unit shall be damaged by fire or other casualty and this Lease is not terminated pursuant to <u>Section 12.1</u>, the damage (a) to the Retail Unit shall be repaired by and at the expense of Landlord so that (x) access to the Premises and (y) the common areas of the Building serving the Premises shall be substantially the same as prior to the damage, (b) to the Premises shall be repaired (i) by Landlord as to the core, shell, floors, roof, curtain wall, windows, Building Systems and all other structural elements of the Retail Unit located in the Premises including all of Landlord's Work, and (ii) by Tenant as to Tenant's Alterations and Tenant's Property, and (c) to the Building Systems shall be repaired by Landlord up to and including the point of delivery to each floor of the Premises (the work to be performed pursuant to the foregoing clauses (a), (b)(i) and (c) is referred to collectively as the "<u>Base Building Restoration</u>").   In no event shall Landlord be obligated to repair or restore Tenant's Work, other Alterations, Tenant's Property or paneling or other finishes, carpeting or wall coverings.

(b)      (i) Where Landlord is obligated or otherwise elects to effect restoration of the Premises, unless such restoration is substantially completed within eighteen (18) months from the date of the casualty, or within the one hundred eighty (180) day period applicable during the last eighteen (18) months of the Term (each such period to be subject, however, to extension by one day for each day of Unavoidable Delay), Tenant shall have the right to terminate this Lease within thirty (30) days after the expiration of such eighteen (18) month period or one hundred eighty (180) day period, as applicable (as each such period may be extended for Unavoidable Delays), but prior to the time that the restoration is substantially completed, such termination to take effect as of the thirtieth (30th) day after such notice is given, with the same force and effect as if such date were the date originally established as the Expiration Date unless, within such thirty (30) day period such restoration is substantially completed, in which case Tenant's notice of termination shall be of no force and effect and this Lease and the Term shall continue in full force and effect.  If Tenant shall not have exercised

Tenant's termination right within the time periods aforesaid, Tenant shall have no further right to exercise such termination right thereafter in respect of the casualty in question.

(ii)    In addition to Tenant's rights as provided in subsection (i) of this Section 12.2(b), if Landlord's restoration of the Premises is not substantially completed within eighteen (18) months from the date of the casualty (subject to extension by one day for each day of Unavoidable Delay), Tenant shall have the right to request from Landlord a revised estimate of the time necessary for Landlord to substantially complete its restoration of the Premises within thirty (30) days after the expiration of such eighteen (18) month period.  Within thirty (30) days following Landlord's giving to Tenant to its revised estimate for the time to substantially complete its restoration of the Premises, Tenant may elect to either (A) terminate the Lease, such termination to take effect as of the thirtieth (30th) day after such notice is given, with the same force and effect as if such date were the date originally established as the Expiration Date unless, within such thirty (30) day period such restoration is substantially completed, in which case Tenant's notice of termination shall be of no force and effect and this Lease and the Term shall continue in full force and effect or (B) to extend the eighteen (18) month period to the date set forth in Landlord's notice as the revised date upon which Landlord  will substantially complete its restoration of the Premises.

Section 12.3    Until this Lease is terminated pursuant to Section 12.1 or Section 12.4 or, if this Lease is not so terminated, until the completion of Landlord's restoration work pursuant to Section 12.2, Fixed Rent, Tenant's Tax Payment and Tenant's Operating Payment shall be abated in the proportion by which the RSF of the affected portion of the Premises bears to the total RSF of the Premises.  Except as otherwise provided herein, no damages, compensation or claims shall be payable by Landlord for inconvenience, loss of business or annoyance arising from any repair or restoration of any portion of the Premises or of the Building.  Nothing contained in this Section is intended to contravene the provisions of Section 11.6 hereof.

Section 12.4    Notwithstanding anything to the contrary contained in this Lease, if  the Building or the Premises shall be substantially damaged by fire or casualty as the result of a risk not covered by casualty insurance maintained or required to be maintained by Landlord, Landlord may, at its election, terminate this Lease by notice to Tenant given within sixty (60) days after such loss.  If Landlord shall give such notice, then this Lease shall terminate as of the date of such notice with the same force and effect as if such date were the date originally established as the Expiration Date.

ARTICLE 13

EMINENT DOMAIN

Section 13.1    If the whole of the Building or of the Premises shall be taken by condemnation or in any other manner for any public or quasi-public use or purpose (other than for temporary use or occupancy), the Term shall forthwith cease and terminate as of the date of vesting of title by reason of such taking (which date is hereinafter referred to as the "Date of the Taking"), and Rent shall be apportioned as of such date.  If such portion of the Building shall be so taken so that substantial structural alterations or reconstruction of the Building shall be necessary as a result of such taking (whether or not the Premises be affected), which alterations

43

or reconstruction cannot reasonably be completed within one hundred eighty (180) days from the date of such taking to complete, Landlord may, at its option, terminate this Lease and the Term and estate hereby granted as of the date of such vesting of title by notifying Tenant in writing of such termination within sixty (60) days following the date of the taking. If any substantial part of the Premises or access thereto which shall in Tenant's commercially reasonable opinion render the Premises remaining after such taking unfit for the purposes demised, Tenant shall have the right to terminate this Lease upon notice to Landlord within 60 days after the Date of the Taking.

**Section 13.2**   If any part, but less than all, of the Premises shall be so taken and this Lease shall not be terminated pursuant to Section 13.1, then the part so taken shall no longer constitute part of the Premises but this Lease shall otherwise remain unaffected by such taking; provided, however, that Tenant may elect to terminate the Term in the event of:

(i)   a taking of more than ten percent (10%) of the total RSF of the Premises; or

(ii)   a taking that deprives Tenant of reasonable access to the Building or the Premises, if Landlord determines that it will be unable to provide or in fact fails to provide adequate alternative access to the Building and the Premises within sixty (60) days thereafter, or in the event a taking renders the ongoing conduct of Tenant's business within the Premises as impractical, materially adversely impacts Tenant's business, or materially increases Tenant's costs of operation

by giving notice of such election to Landlord not later than sixty (60) days after Tenant's receipt from Landlord of notice of such taking (describing the nature and extent of such taking) or the date of such taking, whichever first occurs.   If notice of termination of this Lease shall be given pursuant to this Section 13.2, then upon such date as may be specified by Tenant by notice to Landlord, which date shall be not earlier than thirty (30) and not later than sixty (60) days after the date of Tenant's notice, the Term shall terminate as of the date specified in such notice and Rent shall be apportioned as of such date of termination.   Upon a partial taking and this Lease continuing in force as to any part of the Premises:

(a)   Fixed Rent shall be reduced for the remainder of the Term, by an amount equal to the product of RSF so taken, multiplied by the Fixed Rent paid for such portion taken, and the Tenant's Tax Payment and Tenant's Operating Payment shall be proportionally reduced by the amount of RSF so taken to the extent included in the determination of RSF; and

(b)   Landlord shall, at its expense, restore with reasonable diligence the remaining portions of the Premises as nearly as practicable to the same condition as it was in prior to such condemnation or taking; provided, however, that Landlord shall not be obligated to expend for such restoration and for restoration of the remainder of the Building any amount in excess of the net condemnation proceeds actually received by Landlord.

**Section 13.3**   In the event of any condemnation or taking hereinabove mentioned of all or a part of the Building (whether or not the Premises be affected) Landlord shall be entitled to receive the entire award in the condemnation proceeding, including any award made for the value of the estate vested by this Lease in Tenant, and Tenant hereby expressly assigns to

44

Landlord any and all right, title and interest of Tenant now or hereafter arising in or to any such award or any part thereof, and Tenant shall be entitled to receive no part of such award. The foregoing, however, shall not be deemed to preclude Tenant from recovering a separate award for Tenant's moving expenses, Tenant's Property and the unamortized value of Tenant's Alterations paid by Tenant. Notwithstanding the above, Tenant may pursue any condemnation award to which it is entitled by applicable law.

**Section 13.4**    If all or any part of the Premises shall be taken for a temporary period, Tenant shall be entitled, except as hereinafter set forth, to that portion of the award for such taking which represents compensation for the use and occupancy of the Premises, for the taking of Tenant's Property and for moving expenses, and Landlord shall be entitled to that portion which represents reimbursement for the cost of restoration of the Premises. This Lease shall remain unaffected by such taking and Tenant shall continue to be responsible for all of its obligations under this Lease and shall continue to pay in full all Rent when due. If the period of temporary use or occupancy shall extend beyond the Expiration Date, that part of the award that represents compensation for the use and occupancy of the Premises shall be apportioned between Landlord and Tenant as of the Expiration Date.

ARTICLE 14

ASSIGNMENT, SUBLETTING, MORTGAGE, ETC.

**Section 14.1**    Except as otherwise expressly provided herein, Tenant, for itself, its heirs, distributees, executors, administrators, legal representatives, successors, subtenants and assigns, expressly covenants that it shall not assign, mortgage, pledge, encumber, or otherwise transfer this Lease, nor sublet (nor underlet), nor suffer, nor permit, nor license the Premises or any part thereof to be used or occupied by others, without the prior written consent of Landlord in each instance, and any such assignment, mortgage, pledge, encumbrance, transfer, sublet, underlet, license or use, whether occurring voluntarily, by operation of law or otherwise, shall be and hereby is expressly prohibited. For the purpose of this Article 14, an "assignment" shall mean (x) a sale of all or substantially all of Tenant's assets, (y) a transfer of the Premises for the remainder of or substantially all of the remainder of the Term and (z) the merger or consolidation of Tenant into or with any other entity. If and so long as Tenant is a corporation with fewer than five hundred (500) shareholders or a partnership (whether general, limited or limited liability) or other legal entity, an assignment, within the meaning of this Article 14, shall be deemed to include, whether by one or more transactions or by operation of law or otherwise or the issuance of new stock, partnership or other ownership interests, a change in Control of Tenant. For the purpose of this Section 14.1, ownership of stock or partnership interests shall be determined in accordance with the principles set forth in Section 544 of the Internal Revenue Code of 1986, as amended, or the corresponding provisions of any subsequent law. If, whether by operation of law or otherwise this Lease is assigned, or the Premises or any part thereof are sublet or occupied by any Person other than Tenant, or this Lease or the Premises are encumbered, then Landlord may, after default by Tenant beyond applicable grace or notice periods, collect rent from the assignee, subtenant or occupant, and apply the net amount collected to Fixed Rent and Additional Rent, but no assignment, subletting, occupancy or collection shall be deemed a waiver by Landlord of the provisions hereof, the acceptance by Landlord of the assignee, subtenant or occupant as a tenant, or a release by Landlord of Tenant from the further

45

performance by Tenant of its obligations under this Lease, and Tenant shall remain fully liable therefor. The consent by Landlord to any assignment or subletting shall not in any way be construed to relieve Tenant from obtaining the express consent in writing of Landlord to any further assignment or subletting. In no event shall any permitted subtenant assign or encumber its sublease or further sublet all or any portion of its sublet space, or otherwise suffer or permit the sublet space or any part thereof to be used or occupied by others, except in accordance with this Lease. Any assignment, sublease, mortgage, pledge, encumbrance, underlet, license or transfer in contravention of the provisions of this Article 14 shall be void and shall constitute a default hereunder. The limitations set forth in this Section 14.1 shall be deemed to apply to subtenant(s), assignee(s) and any guarantor(s) of this Lease.

    **Section 14.2**  (a)    Anything in the foregoing Section 14.1 to the contrary notwithstanding, transactions with an entity (i) into or with which Tenant is merged or consolidated or created by a reorganization or recapitalization, (ii) to which substantially all of the stock in Tenant or Tenant's assets are transferred as a going concern, (iii) which results in a change in Control of Tenant, or (iv) to which a majority of Tenant's stores in the City of New York (but no less than three (3) stores) are assigned ("Permitted Transferees"), shall not require the consent of Landlord; provided that, in the event of any of such transfers (whether effectuated through a single transaction or a series of transactions): (1) ) the business and activities of such successor to Tenant shall not diminish the value of the Building and such business and activities constitute the Permitted Use in accordance with the provisions of Article 2 hereof; (2) the successor to Tenant agrees, by written instrument in form reasonably satisfactory to Landlord, to be bound by all the obligations of Tenant hereunder, including, without limitation, the limitations relating to assignment and subletting, it being understood that Landlord shall be specifically named as a third party beneficiary under such written agreement; (3) in no event shall Tenant be released from its obligations under this Lease other than as specifically hereinafter provided; (4) the successor to Tenant has a tangible net worth at least equal to the greater of (x) the tangible net worth of Tenant as of the date of this Lease and (y) the tangible net worth of Tenant as of the date of such transfer; (5) any such transfer or transaction is for a legitimate, regular business purpose of Tenant other than a transfer of Tenant's interest in this Lease or avoiding the obligations under this Lease, including Section 14.9; and (6) a duplicate original of the instrument of transfer shall be delivered to Landlord within ten (10) Business Days after the effective date thereof. Notwithstanding the foregoing, a transfer of all or substantially all of Tenant's assets that does not include this Lease or Tenant's operations in the Premises, shall be an assignment for purposes of this Article 14 and shall be subject to Section 14.1.

        (b)    Anything in the foregoing Section 14.1 to the contrary notwithstanding, an assignment or subletting to an Affiliate of Tenant shall not require the consent of Landlord; provided that (i) the assignee or subtenant agrees directly with the Landlord, by written instrument in form reasonably satisfactory to Landlord, to be bound by all the obligations of Tenant hereunder (except that in case of a sublease, such obligations shall be limited to the rent and additional rent payable thereunder, (ii) in no event shall Tenant be released from its obligations under this Lease, (iii) any such transfer or transaction is for a legitimate, business purpose of Tenant and not principally for the purpose of effectuating a transfer of Tenant's interest in this Lease, (iv) appropriate evidence that such Person is an Affiliate is delivered to Landlord, and (v) as to Affiliates of Tenant other than Affiliates of

46

Original Tenant, the business and activities of such Affiliate shall not diminish the value of the Building and such Affiliate shall operate solely for the Permitted Use.

(c)     If any Person to whom Tenant shall have assigned this Lease or sublet all or any portion of the Premises pursuant to and in accordance with this Section 14.2 shall thereafter cease to be an Affiliate of Tenant, then the continuation of such Person's tenancy or subtenancy, as applicable, after the date such Person shall cease to be an Affiliate of Tenant, shall be subject to Landlord's consent pursuant to Section 14.6 (it being agreed, however, that Landlord shall not be entitled to exercise its rights under Section14.5 hereof in connection therewith).  In the event Tenant shall assign this Lease or sublet all or any part of the Premises to an Affiliate of Tenant in accordance with this Section 14.2, the parties agree that if such Affiliate desires to assign this Lease or sublet all or any part of the Premises to a Person other than an Affiliate of Tenant, then the provisions of this Article 14 shall apply with respect thereto and for purposes of calculating profits Sections 14.9(a)(i) and (ii) shall apply, but the sums to be paid to Landlord shall be calculated as if the sublet or assignment to an Affiliate of Tenant had not occurred and the sublease and assignment were made directly by Tenant.

**Section 14.3**   (a)     Offer Notice.  Prior to subletting all the Premises or assigning this Lease within the meaning of this Article 14 (other than to Permitted Transferees or Affiliates) Tenant shall submit to Landlord a notice (any such notice being hereinafter called an "Offer Notice"), which may or may not be based upon a bona fide written offer from an independent third party or such third party's broker.  If Tenant shall have received and negotiated a bona fide written offer from an independent third party or such third party's broker, the Offer Notice shall contain the information set forth in clauses (i), (ii) and (iii) below.  If Tenant shall not have received and negotiated a bona fide written offer from an independent third party or such third party's broker, the Offer Notice shall contain the information set forth in clause (ii) below.

(i)     the name and address of the proposed subtenant or assignee and a brief description of such Person's business, such Person's proposed use of the Premises, such financial information in respect of such Person as Landlord may reasonably request (Landlord agreeing to hold any such financial information in confidence and make no disclosure thereof except to Landlord's accountants and attorneys, a Mortgagee or Superior Lessor, and otherwise as required by law), the identity of any broker entitled to a commission in respect of such subletting or assignment and the commission, if any, payable to such broker, and any other information reasonably requested by Landlord;

(ii)     a description of all of the material economic terms and conditions of the proposed subletting or assignment (including, without limitation, with respect to a subletting, the proposed fixed rent, additional rent, base amounts or years, if any, free rent and other concessions, if any, the term, the party responsible for the cost of physical separation and end of term restoration, and other similar, material proposed terms and conditions) setting forth all consideration to be received by Tenant for or in connection with such subletting or assignment (including, without limitation, any payment to be made for Tenant's Property or leasehold improvements) and the terms of payment therefor.  The effective date of the proposed sublease or assignment shall be at least forty-five (45) days but not more than twelve (12) months after the date of the giving of such notice, and the offer shall be conditioned on Landlord's consent thereto and shall comply with the provisions of Section 14.6; and

47

(iii)   executed copies of all other agreements, if any, relating to the proposed assignment or sublease and, if not fully disclosed by such agreements, a statement of all consideration to be received by Tenant for or in connection with such assignment or sublease (including, without limitation, any payment to be made for Tenant's Property or leasehold improvements or consideration relating to another transaction with Tenant or its Affiliates) and the terms of payment therefor.

(b)   <u>Preliminary Approval</u>.   Subject to Landlord's recapture rights under <u>Section 14.5</u> hereof, and subject to Landlord's final approval under <u>Section 14.6</u> hereof, as applicable, if the Offer Notice is based upon a bona fide written offer from an independent third party and contains the information required by <u>Section 14.3(a)</u> above, Landlord shall, within thirty (30) days after receipt of such Offer Notice approve or disapprove the identity of the proposed subtenant or assignee, which approval shall not be unreasonably withheld provided that the conditions of <u>Section 14.6</u> shall be satisfied.

**Section 14.4**   Intentionally Omitted.

**Section 14.5**   <u>Landlord's Right to Terminate</u>.

(a)   Upon receipt of any Offer Notice in which Tenant proposes to assign this Lease, or in which Tenant proposes to sublet the Premises, then and in either of such events Landlord shall have the right, exercisable by notice to Tenant given within forty-five (45) days after Landlord receives Tenant's Offer Notice, and in addition to the other rights granted Landlord under this <u>Article 14</u>, to terminate this Lease, in which event this Lease shall terminate on the date fixed in the Offer Notice, which shall not be less than thirty (30) days after the giving of such notice, with the same force and effect as if the termination date fixed in Landlord's notice were the date originally fixed in this Lease as the Expiration Date.   In the event Landlord elects to terminate this Lease pursuant to this Section 14.5(a), Landlord shall Landlord shall reimburse Tenant for then (as of the termination date of the Lease) unamortized (based on a straight-line amortization over the initial 15 year term of this Lease) cost of Tenant's Initial Alterations (less the costs of Landlord's Work and amount of Landlord's Contribution), provided Tenant provides Landlord with reasonable documentation of such costs and expenses, including copies of paid bills and invoices.

**Section 14.6**   (a)   If Landlord does not exercise any option granted to Landlord by <u>Section 14.5</u> and provided that no monetary or material non-monetary Event of Default shall have occurred and be continuing under this Lease as of the time Landlord's consent is requested by Tenant, Tenant may request Landlord's approval to assign or sublease its rights under this Lease.   Landlord agrees not to unreasonably withhold, condition or delay its consent (which must be in writing) to the proposed assignment or sublease for the Permitted Use.   Notwithstanding anything to the contrary contained herein, the terms of the assignment or sublease, as the case may be, shall conform to the terms of the Offer Notice and as a condition to the effectiveness of any such assignment or sublease the following shall be true in all respects:

48

(i)       Tenant shall have complied with the provisions of Section 14.3 hereof, and Landlord shall not have exercised any of its options thereunder within the time permitted therefor;

(ii)      The proposed assignee or subtenant is engaged in a business or activity, and the Premises, or the relevant part thereof, will be used in a manner, which (A) is in keeping with the then standards of the Building, (B) is limited to Permitted Use in accordance with Article 2 hereof, and (C) shall not use the Premises for a use that Landlord may have granted an exclusive right for such use to another tenant or a perspective tenant or any use which is otherwise restricted pursuant to the terms of this Lease and the Declaration;

(iii)     The business and activities of such proposed assignee or subtenant shall not diminish the value of the Building, and, such proposed assignee shall have sufficient financial worth considering the responsibility involved, and Landlord has been furnished with reasonable evidence of such financial worth;

(iv)     In the event Landlord has retail space in the Building available for lease for a substantially equivalent term and which is reasonably comparable to the space which is the subject of such proposed assignment or subletting, the proposed assignee or subtenant is not a Person with whom Landlord or Landlord's agent is then actively negotiating in connection with the rental of comparable space in the Building or has negotiated in connection with the rental of comparable space in the Building at any time during the immediately preceding three (3) month period;

(v)      The form of the proposed sublease or instrument of assignment shall be reasonably satisfactory to Landlord and shall comply with the applicable provisions of this Article 14, and Tenant has delivered a true and complete original, fully executed counterpart of such sublease or other instrument to Landlord promptly after the execution and delivery thereof;

(vi)     The economic and other material terms of any sublease or assignment shall conform to those set forth in the Offer Notice pursuant to Section 14.6 hereof, as applicable;

(vii)    Tenant and its proposed subtenant or assignee, as the case may be, shall execute and deliver to Landlord an agreement in a form reasonably acceptable to Landlord setting forth the terms and conditions upon which Landlord shall have granted its consent to such assignment or subletting, and the agreement of Tenant and such subtenant or assignee, as the case may be, to be bound by the provisions of this Article 14;

(viii)   any subletting shall comprise of the entire Premises and not a portion thereof;

(ix)     Tenant shall reimburse Landlord, as Additional Rent within thirty (30) days after demand, for (A) the reasonable, actual out-of-pocket costs and expenses incurred by Landlord in connection with the assignment or sublease, including the costs of making

49

investigations as to the acceptability of the proposed assignee or subtenant and the cost of reviewing plans and specifications proposed to be made in connection therewith and (B) Landlord's reasonable out-of-pocket legal fees and disbursements actually incurred in connection with the granting of any requested consent and the preparation of Landlord's consent to the sublease or assignment;

(x)    Tenant shall not have advertised or publicized in any way the rental rate for the Premises  without prior notice to and approval of Landlord, which approval may be withheld by Landlord in its sole and absolute discretion;

(xi)    The proposed occupancy shall not (A) impose an extra material burden upon services to be supplied by Landlord to Tenant or (B) increase Operating Expenses with respect to the Premises;

(xii)    The proposed subtenant or assignee shall not be entitled, directly or indirectly, to diplomatic or sovereign immunity and shall be subject to the service of process in, and the jurisdiction of the courts of, New York State, or shall agree to consent thereto; and

(xiii)   No subletting shall be for a term of less than twelve (12) months.

(b)    Each sublease pursuant to this Section 14.6 shall be subject to all of the covenants, agreements, terms, provisions and conditions contained in this Lease. Notwithstanding any such sublease or any acceptance of Fixed Rent or Additional Rent by Landlord from any subtenant, Tenant will remain fully liable for the payment of the Fixed Rent and Additional Rent due and to become due hereunder and for the performance of all the covenants, agreements, terms, provisions and conditions contained in this Lease on Tenant's part to be observed and performed, and for all acts and omissions of any licensee or subtenant or anyone claiming under or through any subtenant which shall be in violation of any of the obligations of this Lease, and any such violation shall be deemed to be a violation by Tenant. If Landlord shall decline to give its consent pursuant to the provisions of this Lease, to any proposed assignment or sublease, or if Landlord shall exercise its options under Section 14.5 hereof, Tenant shall indemnify, defend and hold harmless Landlord against and from any and all losses, liabilities, damages, costs, and expenses (including reasonable attorneys' fees and disbursements) resulting from any claims that may be made against Landlord by the proposed assignee or subtenant arising from or in connection with such proposed assignment or subletting (such indemnity shall not be applicable if it is determined by a court of competent jurisdiction with the burden of proof on Tenant that Landlord acted in so-called "bad faith" in declining to give its consent), or by any brokers or other Persons (with whom Tenant or its proposed assignee or subtenant may have dealt) claiming a commission or similar compensation in connection with the proposed assignment or sublease.

Section 14.7   If Landlord grants its preliminary consent to a proposed assignment or subletting under Section 14.3(b) and such assignment or sublease has not been executed for any reason not caused by a default by Landlord under this Lease within one hundred and fifty (150) days after the granting of such preliminary consent, or if Landlord grants its final consent to a proposed assignment or subletting under Section 14.6 and such assignment or sublease has not been executed for any reason not caused by a default by Landlord under this Lease within one

50

hundred fifty (150) days after the granting of such consent, or if the material economic terms of such assignment or sublease is modified or amended prior to its becoming effective, then and in any such event Landlord's consent shall be deemed to have been withdrawn and Tenant shall not have the right to assign this Lease or to sublease the Premises without once again complying with all of the provisions and conditions of this Article 14. In no event shall Tenant modify or amend the economic terms of any assignment or sublease or modify or amend any other material terms of any assignment or sublease to which Landlord has finally consented under Section 14.6 without Landlord's prior written consent, such consent not to be unreasonably withheld or delayed. In addition, in the event that the applicable assignment or sublease does not conform to the terms of the Offer Notice (as defined in Section 14.3(a) hereof), then and in any such event Landlord's consent shall be deemed to have been withdrawn and Tenant shall not have the right to assign this Lease or to sublease the Premises without once again complying with all of the provisions and conditions of this Article 14.

Section 14.8    With respect to each and every sublease authorized by Landlord under the provisions of this Lease:

(a)    No sublease shall be for a term ending later than one day prior to the Expiration Date of this Lease;

(b)    No sublease shall be delivered, and no subtenant shall take possession of the Premises or any part thereof, until an executed counterpart of such sublease has been delivered to Landlord;

(c)    Each sublease shall contain the condition and restriction that the sublease shall not be assigned, encumbered or otherwise transferred or the subleased premises further sublet by the sublessee in whole or in part, or any part thereof suffered or permitted by the sublessee to be used or occupied by others, without the prior written consent of Landlord in each instance; and

(d)    Each sublease shall be subject and subordinate to this Lease and to the matters to which this Lease is or shall be subordinate, and each subtenant by entering into a sublease is deemed to have agreed that in the event of termination, re-entry or dispossession by Landlord under this Lease, Landlord may, at its option, take over all of the right, title and interest of Tenant, as sublandlord, under such sublease, and such subtenant shall, at Landlord's option, attorn to Landlord as sublandlord under such sublease for the balance of the term and on all of the then executory provisions of such sublease, except that Landlord shall not (i) be liable for any previous act or omission of Tenant under such sublease, (ii) be subject to or liable for any credit, counterclaim, offset or defense, which theretofore accrued to such subtenant against Tenant, (iii) be bound by any rent which such subtenant might have paid for more than the current month to Tenant, (iv) be required to account for any security deposit other than the security deposit actually delivered to Landlord, (v) be liable for any brokerage commission payable in connection with such sublease or any renewal thereof, (vi) be bound by any amendment, modification or surrender of such sublease made without Landlord's prior written consent, such consent not to be unreasonably withheld or delayed, other than modifications which do not increase Landlord's obligations, decrease Tenant's obligations or increase Tenant's rights, (vii) be liable for any claim for damages of any kind whatsoever as the result of any

51

breach by Tenant that occurred before the date of attornment, (viii) be bound by any obligation to restore the Building, such subtenant's premises or property located therein in the event of a casualty or condemnation of the Building or such subtenant's premises or any portion thereof except as required by this Lease, or (ix) be obligated to perform, or be liable for any payment to such subtenant of any sums or the granting to such subtenant of any credit in the nature of a contribution toward the cost of, any work in the subleased space or to prepare it for occupancy beyond Landlord's obligations under this Lease, and in connection with such attornment, the subtenant shall execute and deliver to Landlord any instruments Landlord may reasonably request to evidence and confirm such attornment. Each subtenant or licensee of Tenant shall be deemed, automatically upon and as a condition of its occupying or using the Premises or any part thereof, to have agreed to be bound by the terms and conditions set forth in this Article 14. The provisions of this Article 14 shall be self-operative and no further instrument shall be required to give effect to this provision.

**Section 14.9** (a)    If Landlord shall consent to any assignment of this Lease or to any sublease, or if Tenant shall enter into any other assignment or sublease permitted hereunder, Tenant shall, in consideration therefor, pay to Landlord, as Additional Rent the following amounts ("Transaction Profits"), after first deducting therefrom (but not below zero) Transaction Expenses (as hereinafter defined) incurred by Tenant in connection with such assignment or subletting:

(i)    in the case of an assignment, an amount equal to fifty percent (50%) of all sums and other consideration payable to or for the benefit of Tenant by the assignee for or by reason of such assignment (including sums paid for (A) Tenant's Property which are in excess of fair market value thereof and (B) fixtures and leasehold improvements less the then unamortized cost therefore as reflected in Tenant's books and records).

(ii)    in the case of a sublease, an amount equal to fifty percent (50%) of all rents, additional charges or other consideration payable to or for the benefit of Tenant under or by reason of the sublease in excess of the Fixed Rent and Additional Rent payable during the term of the sublease in respect of the subleased space (at the rate per square foot payable by Tenant hereunder) pursuant to the terms hereof (including sums paid for (A) the sale or rental of Tenant's Property which are in excess of fair market value thereof and (B) fixtures or leasehold improvements less the then unamortized cost therefore as reflected in Tenant's books and records).

"Transaction Expenses" shall mean to the extent actually paid by Tenant to unrelated third parties, (A) the reasonable out-of-pocket costs and expenses of Tenant in entering into the sublease or assignment, such as customary real estate brokerage commissions, legal and architectural fees, and advertising fees paid to unrelated third parties, (B) free rent, rent concessions or rent abatements solely to the extent of any Rent payable by Tenant to Landlord for the portion of the Term during which the free rent or rent abatement period under the sublease occurs, (C) the cost of improvements, construction contributions or alterations made by Tenant expressly and solely for the purpose of preparing the space for such tenancy and in no event to include costs expended for Tenant's Initial Alterations, and (D) any work allowance or other monetary concession actually paid to the assignee or subtenant as the case may be (i.e., exclusive of Landlord's Contribution).

52

The sums payable under this Section 14.9 shall be paid by Tenant to Landlord as Additional Rent as and when paid by the subtenant or assignee to Tenant.  In the case of a sublease, Transaction Expenses may be deducted from amounts which otherwise would be payable to Landlord under this Section 14.9, without interest, as and when actually expended.

**Section 14.10** (a)    Each permitted assignee or transferee shall assume and be deemed to have assumed the obligations of Tenant under this Lease to be performed, or arising or accruing, on and after the effective date of such assignment or transfer and shall be and remain liable jointly and severally with Tenant for the payment of Rent, and for the due performance of all the terms, covenants, conditions and agreements herein contained on Tenant's part to be performed for the remainder of the Term.  With respect to any assignment or transfer (other than an assignment by operation of law), whether made with Landlord's consent pursuant to Section 14.1 hereof or without Landlord's consent to the extent permitted under Sections 14.2 hereof, Landlord shall have the right to require that the assignee execute and deliver to Landlord within thirty (30) days after such assignment or transfer an agreement in a form reasonably acceptable to Landlord whereby the assignee shall assume the obligations of this Lease on the part of Tenant to be performed or observed from and after the effective date of such assignment or transfer, and whereby the assignee shall agree that the provisions in Article 14 hereof shall, notwithstanding such assignment or transfer, continue to be binding upon it in respect of all future assignments and transfers.  In connection with any assignment of this Lease by operation of law, Tenant shall provide Landlord with a written instrument confirming such assignment in form and substance reasonably satisfactory to Landlord within thirty (30) days after the effective date of such assignment.

(b)    The joint and several liability of Tenant and any immediate or remote successor in interest of Tenant and the due performance of the obligations of this Lease on Tenant's part to be performed or observed shall not be discharged, released or impaired in any respect by any agreement or stipulation made by Landlord, or any grantee or assignee of Landlord by way of mortgage or otherwise, extending the time, or modifying any of the obligations of this Lease, or by any waiver or failure of Landlord, or any grantee or assignee of Landlord by way of mortgage or otherwise, to enforce any of the obligations of this Lease.

(c)    The listing of any name other than that of Tenant, whether on the doors of the Premises or the Building directory, or otherwise, shall not operate to vest any right or interest in this Lease or in the Premises, nor shall it be deemed to be the consent of Landlord to any assignment or transfer of this Lease or to any sublease of Premises or to the use or occupancy thereof by others.

**Section 14.11** Tenant covenants and agrees that no security agreement, whether by way of conditional bill of sale, chattel mortgage or instrument of similar import, shall be placed upon any improvement at the Premises which is affixed to the Real Property.

ARTICLE 15

ACCESS TO PREMISES; BASE BUILDING UPGRADE WORK

**Section 15.1**   Subject to the provisions of <u>Sections 10.12</u> and <u>10.13</u> hereof, Tenant shall permit Landlord, Landlord's agents and public utilities servicing the Building to erect, use and maintain concealed ducts, concealed pipes and concealed conduits in and through the Premises. The foregoing installations shall be concealed behind then existing walls and ceilings of the Premises if reasonably feasible and permitted under applicable Legal Requirements; provided however, in no event shall any such systems interfere with Tenant's intended use of the Premises for the Permitted Use or any of Tenant's Alternations or installations and shall be constructed in an architecturally harmonious manner. Landlord or Landlord's agents shall have the right to enter the Premises at all reasonable times and from time to time upon reasonable prior notice (except no such prior notice shall be required in case of emergency), to examine the same, to show them to prospective purchasers, Mortgagees, Superior Lessors or ground lessees of the Building and their respective agents and representatives or, during the last six (6) months of the Term, to prospective tenants of the Premises, and to make such repairs, alterations, improvements or additions (a) which constitute Landlord Repairs, or (b) which Landlord may elect to perform following Tenant's failure (after the expiration of all applicable notice and grace periods) to make repairs or perform any work which Tenant is obligated to make or perform under this Lease, and Landlord shall be allowed to take all material into and upon the Premises that may be required therefor without the same constituting an eviction or constructive eviction of Tenant in whole or in part, and except as otherwise provided in this, Rent will not be abated while such repairs, alterations, improvements or additions are being made, by reason of loss or interruption of the business of Tenant, or otherwise.  Landlord shall use reasonable efforts to perform such work in such a manner so as to minimize the extent and duration of any interference that might be occasioned to Tenant's business operations and to minimize any damage that might result to the appearance or function of the affected areas of the Premises or to Tenant's Property.  Further, Landlord shall restore or replace any of Tenant's Property that is adversely affected or damaged by any such work.  Supplementing the provisions of this Section 15.1, Landlord agrees that any pipes, ducts or conduits installed in or through the Premises during the Term pursuant to the provisions hereof, shall be tight to the structure to the extent possible and either be concealed behind, beneath or within partitioning, columns, ceilings or floors, or completely furred at points immediately adjacent to partitioning, columns or ceilings, and that when the installation of such pipes, ducts or conduits shall be completed, such pipes, ducts or conduits shall not reduce the usable area of the Premises, materially reduce the interior ceiling heights by more than a de minimis amount, interfere with Tenant's Alterations or installations and be constructed in an architecturally harmonious manner.

**Section 15.2**   If Tenant shall not be present when for any reason entry into the Premises shall be necessary because of an emergency or if otherwise permissible under this Lease, Landlord or Landlord's agents may enter the same without rendering Landlord or such agents liable therefor (if during such entry Landlord or Landlord's agents shall accord reasonable care to Tenant's Property and notify Tenant immediately thereafter), and without in any manner affecting this Lease, provided, that Landlord shall use reasonable efforts, other than in an emergency, to give Tenant the opportunity to have a representative present upon Landlord's entry into the Premises.  If Tenant has not provided Landlord with keys to the Premises and if

54

Tenant shall not be present when for any reason entry into the Premises shall be necessary because of an emergency, Landlord may forceably enter the Premises. In such event, if Tenant is not present when Landlord leaves the Premises, Landlord shall use its reasonable efforts to secure the Premises.

**Section 15.3**   Landlord shall have the right from time to time to alter the Building and, without the same constituting an actual or constructive eviction and without incurring any liability to Tenant therefor (except in the case of Landlord's negligence or misconduct), to change the arrangement or location of entrances or passageways, doors and doorways, and corridors, elevators, stairs, toilets, or other public parts of the Building, <u>provided</u> that such alterations or changes do not change in any regard Tenant's layout, the square footage of the Premises (other than to a de minimis extent), or access to the Premises, interfere with any of Tenant's installations or Alterations and shall be constructed in an architecturally harmonious manner.

**Section 15.4**   Except as provided in Section 2.3, all parts of all walls, windows and doors bounding the Premises (including exterior Building walls, exterior core corridor walls, exterior doors and entrances other than doors and entrances exclusively servicing the Premises, all balconies, terraces and roofs adjacent to the Premises, all space in or adjacent to the Premises used for shafts, stacks, stairways, chutes, pipes, conduits, ducts, fan rooms, heating, air cooling, plumbing and other mechanical facilities, mechanical rooms, service closets (including electrical and janitorial closets) and other Building facilities may not be used by Tenant (other than the portions of such systems exclusively serving the Premises), and Landlord shall have the use thereof, as well as reasonable access thereto through the Premises for the purposes of operation, maintenance, alteration and repair, subject to the provisions of <u>Sections 15.1</u> and <u>15.2</u>,

## ARTICLE 16

## CERTIFICATE OF OCCUPANCY

**Section 16.1**   Tenant shall not at any time use or occupy the Premises in violation of the certificate of occupancy at such time issued for the Premises or for the Building and in the event that any Governmental Authority shall hereafter contend or declare by notice, violation, order or in any other manner whatsoever that the Premises are used for a purpose which is a violation of such certificate of occupancy, then, Tenant shall, upon five (5) days' written notice from Landlord or any Governmental Authority, immediately discontinue such use of the Premises. Landlord shall maintain the certificate of occupancy (or an equivalent replacement thereof) for the core and shell of the Building in effect. Tenant shall be obligated to maintain a temporary certificate of occupancy for the Premises which permits use thereof for the Permitted Use. Landlord warrants and represents that on the Delivery Date the temporary certificate of occupancy for the Building permits the use of the Premises as Use Group 6.

## ARTICLE 17

## DEFAULT

**Section 17.1**   Each of the following events shall be an "Event of Default" hereunder:

00295140.10

(a)    if Tenant defaults in the payment when due of any installment of Fixed Rent or Additional Rent (as hereinafter defined) and such default continues for a period of ten (10) days after receipt by Tenant from Landlord of an invoice therefor or any notice of default in respect thereof; provided that the foregoing notice and/or grace periods shall not apply in the event Tenant fails to pay more than two (2) installments of Fixed Rent or Additional Rent when due in any twelve (12) month period; or

(b)    if Tenant admits in writing its inability to pay its debts as they become due; or

(i)    if Tenant commences or institutes any case, proceeding or other action (A) seeking relief as a debtor, or to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, or (B) seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its property; or

(ii)    if Tenant makes a general assignment for the benefit of creditors; or

(iii)    if any case, proceeding or other action is commenced or instituted against Tenant (A) seeking to have an order for relief entered against it as debtor or to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, or (B) seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its property, in each case which remains undismissed for a period of one hundred twenty (120) days; or

(iv)    if any case, proceeding or other action is commenced or instituted against Tenant seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its property which results in the entry of an order for any such relief which has not been vacated, discharged, or stayed or bonded pending appeal within ninety (90) days from the entry thereof; or

(v)    if a trustee, receiver or other custodian is appointed for any substantial part of the assets of Tenant or any guarantor, which appointment is not vacated or effectively stayed within seventy (70) Business Days, or if any such vacating or stay does not thereafter remain in effect; or

(c)    if Tenant fails to maintain any of the insurance required to be maintained by Tenant hereunder or to deliver certificates or copies thereof when required hereunder and Tenant fails to remedy such default within ten (10) Business Days after notice by Landlord to Tenant specifying such default; or

(d)    if an assignment or subletting shall occur or if Tenant's interest in this Lease or the Premises shall devolve upon or pass to any person or entity, whether by

operation of law or otherwise, and whether directly or indirectly, except as expressly permitted by Article 14 hereof and Tenant fails to remedy such default within fifteen (15) days after notice by Landlord to Tenant specifying such default, or

(e)    if Tenant shall fail to perform or observe some term or condition of this Lease which, because of its character, would immediately (i) jeopardize Landlord's interest in the Real Property (ii) have a material and adverse affect on the operation of the Building or any Building System, or (iii) have a material and adverse affect on the business operations of any occupant, and such failure continues for five (5) days after notice from Landlord to Tenant specifying such default, or, if such default is of such a nature that it cannot be completely remedied within said period of five (5) days, if Tenant fails to commence to remedy such default within such five (5) day period, or fails thereafter to diligently prosecute to completion all steps necessary to remedy such default; or

(f)    Intentionally Deleted; or

(g)    if Tenant defaults in the observance or performance of any other term, covenant or condition of this Lease on Tenant's part to be observed or performed and Tenant fails to remedy such default within thirty (30) days after notice by Landlord to Tenant specifying such default, or, if such default is of such a nature that it cannot be completely remedied within said period of thirty (30) days, if Tenant fails to commence to remedy such default within such thirty (30) day period, or fails thereafter to diligently prosecute to completion all steps necessary to remedy such default; or

(h)    If, at any time, (i) Tenant shall comprise two (2) or more Persons, (ii) Tenant's obligations under this Lease shall have been guaranteed by any Person other than Tenant, or (iii) Tenant's interest in this Lease shall have been assigned, the word "Tenant", as used in Section 17.1(c), shall be deemed to mean any one or more of the Persons primarily or secondarily liable for Tenant's obligations under this Lease. Any monies received by Landlord from or on behalf of Tenant during the pendency of any proceeding of the types referred to in Section 17.1(c) shall be deemed paid as compensation for the use and occupation of the Premises and the acceptance of any such compensation by Landlord shall not be deemed a waiver on the part of Landlord of any rights hereunder.

**Section 17.2**    Conditions of Limitation. If an Event of Default occurs, Landlord may serve a written five (5) day notice of termination of this Lease upon Tenant, and, upon the expiration of said five (5) day period, this Lease and the Term and all rights of Tenant under this Lease shall end, expire and terminate as fully and completely as if the expiration of said five (5) day period were the date set forth herein as the Expiration Date and Tenant immediately shall quit and surrender the Premises, but Tenant shall remain liable as hereinafter provided. If the notice provided for in this Section 17.2 shall have been given and the Term shall expire as aforesaid, then Landlord may, without notice, re-enter the Premises and dispossess Tenant and recover possession of the Premises by summary proceedings and in such manner as set forth in Article 18 and the legal representative of Tenant or other occupant of the Premises and remove their effects and hold the Premises as if this Lease had not been made, and Tenant hereby waives the service of notice of intention to re-enter or to institute legal proceedings to that end. Anything contained herein to the contrary notwithstanding, (a) if such termination shall be stayed

57

by order of any court having jurisdiction over any proceeding described in Section 17.1(c), or by federal or state statute, then, following the expiration of any such stay, (b) if the trustee appointed in any such proceeding, Tenant or Tenant as debtor-in-possession shall fail to assume Tenant's obligations under this Lease within the period prescribed therefor by law or within one hundred twenty (120) days after entry of the order for relief or as may be allowed by the court, or (c) if said trustee, Tenant or Tenant as debtor-in-possession shall fail to provide adequate protection of Landlord's right, title and interest in and to the Premises or adequate assurance of the complete and continuous future performance of Tenant's obligations under this Lease, Landlord, to the extent permitted by law or by leave of the court having jurisdiction over such proceeding, may serve a written five (5) day notice of the termination of this Lease upon Tenant, Tenant as debtor-in-possession or said trustee and upon the expiration of said five (5) day period this Lease shall cease and expire as set forth above and Tenant, Tenant as debtor-in-possession or said trustee shall immediately quit and surrender the Premises as aforesaid.

ARTICLE 18

REMEDIES AND DAMAGES.

**Section 18.1**    (a)    If an Event of Default shall occur, and this Lease and the Term shall expire and come to an end as provided in Article 17:

(i)    Tenant shall quit and peacefully surrender the Premises to Landlord, and Landlord and its agents may at any time after the date upon which this Lease and the Term shall expire and come to an end, re-enter the Premises or any part thereof, without further notice, either by summary proceedings, or by any other applicable legal action or proceeding, and may repossess the Premises and dispossess Tenant and any other Persons from the Premises and remove any and all of their property and effects from the Premises; and

(ii)    Landlord, at Landlord's option, may relet the whole or any part or parts of the Premises from time to time, either in the name of Landlord or otherwise, to such tenant or tenants, for such term or terms ending before, on or after the Expiration Date, at such rental or rentals and upon such other conditions, which may include concessions and free rent periods, as Landlord, in its sole discretion, may determine; provided, however, that Landlord shall have no obligation to relet the Premises or any part thereof and shall in no event be liable for refusal or failure to relet the Premises or any part thereof, or, in the event of any such reletting, for refusal or failure to collect any rent due upon any such reletting, and no such refusal or failure shall operate to relieve Tenant of any liability under this Lease or otherwise affect any such liability, and Landlord, at Landlord's option, may make such repairs, replacements, alterations, additions, improvements, decorations and other physical changes in and to the Premises as Landlord, in its sole discretion, considers advisable or necessary in connection with any such reletting or proposed reletting, without relieving Tenant of any liability under this Lease or otherwise affecting any such liability.

(b)    Tenant, on its own behalf and on behalf of all Persons claiming through or under Tenant, including all creditors, hereby waives any and all rights which Tenant and all such Persons might otherwise have under any present or future law to redeem the Premises, or to re-enter or repossess the Premises, or to restore the operation of this Lease, after (i) Tenant shall

58

have been dispossessed by a judgment or by warrant of any court or judge, or (ii) any expiration or termination of this Lease and the Term, whether such dispossession, re-entry, expiration or termination shall be by operation of law or pursuant to the provisions of this Lease. The words "re-enter," "re-entry" and "re-entered" as used in this Lease shall not be deemed to be restricted to their technical legal meanings.

Section 18.2    (a)    If this Lease and the Term shall expire and come to an end as provided in Article 17, or if Landlord shall re-enter by or under any summary proceeding or any other legal action or proceeding, then, in any of such events:

(i)    Tenant shall pay to Landlord an amount equal to all Rent payable under this Lease by Tenant to Landlord from the Rent Commencement Date to the date upon which (i) this Lease and the Term shall have expired and come to an end or (ii) Landlord shall have re-entered or taken possession of the Premises;

(ii)    Tenant also shall be liable for and shall pay to Landlord, as liquidated damages, any deficiency (the "Deficiency") between (A) Rent for the period from the Rent Commencement Date through the date which otherwise would have constituted the expiration date of the Term (conclusively presuming the Additional Rent for each year thereof to be the same as was payable for the year immediately preceding such termination or re-entry increased by an amount to take into account an increase in the CPI), and (B) the net amount, if any, of rents collected under any reletting effected pursuant to the provisions of Section 18.1(a)(ii) for any part of such period (first deducting from the rents collected under any such reletting all of Landlord's expenses in connection with the termination of this Lease, Landlord's re-entry upon the Premises and with such reletting including all repossession costs, brokerage commissions, reasonable legal expenses, reasonable attorneys' fees and disbursements, alteration costs and other commercially reasonable expenses of keeping the Premises in good order or the for preparing the Premises for such reletting); provided that if the Premises or any part thereof should be relet in combination with other space or for a term which extends beyond the Expiration Date, then proper apportionment (on a per Rentable Square Foot basis in the case of a reletting in combination with other space) shall be made of the rent received from such reletting and of the expenses of reletting. Tenant shall pay the Deficiency in monthly installments on the days specified in this Lease for payment of installments of Fixed Rent, and Landlord shall be entitled to recover from Tenant each monthly Deficiency as the same shall arise. No suit to collect the amount of the Deficiency for any month shall prejudice Landlord's right to collect the Deficiency for any subsequent month by a similar proceeding; and

(iii)    whether or not Landlord shall have collected any monthly Deficiency as aforesaid, Landlord shall be entitled to recover from Tenant, and Tenant shall pay to Landlord, on demand, in lieu of any further Deficiency as and for liquidated and agreed final damages, a sum equal to (A) the amount by which Rent for the period from the Rent Commencement Date through the date which otherwise would have constituted the expiration date of the Term (conclusively presuming the Additional Rent for each year thereof to be the same as was payable for the year immediately preceding increased each year by the CPI Fraction) exceeds (B) the then fair and reasonable rental value of the Premises, including Additional Rent for the same period, both discounted to present value at six (6%) percent, less (C) the aggregate amount of Deficiencies previously collected by Landlord pursuant to the provisions of Section

59

18.2(a)(ii) for the same period. If, before presentation of proof of such liquidated damages to any court, commission or tribunal, Landlord shall have relet the Premises or any part thereof on an arm's length basis for the period which otherwise would have constituted the unexpired portion of the Term, or any part thereof, the amount of net rents collected in connection with such reletting shall be deemed, *prima facie*, to be the fair and reasonable rental value for the part or the whole of the Premises so relet during the term of the reletting.

(b)    If Landlord shall relet the Premises, or any part thereof, together with other space in the Building, the net rents collected under any such reletting and the expenses of any such reletting shall be equitably apportioned for the purposes of this Section 18.2. Tenant shall in no event be entitled to any rents collected or payable under any reletting, whether or not such rents shall exceed the Fixed Rent reserved in this Lease. Nothing contained in Article 17 or this Article 18 shall be deemed to limit or preclude the recovery by Landlord from Tenant of any sums or damages to which Landlord may be entitled in addition to the damages set forth in this Section 18.2 (it being agreed, however, that the only damages that Landlord is entitled to in respect of Tenant's failure to pay Rent for the remainder of the Term in the event of the termination of this Lease by reason of Tenant's default are as set forth in this Section 18.2).

ARTICLE 19

FEES AND EXPENSES

**Section 19.1**    (a)    If an Event of Default shall occur under this Lease or if Tenant shall do or permit to be done any act or thing upon the Premises which would cause Landlord to be in default under this Lease or if Tenant shall fail to comply with its obligations under this Lease and the preservation of property or the safety of any tenant, occupant or other person is imminent, Landlord may, after reasonable prior notice to Tenant except in an emergency (in which event Landlord shall provide Tenant with such notice as is reasonably practicable under the circumstances), if Tenant has not cured such Event of Default, perform the same for the account of Tenant or make any expenditure or incur any obligation for the payment of money for the account of Tenant; provided, that any expenditures or costs incurred by Landlord under this Section 19.1(a) for the performance of Tenant's obligations shall be reasonable. All amounts actually expended by Landlord in connection with the foregoing, including reasonable out-of-pocket attorneys' fees and disbursements in instituting, prosecuting or defending any action or proceeding or recovering possession of the Premises, and the cost thereof, with interest thereon at the Default Rate, shall be deemed to be Additional Rent hereunder and shall be paid by Tenant to Landlord within thirty (30) days of rendition of any bill or statement to Tenant therefor.

(b)    If for any reason any suit is initiated between Landlord and Tenant to interpret or enforce any provision of this Lease, the prevailing party in such suit shall be entitled to recover from the other party all reasonable out-of-pocket legal costs incurred by such prevailing party in connection with such dispute.

**Section 19.2**    If Tenant shall fail to pay all or any part of any installment of Fixed Rent and/or Additional Rent when due (each, a "Late Payment"), Tenant shall pay to Landlord, in addition to such installment of Fixed Rent and/or Additional Rent, as the case may be, as a late

charge and as Additional Rent, a sum equal to interest at the Default Rate on the amount unpaid, computed from the date the Late Payment was due to and including the date of payment.

## ARTICLE 20

## REPRESENTATIONS BY LANDLORD

**Section 20.1**   Except as expressly set forth in this Lease, neither Landlord nor any Landlord Party has made any warranties, representations, statements or promises with respect to (a) the rentable and usable areas of the Premises or the Building, (b) the amount of any current or future Operating Expenses or Taxes, (c) the compliance with applicable Legal Requirements of the Premises or the Building, or (d) the suitability of the Premises for any particular use or purpose.  Except as expressly set forth herein, no rights, easements or licenses are acquired by Tenant under this Lease, by implication or otherwise.  This Lease (including any Exhibits and Schedules referred to herein and all supplementary agreements provided for herein) contains the entire agreement between the parties and all understandings and agreements previously made between Landlord and Tenant are merged in this Lease, which alone fully and completely expresses their agreement.  Tenant is entering into this Lease after full investigation, and is not relying upon any statement or representation made by Landlord or Landlord Party not embodied in this Lease.

## ARTICLE 21

## END OF TERM

**Section 21.1**   All Tenant's Property shall remain the property of Tenant and may be removed by Tenant at any time during the Term.  Upon the expiration or other termination of this Lease, Tenant shall quit and surrender to Landlord the Premises, vacant, broom-clean and in good condition, ordinary wear and tear, damage caused by fire or other casualty or condemnation and damage for which Tenant is not responsible under the terms of this Lease excepted, and Tenant shall remove all of Tenant's Property and the Non-Standard Alterations which must be removed by Tenant pursuant to Section 4.4 (except as otherwise expressly set forth in this Lease) from the Premises to the extent required under Article 4.  Tenant shall repair any damage to the Premises occasioned by the removal by Tenant or any person claiming under Tenant of any of Tenant's Property and all Non-Standard Alterations from the Premises.  Tenant's obligations pursuant to this Article 21 shall survive the expiration or sooner termination of the Term.  If the last day of the Term or any renewal thereof falls on Saturday or Sunday, this Lease shall expire on the Business Day next succeeding such day.  Tenant expressly waives, for itself and for any Person claiming through or under Tenant, any rights which Tenant or any such Person may have under the provisions of Section 2201 of the New York Civil Practice Law and Rules and of any successor law of like import then in force in connection with any holdover summary proceedings which Landlord may institute to enforce the foregoing provisions of this Article 21.

**Section 21.2**   (a)   Tenant agrees that if for any reason Tenant or any subtenant of Tenant shall fail to vacate and surrender possession of the Premises or any part thereof on or before the expiration or earlier termination of this Lease and the Term, then Tenant's continued possession of the Premises shall be as a month-to-month tenancy, during which time, without

61

prejudice and in addition to any other rights and remedies Landlord may have hereunder or at law, Tenant shall (1) pay to Landlord an amount per month (the "Holdover Amount") equal to (A) during the first sixty (60) days of any such holding over, one hundred and fifty percent (150%) of the total monthly amount of Fixed Rent payable hereunder prior to such termination, plus Additional Rent payable hereunder, (B) during the next six (6) months of any such holding over, one hundred seventy five percent (175%) of the total monthly amount of Fixed Rent payable hereunder prior to such termination, plus Additional Rent payable hereunder and (C) thereafter, two hundred percent (200%) of the greater of (x) the total monthly amount of Fixed Rent and regularly recurring Additional Rent payable hereunder prior to such termination and (y) the then current market rent for the Premises and (2) comply with all other terms and conditions of this Lease. The provisions of this Section 21.2 shall not in any way be deemed to (i) permit Tenant to remain in possession of the Premises after the Expiration Date or sooner termination of this Lease or (ii) imply any right of Tenant to use or occupy the Premises upon expiration or termination of this Lease and the Term, and no acceptance by Landlord of payments from Tenant after the Expiration Date or sooner termination of the Term shall be deemed to be other than on account of the amount to be paid by Tenant in accordance with the provisions of this Article 21. Landlord waives no rights against Tenant by reason of accepting any holding over by Tenant, including without limitation the right to terminate such month-to-month tenancy as provided by law at any time after the expiration of the Term and any right to damages in the event that Tenant's holding over causes Landlord to suffer any loss. Any determination of "market rent" pursuant to this Section 21.2(a) shall be made taking into consideration all relevant market factors. Tenant's obligations under this Article 21 shall survive the expiration or earlier termination of this Lease.

(b)    Notwithstanding anything herein to the contrary, Tenant shall indemnify and save Landlord harmless against all costs, claims, loss or liability resulting from delay by Tenant in surrendering the Premises upon expiration or sooner termination of the Term, including, without limitation, any claims made by any succeeding tenant founded on such delay or any lost profits, losses, costs, expenses or liability payable to such tenant as a result thereof.

ARTICLE 22

QUIET ENJOYMENT

Provided this Lease is in full force and effect, Tenant (and any Person claiming by, through or under Tenant who is permitted to enjoy the Premises pursuant to the terms hereof) may peaceably and quietly enjoy the Premises without hindrance or molestation by Landlord or by any other person lawfully claiming the same, subject to the covenants, agreements, terms, provisions and conditions of this Lease and to any Superior Leases and any Mortgages to which this Lease is subject and subordinate (taking into account the provisions of any Non-Disturbance Agreements entered into with the Superior Lessor and/or Mortgagee), as hereinbefore set forth.

00295140.10

ARTICLE 23

NO WAIVER; NON-LIABILITY

**Section 23.1**   No act or thing done by Landlord or Landlord's agents during the Term shall be deemed an acceptance of a surrender of the Premises, and no agreement to accept such surrender shall be valid unless in writing and signed by Landlord.   No employee of Landlord or of Landlord's agents shall have any power to accept the keys of the Premises prior to the termination of this Lease.   Unless pursuant to a written agreement of termination or the natural expiration of the Lease, the delivery of keys to any employee of Landlord or of Landlord's agents shall not operate as a termination of this Lease or a surrender of the Premises.

**Section 23.2**   The failure of Landlord to seek redress for violation of, or to insist upon the strict performance of, any covenant or condition of this Lease, or any of the Rules and Regulations set forth or hereafter adopted by Landlord shall not prevent a subsequent act, which would have originally constituted a violation, from having all of the force and effect of an original violation.   The receipt by Landlord of Fixed Rent and/or Additional Rent even with knowledge of the breach of any covenant of this Lease shall not be deemed a waiver of such breach.   No provision of this Lease shall be deemed to have been waived by either Landlord or Tenant, unless such waiver be in writing signed by the party against whom such waiver is claimed.   No payment by Tenant or receipt by Landlord of a lesser amount than the monthly Fixed Rent or any Additional Rent shall be deemed to be other than on account of the next installment of Fixed Rent or Additional Rent, as the case may be (unless such Fixed Rent or Additional Rent has been abated in accordance with the terms of this Lease), or as Landlord may elect to apply same, nor shall any endorsement or statement on any check or any letter accompanying any check or payment as Fixed Rent or Additional Rent be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such Fixed Rent or Additional Rent or pursue any other remedy in this Lease provided.   The consent or approval of Landlord or Tenant to or of any action by the other requiring such consent or approval shall not be construed to waive or render unnecessary Landlord's or Tenant's consent or approval to or of any subsequent similar act by the other. Unless otherwise expressly provided herein, references in this Lease to the consent or approval of either party shall be deemed to mean the written consent or approval of such party and no consent or approval of such party shall be effective for any purpose unless such consent or approval is set forth in a written instrument executed by such party.   Any right herein contained on the part of Landlord to terminate this Lease shall continue during any extension or renewal hereof and any default or Event of Default which occurs and is not cured prior to the commencement of a renewal term or extension of the Term shall continue as such in and during such renewal term or extension of the Term.

**Section 23.3**   If, at any time or from time to time, any windows of the Premises are temporarily blocked, darkened or bricked-up for any reason whatsoever outside of Landlord's reasonable control (except that Landlord shall have the right to erect hoisting on the exterior of the Building from time to time (without entering the Premises) which may darken windows of the Premises that are located beside such hoist, which hoist shall remain only for such time as is reasonably necessary for the construction requiring such hoist), or by Landlord in connection with the performance of repairs, maintenance or improvements to the Building, or if required by

63

any Legal Requirements, or if any of such windows are permanently blocked, darkened or bricked-up if required by any Legal Requirement or by reason of any construction upon property adjacent to the Real Property by parties other than Landlord or any Affiliate of Landlord (but unrelated to the Building), Landlord shall not be liable for any damage Tenant may sustain thereby and Tenant shall not be entitled to any compensation therefor nor abatement of Fixed Rent or Additional Rent nor shall the same release Tenant from its obligations hereunder nor constitute an eviction or constructive eviction of Tenant from the Premises.

**Section 23.4**   Tenant understands that it may be necessary for Landlord to erect a sidewalk bridge or scaffolding (collectively, "scaffolding") in front of the Building in connection with repairs or improvements to or expansion of the Building. Tenant agrees that the existence of such scaffolding will not entitle Tenant to make a claim against Landlord for damages or entitle Tenant to an abatement of Rent. Landlord agrees that (i) Landlord shall use its reasonable efforts (or use its reasonable efforts to cause the Condominium Board to use its reasonable efforts) to coordinate its use of the scaffolding with Tenant's Initial Alterations to the Premises so that such scaffolding will be removed, prior to Tenant's completion of its Initial Alterations or, alternatively, no scaffolding shall be installed until six months after Tenant opens for business in the Premises unless such installation is required by Legal Requirements in connection with work at the Building that is necessary to be undertaken immediately, (ii) Landlord will permit (or use its reasonable efforts to cause the Condominium Board to permit) Tenant to erect signs on the scaffolding to advertise Tenant's presence in the Building and (iii) in all events, Landlord will use its reasonable efforts (or use its reasonable efforts to cause the Condominium Board to use its reasonable efforts) to use such scaffolding for the shortest period of time necessary and, to the extent practical, will construct it in such a way as to minimize interference with access to and visibility of the Premises and the conduct of Tenant's business. Landlord will use its reasonable efforts (or use its reasonable efforts to cause the Condominium Board to use its reasonable efforts) to give Tenant at least thirty (30) days notice of the installation of such scaffolding

ARTICLE 24

WAIVERS

**Section 24.1   THE RESPECTIVE PARTIES HERETO SHALL AND THEY HEREBY DO WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER (EXCEPT FOR PERSONAL INJURY OR PROPERTY DAMAGE) ON ANY MATTERS WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS LEASE, THE RELATIONSHIP OF LANDLORD AND TENANT, TENANT'S USE OR OCCUPANCY OF THE PREMISES, OR FOR THE ENFORCEMENT OF ANY REMEDY UNDER ANY STATUTE, EMERGENCY OR OTHERWISE.   IF LANDLORD COMMENCES ANY SUMMARY PROCEEDING AGAINST TENANT, TENANT WILL NOT INTERPOSE ANY COUNTERCLAIM OF WHATEVER NATURE OR DESCRIPTION IN ANY SUCH PROCEEDING (UNLESS FAILURE TO IMPOSE SUCH COUNTERCLAIM WOULD PRECLUDE OR OTHERWISE PREJUDICE TENANT FROM ASSERTING IN A SEPARATE ACTION THE CLAIM WHICH IS THE SUBJECT OF SUCH COUNTERCLAIM), AND WILL NOT SEEK TO CONSOLIDATE SUCH PROCEEDING WITH ANY OTHER ACTION**

00295140.10

**WHICH MAY HAVE BEEN OR WILL BE BROUGHT IN ANY OTHER COURT BY TENANT**.

**Section 24.2** (a)    Tenant, for itself and any and all Persons claiming through or under Tenant, including its creditors, upon the termination of this Lease or expiration of the Term in accordance with the terms hereof, or in the event of entry of judgment for the recovery of the possession of the Premises in any judicial action or proceeding, or if Landlord shall reenter the Premises by any judicial action or proceeding, hereby waives any right of redemption provided or permitted by any statute, law or decision now or hereafter in force, and does hereby waive, surrender and give up all rights or privileges which it or they may or might have under and by reason of any present or future law or decision, to redeem the Premises or for a continuation of this Lease for the Term after having been dispossessed or ejected therefrom by process of law.

ARTICLE 25

INABILITY TO PERFORM

**Section 25.1**  Except as expressly provided in this Lease, the obligation of Tenant to perform all of the covenants and agreements hereunder on the part of Tenant to be performed, and the obligation of Landlord to perform all of the covenants and agreements hereunder on the part of Landlord to be performed, will not be affected, impaired or excused because Landlord or Tenant, as the case may be, is unable to fulfill any of its obligations under this Lease expressly or impliedly to be performed by Landlord or Tenant, as the case may be, or because Landlord or Tenant, as the case may be, is unable to make, or is delayed in making any repairs, additions, alterations, improvements or decorations or is unable to supply or is delayed in supplying any equipment or fixtures, unless Landlord or Tenant, as the case may be, is prevented or delayed from so doing by reason of Force Majeure (all of the foregoing, collectively, "Unavoidable Delays"); provided, however, in no event shall such party's financial inability to perform be an Unavoidable Delay.    Notwithstanding anything to the contrary set forth herein, Tenant's obligation to pay Rent hereunder shall not be affected hereby unless specifically provided for in this Lease.  Landlord and Tenant each shall notify the other as promptly as is reasonably practicable after learning of any Unavoidable Delays which prevent such party from fulfilling any of its obligations under this Lease, and after such initial notification promptly after request of the other party, Landlord or Tenant (as the case may be) shall notify the other party of the status of such delay.  Each party shall use all commercially reasonable efforts to mitigate the delay caused by any event of Unavoidable Delays to the extent reasonably commercially practicable, but without the necessity of employing overtime labor unless such party elects to do so within its sole discretion or unless the other party elects to pay for such overtime labor.

ARTICLE 26

BILLS AND NOTICES

**Section 26.1**  Except as otherwise expressly provided in this Lease, any bills, statements, consents, notices, demands, requests or other communications given or required to be given under this Lease shall be in writing and shall be given or rendered if by (i) hand delivery, (ii)

65

certified or registered United States mail, postage prepaid, return receipt requested, or (iii) expedited prepaid delivery service, by a recognized national overnight delivery service (e.g., Federal Express or UPS), with proof of delivery or attempted delivery required, in the case of (i), (ii) or (iii) above, in each case, addressed as shown below:

If to Tenant, as follows:

Guitar Center Stores, Inc.
5795 Lindero Canyon Road
Thousand Oaks, CA 91362
Attn: Robert J. Stannard


with a copy to:

Guitar Center Stores, Inc.
5795 Lindero Canyon Road
Thousand Oaks, CA 91362
Attn: Legal Department

If to Landlord, as follows:

AI 229 West 43rd Street Property Owner, LLC
232 West 44th Street, 1 Mezzanine
New York, New York 10036
Attention:  General Counsel

with copies to:

AI 229 West 43rd Street Property Owner, LLC
232 West 44th Street, 1 Mezzanine
New York, New York 10036
Attention:  Building Manager

and

Goldfarb & Fleece LLP
345 Park Avenue
New York, New York 10154
Attention:  Marc J. Becker, Esq.


and a copy of any default or termination notice to Landlord's Mortgagee and all Superior Lessors at an address to be provided by Landlord.

Such address may be changed by any party in a written notice to the other parties hereto in the manner provided for in this Article 26.  A notice shall be deemed to have been given:  in

66

the case of hand delivery, at the time of delivery or refusal to accept delivery; in the case of registered or certified mail or expedited prepaid delivery, upon delivery or refusal to accept delivery; or in the event of failure to deliver by reason of changed address of which no notice was given or refusal to accept delivery, as of the date of such failure or refusal. Any notice to be given by any party may be given by such party's attorney.

ARTICLE 27

RULES AND REGULATIONS

**Section 27.1**  (a)    Annexed hereto as <u>Exhibit B</u> are the rules and regulations for the Building.  Annexed hereto as <u>Exhibit C</u> are the rules and regulations governing Alterations (<u>Exhibit B</u> and <u>Exhibit C</u> are collectively, the "<u>Rules and Regulations</u>").  Landlord reserves the right, from time to time, to adopt additional reasonable and non-discriminatory Rules and Regulations and to amend the Rules and Regulations then in effect, all upon reasonable advance notice to Tenant; provided that in no event shall any such amendments increase Tenant's obligations or decrease Tenant's rights, in either case, beyond a de minimis extent.  Tenant and Tenant's contractors, employees, agents, and licensees shall comply with the Rules and Regulations, as so supplemented or amended.  Landlord agrees that Landlord shall not adopt any new Rules or Regulations affecting only Tenant, or enforce any of the Rules and Regulations against Tenant which Landlord shall not then be generally enforcing against other office tenants or occupants of the Building, if any.  If there shall be any inconsistencies between this Lease and any Rules and Regulations (now existing or hereafter adopted), the provisions of this Lease shall prevail.  The failure of Landlord to enforce any of the Rules and Regulations set forth, or hereafter adopted, against Tenant or any other tenant in the Building shall not be deemed a waiver of any such Rules and Regulations.

(b)    Notwithstanding anything to the contrary contained in this Lease, the following provisions of Exhibit B shall not be applicable to Tenant or be amended as provided below:

(i)    Sections 2(b), (c) and (d) shall be deemed deleted;

(ii)    Sections 3(a), (c) and (d) shall be deemed deleted;

(iii)    Section 8(a) shall be subject to Tenant's rights in connection with Tenant's grand opening at the Premises as set forth in Section 2.2(f) of the Lease;

(iv)    Section 9(a) shall be deemed deleted;

(v)    Section 9(b) shall be amended by deleting the words "8 AM or after 6 PM" located on the 2nd line thereof and replacing and same with "10 AM or after 8 PM".  Landlord agrees that Tenant may prepare to commence any such work before 8PM provided that actual work generating the noise and/or vibrations does not commence before 8PM;

(vi)    Section 9(b) shall be further amended by adding the following at the end thereof: "Landlord and Tenant will reasonably cooperate with the other in

67

the performance of the foregoing portions of Tenant's Initial Alterations that such portions of Tenant's Initial Alterations may be completed in a timely manner without disruption or interference with the business of other tenants and occupants of the Building.";

(vii)    Section 10(b) shall be deemed deleted;

(viii)    Section 11 shall be amended by adding the following at the end thereof: "The terms of this Section 11 shall be subject to the terms of Section 10.4 of the Lease.";

(ix)    Section 13(b) shall be amended by deleting the following words: "and shall be......failure to do so";

(x)    Section 13(c) shall be amended by adding the following at the end thereof: "provided that such exterminator charges competitive rates within the market."

(xi)    Section 13(d) shall be amended by adding the following at the end of the first (1st) sentence thereof: "provided that such hauler charges competitive rates within the market."; and

(xii)    Section 15(b) shall be amended by adding the following at the beginning thereof: "Subject to the terms of Section 4.2 of the Lease and Article 11 of the Lease, ".

(c)    Notwithstanding anything to the contrary contained in this Lease, the following provisions of Exhibit C shall not be applicable to Tenant or be amended as provided below:

(i)    The fifth (5th) grammatical paragraph of Section IA shall be amended by adding the following at the end thereof: "In lieu of the foregoing "As Built" drawings, Tenant may deliver to the Building Manager a copy of the final working drawings marked to show as-built conditions.";

(ii)    The first (1st) grammatical sentence of Section IB is hereby amended by deleting the words "and environmental consultant";

(iii)    The first (1st) and second (2nd) grammatical sentence of Section IE are hereby deleted;

(iv)    Section IF shall be amended by adding the following at the end thereof "The terms of this Section IF are subject to the terms of Section 10.4 of the Lease.";

(v)    Section IG shall be amended by deleting the second (2nd) grammatical sentence thereof;

68

(vi)   The first (1st) grammatical sentence of Section II shall be amended by deleting the words "and sub-contractors";

(vii)   The eighth (8th) grammatical paragraph of Section II shall be amended by deleting the words "8:00AM or after 5PM" and replacing the same with the words "8:00AM or after 8PM.";

(viii)   The eighth (8th) grammatical paragraph of Section II is further amended by adding the following at the end thereof: "Landlord and Tenant will reasonably cooperate with the other in the performance of the foregoing portions of Tenant's Initial Alterations that such portions of Tenant's Initial Alterations may be completed in a timely manner without disruption or interference with the business of other tenants and occupants of the Building.";

(ix)   Clause (c) of the ninth (9th) grammatical paragraph (Fire Proofing) of Section II is amended by adding the following at the end thereof: "provided the building engineers are reasonably available to conduct such inspection";

(x)   Section 17 of Article III shall be amended by deleting the first (1st) and second (2nd) grammatical paragraphs thereof (i.e., the paragraphs beginning with the words ""Floor trenching"" and "Where the installation", respectively); and

(xi)   Article VIII shall be amended by adding the following at the beginning thereof: "Subject to the terms of Section 4.2 of the Lease and Article 11 of the Lease,".

ARTICLE 28

BROKER

**Section 28.1**   Each of Landlord and Tenant represents and warrants to the other that it has not dealt with any broker in connection with this Lease other than Bruce Shepard of SCG-Retail, and CBRE, Inc. (collectively, "Brokers") and that to the best of its knowledge and belief, no other broker, finder or similar Person procured or negotiated this Lease or is entitled to any fee or commission in connection herewith. Landlord shall be responsible for and pay all fees and commissions due to Brokers in connection with this Lease pursuant to separate agreement.

**Section 28.2**   Each of Landlord and Tenant shall indemnify, defend, protect and hold the other party harmless from and against any and all losses, liabilities, damages, claims, judgments, fines, suits, demands, costs, interest and expenses of any kind or nature, including reasonable attorneys' fees and disbursements, which the indemnified party may incur by reason of any claim of or liability to any broker, finder or like agent (other than Brokers) arising out of any dealings claimed to have occurred between the indemnifying party and the claimant in connection with this Lease, or arising from a breach by such party of the representation and warranty set forth in Section 28.1. Landlord shall indemnify, defend, protect and hold Tenant harmless from and

69

against any and all losses, liabilities, damages, claims, judgments, fines, suits, demands, costs, interest and expenses of any kind or nature, including reasonable attorneys' fees and disbursements, which Tenant may incur by reason of any claim of or liability to Brokers arising out of any dealings claimed to have occurred between the indemnifying party and the claimant in connection with this Lease.  The provisions of this Article 28 shall be subject to Sections 29.1 and shall survive the expiration or earlier termination of the Term.

ARTICLE 29

INDEMNITY

**Section 29.1**    (a)    To the maximum extent permitted by law, Tenant shall indemnify, defend and hold harmless Landlord and all Landlord Parties from and against any and all claims against any of such parties arising from (i) the use or occupancy of the Premises or any business therein, (ii) any work or thing whatsoever done, or any condition created in or about the Premises or (iii) any negligent act or omission, or willful misconduct, of Tenant or any Tenant Party, licensees or invitees, whether resulting in injury or death to persons or damage to property or otherwise; except, in each case, to the extent that any such claim results from the negligence or willful misconduct of Landlord or any other Landlord Party; together with all costs, expenses and liabilities incurred in or in connection with each such claim or action or proceeding brought thereon, including all reasonable attorneys' fees and expenses.  The indemnity contained in this Article shall survive the termination of this Lease.

(b)    If any claim that is within the scope of any indemnity set forth in this Lease is asserted against any indemnified party, then the indemnified party shall give prompt notice (each, an "Indemnified Party Notice") thereof to the indemnifying party (i.e., within a time period so as not to prejudice the indemnifying party's or its insurer's ability to defend effectively any action or proceeding brought on such claim) and subject to the terms hereof, the indemnifying party shall have the right to defend and control the defense of any action or proceeding brought on such claim with counsel chosen by the indemnifying party subject to the approval of the indemnified party (such approval not to be unreasonably withheld) or by the indemnifying party's insurance company.  If the indemnified party fails promptly to deliver the Indemnified Party Notice, the indemnifying party shall continue to be liable within the scope of the indemnity provided herein, provided, however, the indemnifying party shall not be liable for such loss sustained by any indemnified party as a result of the failure by the indemnified party to promptly deliver to the indemnifying party the Indemnified Party Notice.

(c)    To the maximum extent permitted by law, Landlord shall indemnify, defend and hold harmless Tenant and all Tenant Parties from and against from (i) the use of the Common Areas, (ii) any work or thing whatsoever done, or any condition created in or about the Common Areas, (iii) any and all claims against any of such parties arising from any negligent act or omission, or willful misconduct, of Landlord or any Landlord Party whether resulting in injury or death to persons or damage to property or otherwise or (iv) the untruth in any material respect of any of Landlord's representations set forth in Section 36.9 of this Lease; except, in each case, to the extent that any such claim results from the negligence or willful misconduct of Tenant or any other Tenant Party; together with all costs, expenses and liabilities incurred in or in

70

connection with each such claim or action or proceeding brought thereon, including all reasonable attorneys' fees and expenses.

## ARTICLE 30

### INTENTIONALLY OMITTED

## ARTICLE 31

### LANDLORD'S CONTRIBUTION

**Section 31.1**   (a)    Provided that this Lease shall be in full force and effect and no material default shall have occurred and be continuing hereunder, within thirty (30) days following the date of Tenant's demand accompanied by copies of all of Tenant's Permits (as defined Exhibit D), Landlord shall contribute Two Hundred Twenty Five Thousand ($225,000) Dollars (which is ninety (90%) of an amount ("Landlord's Contribution") equal to TWO HUNDRED FIFTY HUNDRED THOUSAND and 00/100 Dollars ($250,000.00)).

(b)    Any cost of Tenant's Initial Alterations in excess of Landlord's Contribution shall be paid by Tenant. No part of Landlord's Contribution may be assigned by Tenant prior to actual payment thereof by Landlord to Tenant.

(c)    Tenant's Initial Alterations for which Tenant has received payments from the Landlord's Contribution shall be the property of, and for federal income tax purposes shall be owned by, Landlord.

(d)    Notwithstanding anything to the contrary contained in this Article 31, in the event that this Lease is terminated, Landlord shall have no further obligations to pay to Tenant the Landlord's Contribution (except for portions of work already completed provided that such termination was not a result of a Tenant default)

**Section 31.2**   Landlord shall pay to Tenant the remaining Twenty Five Thousand ($25,000) Dollars (which is ten percent (10%) of Landlord's Contribution) within thirty (30) days following the Substantial Completion of Tenant's Initial Alterations and Tenant's demand accompanied by (i) copies of all governmental sign-offs and approvals with respect to Tenant's Initial Alterations, (ii) final lien waivers issued by all contractors, subcontractors and material suppliers providing services or materials in connection with Tenant's Initial Alterations and (iii) written certificate from Tenant's architect certifying that Tenant's Initial Alterations has been Substantially Completed substantially in accordance with the final plans as approved by Landlord.

00295140.10

ARTICLE 32

INTENTIONALLY DELETED

ARTICLE 33

OFAC LIST REPRESENTATIONS

**Section 33.1**    Tenant represents and warrants that it is not listed, nor is it owned or controlled by, or acting for or on behalf of any person or entity, on the list of Specially Designated Nationals and Blocked Persons maintained by the Office of Foreign Assets Control of the United States Department of the Treasury, or any other list of persons or entities with whom Landlord is restricted from doing business with ("OFAC List").    Notwithstanding anything to the contrary herein contained, Tenant shall not permit the Premises or any portion thereof to be used, occupied or operated by or for the benefit of any person or entity that is on the OFAC List. Tenant shall provide documentary and other evidence of Tenant's identity and ownership as may be reasonably requested by Landlord at any time to enable Landlord to verify Tenant's identity or to comply with any Legal request. Tenant shall indemnify and hold Landlord harmless from and against all losses, damages, liabilities, cost and expenses (including, without limitation, reasonable attorneys' fees and expenses) that are incurred by Landlord and/or its affiliate that derive from a claim made by a third party against Landlord and/or its affiliates arising or alleged to arise from a misrepresentation made by Tenant hereunder or a breach of any covenant to be performed by Tenant hereunder.

ARTICLE 34

INTENTIONALLY OMITTED

ARTICLE 35

INTENTIONALLY OMITTED

ARTICLE 36

MISCELLANEOUS.

**Section 36.1**    (a)    The obligations of Landlord under this Lease shall not be binding upon Landlord named herein after the sale, conveyance, assignment or transfer by such Landlord (or upon any subsequent landlord after the sale, conveyance, assignment or transfer by such subsequent landlord) of its interest in the Building or the Real Property, as the case may be, and in the event of any such sale, conveyance, assignment or transfer, Landlord shall be and hereby is entirely freed and relieved of all covenants and obligations of Landlord hereunder arising from and after such sale, conveyance, assignment or transfer, and the transferee of Landlord's interest in the Building or the Real Property, as the case may be, shall be deemed to have assumed all obligations under this Lease.   The liability of Landlord for Landlord's obligations under this Lease shall be limited to landlord's leasehold estate and interest in the Building and Tenant shall not look to any other property or assets of Landlord or the property or assets of any of the

72

Landlord Exculpated Parties in seeking either to enforce Landlord's obligations under this Lease or to satisfy a judgment for Landlord's failure to perform such obligations.

(b)    Except to the extent of Landlord's leasehold estate and interest in and to the Building, no recourse shall be had on any of Landlord's obligations under this Lease or for any claim based thereon or otherwise in respect thereof against any incorporator of Landlord, subscriber to Landlord's capital stock, shareholder, employee, agent, officer or director, past, present or future, of any corporation, or any partner or joint venturer of any partnership or joint venture, or any member of any limited liability company which shall be Landlord hereunder or included in the term "Landlord" or of any successor of any such corporation or limited liability company, or against any principal, disclosed or undisclosed, or any such corporation or limited liability company, or against any principal, disclosed or undisclosed, or any affiliate of any party which shall be Landlord or included in the term "Landlord", whether directly or through Landlord or through any receiver, assignee, agent, trustee in bankruptcy or through any other person, firm or corporation (collectively, the "Landlord Exculpated Parties"), whether by virtue of any constitution, statute or rule of law or by enforcement of any assessment or penalty or otherwise, all such liability being expressly waived and released by Tenant. Tenant shall look only and solely to Landlord's leasehold estate and interest in and to the Building and the rents and profits and proceeds therefrom for the satisfaction of any right of Tenant arising out of this Lease or for the collection of judgment or other judicial process in connection with this Lease and no other property or assets of any Landlord Exculpated Party shall be subject to levy, lien, execution, attachment, or other enforcement procedure for the satisfaction of Tenant's rights and remedies under or with respect to this Lease, the relationship of Landlord and Tenant hereunder or under law, or Tenant's use and occupancy of the Premises or any other liability of Landlord to Tenant.

**Section 36.2**    (a)    Wherever in this Lease Landlord's consent or approval is required, if Landlord shall refuse such consent or approval, Tenant shall not be entitled to make, nor shall Tenant make, any claim, and Tenant hereby waives any claim, for money damages (nor shall Tenant claim any money damages by way of set-off, counterclaim or defense) based upon any claim or assertion by Tenant that Landlord unreasonably withheld, unreasonably conditioned or unreasonably delayed its consent or approval except if it shall be determined in a court of competent jurisdiction in a final non-appealable order that in withholding any such consent, Landlord acted in bad faith, then this Lease shall not preclude Tenant from collecting any damages so ordered, subject to the provisions of Section 36.13. In such event, Tenant's sole remedies shall be, at Tenant's option, an action or proceeding to enforce any such provision, for specific performance, injunction or declaratory judgment. In no event shall Landlord's withholding consent or approval be deemed to be unreasonable if such withholding of consent is due to Landlord's failure to obtain the consent of a Mortgagee or Superior Lessor where said consent is required and Landlord has made reasonably diligent efforts to obtain same.

(b)    In the event of a breach or threatened breach by either party hereto of any term, covenant or condition of this Lease, the other party shall have the right to enjoin such breach and the right to invoke any other remedy allowed by law or in equity as if no remedies were provided in this Lease for such breach. The rights to invoke the remedies herein before set forth are cumulative and shall not preclude either party from invoking any other remedy allowed at law or in equity.

**Section 36.3** (a)    All of the Exhibits and Schedules attached to this Lease are incorporated in and made a part of this Lease. This Lease may not be changed, modified, terminated or discharged, in whole or in part, except by a writing, executed by the party against whom enforcement of the change, modification, termination or discharge is to be sought. Wherever appropriate in this Lease, personal pronouns shall be deemed to include the other genders and the singular to include the plural. The captions hereof are inserted only as a matter of convenience and for reference and in no way define, limit or describe the scope of this Lease nor the intent of any provision thereof. All Article and Section references set forth herein shall, unless the context otherwise specifically requires, be deemed references to the Articles and Sections of this Lease. Whenever the words "include," "includes," or "including" are used in this Lease, they shall be deemed to be followed by the words "without limitation."

(b)    This Lease shall be governed in all respects by the laws of the State of New York applicable to agreements executed in and to be performed wholly within New York including General Obligations Law 5-1401, but without giving effect to any other principles of conflict of laws.

(c)    If any term, covenant, condition or provision of this Lease, or the application thereof to any person or circumstance, shall ever be held to be invalid or unenforceable, then in each such event the remainder of this Lease or the application of such term, covenant, condition or provision to any other person or any other circumstance (other than those as to which it shall be invalid or unenforceable) shall not be thereby affected, and each term, covenant, condition and provision hereof shall remain valid and enforceable to the fullest extent permitted by law.

(d)    The covenants, conditions and agreements contained in this Lease shall bind and inure to the benefit of Landlord and Tenant and their respective legal representatives, successors, and, except as otherwise provided in this Lease, their assigns.

**Section 36.4    Intentionally Omitted**

**Section 36.5**    Notwithstanding anything to the contrary contained in this Lease:

(a)    Tenant acknowledges that it has reviewed the Declaration establishing a Plan for Condominium Ownership (the "Declaration") known as "229 West 43rd Street Condominium" (the "Condominium") and the by-laws in connection therewith (the "By-Laws"). The Premises constitute a portion of the Retail Unit located in the Condominium. In accordance with Section 9.3 of the Declaration, this Lease and Tenant's interest in and to the Premises is subject and subordinate in all respects to the Condominium Documents and all of the terms, conditions and provisions thereof and, at Landlord's request, Tenant shall execute any documents reasonably requested by Landlord to confirm such subordination. For all purposes of this Lease, the date of formation of the Condominium is deemed to be the date of filing of the Declaration with the NYC Department of Finance (i.e., July 20, 2011).

(b)    Landlord may consent to a modification of the Condominium Documents without in any instance obtaining the consent of Tenant to such modification; provided, however, that Landlord, without Tenant's consent, shall not voluntarily modify the Condominium

74

Documents if and to the extent that Tenant's rights or Landlord's obligations under this Lease would be decreased (except to a *de minimis* extent) or Tenant's obligations or Landlord's rights under this Lease would be increased (except to a *de minimis* extent), in each case as a result of such modification.

(c)     Tenant acknowledges that Landlord may be required by the Condominium Documents to obtain from time to time the consent or approval of the Condominium Board with respect to various matters, including consent or approval regarding the exercise by Landlord or Tenant of certain obligations or rights under this Lease. In each instance during the Term where Tenant desires to take or permit an action which requires the consent or approval of the Condominium Board, (i) Landlord shall reasonably cooperate with Tenant, at Tenant's expense, in seeking such consent or approval (but in no event shall Landlord be required to commence any litigation in connection therewith or have any liability to Tenant if the Condominium Board fails to grant such consent or approval), and (ii) if such action also requires Landlord's consent or approval hereunder, then the Condominium Board's consent shall first be obtained before the matter in question will be considered by Landlord, and if the Condominium Board fails to grant its consent or approval to any such matter (or has not yet granted such consent or approval by any outside date hereunder by which Landlord must grant or deny its consent or approval to such matter) then Landlord may withhold its consent or approval to such matter, even in instances where Landlord is required to be reasonable.

(d)     Landlord and Tenant, at all times during the Term, shall fully comply with all of Landlord's obligations under the Condominium Documents. Without limiting the generality of the preceding sentence, neither Landlord nor Tenant shall do or cause to be done or suffer or permit to be done any act or thing that would or might constitute a default on Landlord's part under the Condominium Documents or cause the Condominium Documents or the rights of Landlord thereunder to be terminated or that would or might cause Landlord to become liable for any damages, costs, claims or penalties or that would or might adversely affect or reduce any of Landlord's rights or benefits under the Condominium Documents.

(e)     Tenant shall reimburse Landlord for (or pay to Landlord) all fees and charges payable by Landlord under the Condominium Documents (except Operating Expenses and Taxes which shall be payable by Tenant in accordance with Article 7 hereof) that are by reason of Tenant's failure to comply with any of the provisions of the Condominium Documents.

(f)     Notwithstanding anything to the contrary contained in this Lease or at law or in equity, (a) the only services or rights to which Tenant is entitled hereunder are those to which Landlord is entitled under the Condominium Documents, and for all such services and rights, Tenant will look solely to the Condominium Board, and (b) Landlord assumes no obligation, liability or responsibility for any covenants, agreements, representations or warranties made by the Condominium Board under the Condominium Documents. Notwithstanding the foregoing, Landlord agrees to use reasonable efforts to cause the Condominium Board to comply with all of its obligations under the Condominium Documents which affect Tenant's use and enjoyment of the Premises and if no action has been taken by the Landlord, Tenant shall have the right to sue the Condominium Board on Landlord's behalf. Nothing contained in this paragraph (f) shall limit Tenant's rights and remedies otherwise set forth in this Lease.

**Section 36.6**   Except as expressly provided to the contrary in this Lease, Landlord and Tenant agree that all disputes arising, directly or indirectly, out of or relating to this Lease, and all actions to enforce this Lease, shall be dealt with and adjudicated in the courts of the State of New York or the Federal courts sitting in New York City; and for that purpose hereby expressly and irrevocably submit to the jurisdiction of such courts.

**Section 36.7**   If pursuant to the Federal Bankruptcy Code, Tenant is permitted to assign or otherwise transfer this Lease (whether in whole or in part in disregard of the restrictions contained in this Section 36.7 and Article 14), Tenant agrees that adequate assurance of future performance by the assignee or transferee permitted under the Federal Bankruptcy Code shall mean the deposit of cash security (or a letter of credit) with Landlord in an amount equal to the sum of one year's Fixed Rent then payable hereunder plus an amount equal to all Additional Rent payable to Landlord for the calendar year preceding the year in which such assignment is intended to become effective, which deposit shall be held by Landlord for the balance of the Term as security for the full and faithful performance of all of the obligations under this Lease on the part of Tenant yet to be performed.  If Tenant receives or is to receive any valuable consideration for such an assignment or transfer (in part or in whole) of this Lease, Landlord shall receive the same fifty percent (50%) of such consideration as Landlord would receive had the assignment or transfer (and the calculation thereunder) been made pursuant to Article 14. Nothing contained in this Lease shall limit or prejudice the right of Landlord to prove for and obtain, in proceedings for the termination of this Lease by reason of bankruptcy or insolvency, an amount equal to the maximum allowed by any statute or rule of law in effect at the time when, and governing the proceedings in which, the damages are to be proved, whether or not the amount be greater, equal to, or less than the amount of the loss or damages referred to above.

**Section 36.8**   If an excavation or other substructure work shall be made upon land adjacent to the Premises, or shall be authorized to be made, Tenant shall afford to the Person causing or authorized to cause such excavation, license to enter upon the Premises for the purpose of doing such work as shall be necessary to preserve the wall of the Building from injury or damage and to support the same by proper foundations without any claim for damages or indemnity against Landlord, or diminution or abatement of Rent.

**Section 36.9**   (a)      Landlord represents and warrants as of the Effective Date that (i) Landlord is a duly formed and validly existing limited liability company authorized to do business in the State of New York and (ii) the execution, delivery and performance by Landlord of this Lease has been duly authorized by all necessary limited liability company action.

(b)      Tenant represents and warrants as of the Effective Date that (i) Tenant is duly formed and validly existing, authorized to do business in the State of New York and (ii) the execution, delivery and performance by Tenant of this Lease has been duly authorized by all necessary corporate action.

(c)      Landlord further represents, warrants and covenants that, as of the date of this Lease:

76

(i)     To the best of Landlord's knowledge, without investigation other than as set forth in environmental reports delivered to Tenant prior to the date of this Lease, there are no Hazardous Materials, asbestos or mold in the Building;

(ii)    Landlord owns fee simple title to the Retail Unit;

(iv)    There exist no Mortgages other than mortgage held by Banco Inbursa;

(v)     There exist no Superior Leases;

(vii)   There are no pending or, to Landlord's knowledge without investigation, pending claims, actions, or legal proceedings affecting the Premises or the Real Property which would adversely affect Tenant's rights or obligations under this Lease;

(viii)  This Lease and the consummation of the transaction contemplated herein are valid and binding obligations of Landlord and do not constitute a default (or an event which, with the giving of notice or the passage of time, or both, would constitute a default) under, nor are they inconsistent with, any contract to which Landlord is a party or by which Landlord is bound, subject to obtaining Mortgagee consent;

(ix)    Landlord has the legal power, right and authority to enter into this Lease and perform its obligations hereunder;

(x)     That as of the date of this Lease, no person or entity (other than Tenant) will have any rights of possession or occupancy to the Premises; and

(xi)    That there are no tax abatements, reductions or other credits program in effect for the Building other than the ICIP.

**Section 36.10**  This Lease may be executed and delivered in any number of counterparts, each of which so executed and delivered shall be deemed to be an original and all of which shall constitute one and the same instrument.

**Section 36.11**  Notwithstanding anything herein to the contrary, it is to be strictly understood and agreed that (a) the submission by Landlord to Tenant of any drafts of this Lease or any correspondence with respect thereto shall (i) be deemed submission solely for Tenant's consideration and not for acceptance and execution, (ii) have no binding force or effect, (iii) not constitute an option for the leasing of the Premises or a lease or conveyance of the Premises by Landlord to Tenant and (iv) not confer upon Tenant or any other party any title or estate in the Premises, (b) the terms and conditions of this Lease shall not be binding upon either party hereto in any way unless and until it is unconditionally executed and delivered by both parties in their respective sole and absolute discretion and all other conditions precedent to the effectiveness thereof shall have been fulfilled or waived, and (c) if this Lease and other agreements are not so executed and delivered for any reason whatsoever (including, without limitation, either party's willful or other refusal to do so or bad faith), neither party shall be liable to the other with respect to this Lease on account of any written or parol representations or negotiations, or drafts, comments or correspondence between the parties or their respective agents or representatives on

any legal or equitable theory (including, without limitation, part performance, promissory estoppel, undue enrichment, fraud, breach of good faith negotiation obligation or otherwise).

**Section 36.12** Tenant acknowledges that Tenant has no right to any development rights, "air rights" or comparable rights appurtenant to the Land or the Building, and consents, without further consideration, to any utilization of such rights by Landlord and agrees to promptly execute and deliver any instruments which may be reasonably requested by Landlord evidencing such acknowledgment and consent, including, without limitation, any instruments merging zoning lots. The provisions of this Section 36.12 shall be deemed to be and shall be construed as an express waiver by Tenant of any interest Tenant may have as a "party in interest" (as such quoted term is defined in Section 12-10 Zoning Lot of the Zoning Resolution of The City of New York) in the Building or the Land.

**Section 36.13** Notwithstanding anything to the contrary contained herein, except as otherwise expressly set forth herein, neither Landlord nor Tenant shall be liable hereunder for any consequential, special or indirect damages to the other, other than Tenant's indemnification obligations as set forth in Section 21.2(b).

ARTICLE 37

RENEWAL OPTION

**Section 37.1**   Provided that this Lease shall be in full force and effect and no monetary or material non-monetary Event of Default shall have occurred and be continuing under this Lease, Tenant shall have the right, at its option (the "Renewal Option"), to renew the initial Term, as the same may be extended, of this Lease with respect to the entire Premises for three terms of five (5) years (each a "Renewal Term"), commencing on the day following the Expiration Date of the respective term (the "Renewal Term Commencement Date") and expiring on the fifth (5th) anniversary, of the respective Renewal Term Commencement Date (the "Renewal Term Expiration Date").

**Section 37.2**   In the event that Tenant elects to exercise any renewal option and the conditions precedent set forth in Section 37.1 are met, Tenant shall deliver notice to Landlord (each a "Renewal Notice"), no later than the date (the "Outside Exercise Date") which is twelve (12) months prior to the Expiration Date of the initial Term, or the respective Renewal Term of this Lease. Time shall be of the essence as to Tenant's giving of any Renewal Notice. If Tenant fails to timely give any Renewal Notice, Tenant shall have no further rights under this Article 37, and Landlord shall be under no further obligation to offer to renew or extend the Term. Each Renewal Term shall be on all the terms and conditions of this Lease except that the Fixed Rent for each Renewal Term shall be in the amount set forth on Exhibit E annexed hereto. In the event Landlord and Tenant are unable to agree upon the Fixed Rent for the second Renewal Term within ninety (90) days after the Outside Exercise Date, then either Landlord or Tenant may have such Fixed Rent determined as follows:

(a)    Within thirty (30) days after notice by either party requesting determination of the issue (i) the parties shall agree upon a single real estate appraiser or broker having at least ten (10) years of experience in either the appraising or the

78

leasing of first-class retail space in Manhattan (hereinafter referred to as the "Appraiser") to determine the Fixed Rent and (ii) each party shall simultaneously deliver to the other on a certain date reasonably agreed upon between Landlord and Tenant within such thirty (30) day period a determination (referred to as the "Fair Market Determination") of what it believes is the FMRV . If Landlord and Tenant shall have failed to agree upon the Appraiser within such period of thirty (30) days, then the Appraiser shall be appointed by the Real Estate Board of New York, or its successor.

(b)      Within ten (10) days following the selection or appointment of the Appraiser each party shall deliver to the Appraiser such party's Fair Market Determination.

(c)      The Appraiser forthwith shall determine the issue and render its decision as promptly as practicable choosing either Landlord's or Tenant's Fair Market Determination only (it being understood that the appraiser shall have no right to render an independent decision of the what it believes is the FMRV), and if only one (1) party submits a Fair Market Determination to the Appraiser then the Appraiser shall choose the Fair Market Determination so submitted, provided, however, in no event shall the Fixed Rent for the respective Renewal Term be less than the Fixed Rent in effect immediately prior to the respective Renewal Term Commencement Date.  The decision of the Appraiser shall be in writing and shall be final and binding upon Landlord and Tenant whether or not a judgment shall be entered in any court. Duplicate original counterparts of such decision shall be sent by the Appraiser to both Landlord and Tenant.

(d)      The Appraiser , in arriving at its decision as to which Fair Market Determination to accept, shall be entitled to consider all testimony and documentary evidence which may be presented at any hearing as well as facts and data which the Appraiser may discover by investigation and inquiry outside of such hearings.  The Appraiser shall be bound by the provisions of this Lease and shall not add to, subtract from, or otherwise modify such provisions.  The cost and expense of such determination shall be borne equally by Landlord and Tenant, except that each party shall pay its own counsel fees and expenses.

**Section 37.3**   If the final determination of Fixed Rent for the second Renewal Term shall not be made on or before the Renewal Term Commencement Date in accordance with the provisions of this Article 37, then pending such final determination, Tenant shall continue to pay the Fixed Rent in effect immediately prior to the Renewal Term Commencement Date. If, based upon the final determination of such Fixed Rent as provided herein, the payments made by Tenant on account of Fixed Rent for such Renewal Term were (A) less than the Fixed Rent as finally determined in accordance with the provisions hereof, Tenant shall pay to Landlord the amount of such deficiency, from the respective due dates therefor until paid, within thirty (30) days after demand therefor or (B) greater than the Fixed Rent as finally determined in accordance with the provisions hereof, Landlord shall credit the amount of such excess against the next installments of Fixed Rent due under this Lease, from the respective dates of overpayment until credited.

ARTICLE 38

SIGNAGE

**Section 38.1**  Subject to the terms of the Condominium Documents and except as otherwise provided in this Section 38.1 , Tenant shall not place or install any sign on the exterior of the Building (collectively, and/or individually, a "Building Exterior Sign"), nor place or install any sign on the storefront window or entrance door of the Premises (any such sign a "Window/Door Sign"), without first obtaining in each instance Landlord's prior written consent and approval; provided, however, that Tenant may utilize dignified interior signs and signs within the windows of the Premises including Window/Door Signs which are neat, professionally printed, not derogatory in nature to any other tenant in the Building and otherwise first-class and in good taste without obtaining Landlord's consent or approval. Paper signs are not permitted. Indoor decals shall not obscure more than 5% of the area of any external window. Tenant acknowledges that the foregoing is an essential condition of this Lease, it being Landlord's intention to prevent the diminishing of the dignity and character of the Building by Tenant's exhibiting or posting signs which would impair or lessen such character and dignity of the Building. Notwithstanding the foregoing, provided the same are consistent with a First Class Building, Tenant shall have the right to place its professional product photos in the storefront windows and entrance at the ground floor of the Premise without first obtaining in each instance Landlord's prior written consent and approval; provided such photographs comply with the conditions set forth above for Window/Door Signs installed without requiring Landlord's consent and are neat, professionally printed, not derogatory in nature to any other tenant in the Building and otherwise first-class and in good taste and such materials shall not be pornographic, contain lewd or portray scantily clad images, nor contain slogans, mottos or displays relating to social, political, or religious campaigns, all of which shall be and are prohibited.

**Section 38.2**  On or before January 31, 2014 Tenant shall deliver to Landlord for Landlord's review and approval the final design plans for Sign Plans (as defined in Exhibit D) as approved by Tenant.  Without limiting the generality of Section 38.1 above or the terms of Section 38.3 below and subject to Landlord's review and approval of the Sign Plans, Landlord hereby generally consents to the envelope for the location of the Building Exterior Sign as set forth on Exhibit G annexed hereto and made a part hereof.

**Section 38.3**  If Landlord shall give its written consent to any proposed Building Exterior Sign requested by Tenant, no material change in the composition, dimensions or content of such signs or advertising may thereafter be made without first obtaining Landlord's prior written consent thereto such consent not to be unreasonably withheld, conditioned or delayed in each instance provided that such changes to Tenant's Exterior Sign (i) comply with Legal Requirements, (ii) are within the envelope of Tenant's Exterior Sign as shown on Exhibit G, (iii) are consistent with other signage on the exterior of the Building, (iv) do not interfere with the exterior signage of other tenants or unit owners in the Building and (v) do not shine any light into any windows of the Building (other than incidental spread of the lighting).  Landlord will not install or construct any structures or improvements on the portion of the façade of the Building within the area shown on Exhibit G and labeled as "No Build Zone".

80

**Section 38.4**   Tenant, at Tenant's sole cost and expense, prior to installing or displaying any sign, as approved by Landlord, shall first apply for, obtain and thereafter maintain throughout the Term of this Lease all such sign permits as shall be required by any Legal Requirement presently existing or hereafter enacted of any Governmental Authority having jurisdiction for the installation, display and maintenance of any such sign (and Landlord shall reasonably cooperate with Tenant at no cost and expense to Landlord in connection therewith). On the expiration or sooner termination of the Term hereof, Tenant, at Tenant's sole cost and expense, shall (i) promptly remove all Building Exterior Signs installed or displayed by Tenant, and (ii) promptly repair in a good and workmanlike manner in conformity with Legal Requirements and all applicable provisions of this Lease, all damage to the Building caused by such removal.

[Signatures appear on the following page.]

00295140.10

IN WITNESS WHEREOF, Landlord and Tenant have respectively executed this Lease as of the date first set forth above.

**LANDLORD:**

**AI 229 WEST 43RD STREET
PROPERTY OWNER, LLC**

By: _____
Name:
Title:

By: _____
Name:
Title:

**TENANT:**

**GUITAR CENTER STORES, INC.**

By: _____
Name: TIM martin
Title: CFO

By: _____
Name:
Title:

82

IN WITNESS WHEREOF, Landlord and Tenant have respectively executed this Lease as of the date first set forth above.

**LANDLORD:**

**AI 229 WEST 43RD STREET PROPERTY OWNER, LLC**

By: _____
Name: Chagit Sofier-Leiter
Title: CEO

By: _____
Name: Damian Stein
Title: COO

**TENANT:**

**GUITAR CENTER STORES, INC.**

By: _____
Name:
Title:

By: _____
Name:
Title:

## EXHIBIT A

## PREMISES



DATE: 10.25.2013

EXISTING FLOOR PLAN

TIMES SQUARE, NY





THE
TIMES SQUARE
BUILDING
229W43

By **VNO**USA

At 229 West 43rd Street Property
Owner, LLC
229 West 43rd Street
New York, New York 10036
Dec 08, 2010

LEASE EXHIBIT "A"
CELLAR LEVEL

<u>**EXHIBIT B**</u>

<u>**RETAIL RULES AND REGULATIONS**</u>

# *229 West 43rd Street*

## RETAIL TENANTS RULES AND REGULATIONS

**Last updated 7/20/11**
**Building Rules and Regulations are subject to change.**

# TABLE OF CONTENTS

1. Egress Obstructions...............................................................................3

2. Signage...................................................................................................3

3. Window Obstructions.............................................................................3

4. Trash......................................................................................................4

5. Use of Premises.....................................................................................4

6. Hazardous Materials.............................................................................5

7. Alterations.............................................................................................5

8. Security..................................................................................................5

9. Tenant Disturbances.............................................................................6

10. Doors and Locks..................................................................................6

11. Freight Elevator and Loading Dock...................................................6

12. Tenant Requests..................................................................................7

13. 3rd Party Vendors...............................................................................7

14. Fire Safety...........................................................................................7

15. Insurance.............................................................................................8

16. Lease Conflict......................................................................................8

# RETAIL TENANTS RULES AND REGULATIONS

1. **Egress Obstructions**

   a. No tenant shall obstruct or encumber, fire doors or fire stairs, sidewalks, entrances, passages, lobbies, elevators, stairways, vestibules, corridors, halls and other public portions of the Building ("Public Areas")

   b. Fire exits and stairways are for emergency use only, and they shall not be used for any other purposes by any tenant, or the employees, agents, licensees or invitees of any Tenant. Fire stairs may not be used for travel between floors during times other than building emergencies. Fire stairs may not be used for storage of any tenant material or debris. Tenants may not install any type of locks, including fail safe locks, on designated re-entry floors.

   c. No doormat, garbage or garbage receptacle, showcase, furniture, or other article of any kind whatsoever shall be placed or left in the Public Areas or outside any tenant's premises, including the freight elevator lobby.

2. **Signage**

   a. Except in accordance with the signage program, no signs, advertisements, graphics or notices may be installed on the building exterior.

   b. Signs, advertisements, graphics and notices on building floors shall be subject to Building Management's approval; but this sentence shall not be applicable to signs installed by a tenant in an elevator lobby which is wholly within the premises demised to such tenant. Signs on each entrance door, or on any wall adjacent to an entrance door, of any tenant's premises must be approved by the Building Management and such approval shall not be unreasonably withheld.

   c. Any tenant shall have the right to display its name and/or logo at the entrance door to demised premises, subject to Building Management's prior written consent, such consent not to be unreasonably withheld or delayed. Signs shall, at the expense of the tenant, be inscribed, painted or affixed by sign makers selected by the Tenant and approved by Building Management, which approval shall not be unreasonably withheld.

   d. Building Management shall have the right to prohibit any advertising or identifying sign displayed by Tenant (excluding franchise, chain or NYC advertising campaign) which, in Building Management's reasonable judgment, tends to impair the reputation of the Building or its desirability and upon written notice from Building Management, Tenant shall refrain from and discontinue such advertising or identifying sign. In the event of the violation of any of the foregoing by any tenant, Building Management may remove the same without any liability and may charge the expense incurred in such removal to the tenant violating this rule.

3. **Window Obstructions**

   a. No tenant shall cover or obstruct sashes, sash doors, windows that reflect or admit light and air into the

halls, passageways or other public places in the Building or the heating, ventilation and air conditioning vents and doors, or (b) place any bottles, parcels or other articles on the window sills or on the peripheral HVAC enclosures.

b.  Building Management requires access to the window convector units for periodic maintenance. The convectors must be free of all obstacles in order to insure proper operation. Tenant shall not be permitted to block access to convector enclosures or place furniture on top or in front of such enclosures.

c.  All furniture and furniture systems must leave a six inch clearance for access to convectors.  Tenant shall not tamper with or attempt to adjust temperature sensing devices in the leased premises.  Building Management shall make adjustment in temperature upon request from Tenant.

d.  Tenant shall keep façade windows closed at all times.  Windows and window stops are not to be tampered with.

## 4.  Trash and Waste Disposal

a.  Tenant shall not  discharge, or permit to be discharged, acids, harmful vapors or other harmful materials into the waste lines, vents or flues of the Building; (b) use the water and wash closets and other plumbing fixtures for any purposes other than those for which they were designed and constructed, or throw or deposit therein sweepings, rubbish, rags, acids or other foreign substances; or (c) sweep or throw anything into the Public Areas or other areas of the Building, or into or upon any heating or ventilating vents or registers or plumbing apparatus in the Building, or upon adjoining buildings or land or the street.

b.  All damages resulting from any misuse of the fixtures shall be borne by the tenant who, or whose servants, employees, agents, visitors or licensees shall have caused the same.

c.  Tenants shall comply with the building recycling program. The key requirement of the program is to keep all recyclable paper waste (paper, junk mail, newspapers, magazines, paper bags, packaging paper, smooth cardboard, etc.) separate from non-recyclable waste such as coffee cups, plastic salad containers, and other food-related materials.

d.  Tenants shall comply with the recycling program for all bulbs and ballasts as well as e-waste such as computer monitors and towers. Building Management shall be notified via Angus when these types of items are in need of disposal.

e.  Wooden pallets and other irregular debris requires special pick up from the building carting vendor. Building Management shall be notified via Angus when these types of items are in need of disposal.

## 5.  Use of Premises

a.  Tenant shall not bring into or keep in or about its premises any bicycles, vehicles, animals (except seeing-eye dogs or other type of "service" animal), fish or birds of any kind.

b.  Canvassing, soliciting and peddling in the Building are prohibited and each tenant shall cooperate to

prevent the same.

c. Tenant shall be responsible for any odor emitting from cooking or any unusual or objectionable odors to emanate from the demised premises. If the odor is persistent Tenant to install necessary equipment to deal with the odor issues.

d. Vending machines shall be subject to Building Management approval excluding for Tenant employees.

e. Smoking is not permitted throughout the public portions or tenant spaces of the Building. No tenant may establish any smoking area within their demised premises.

f. No tenant shall use its premises for lodging or sleeping or for any immoral or illegal purpose.

6. **Hazardous Materials**

a. No tenant shall at any time bring or keep upon its premises any inflammable, combustible or explosive fluid, chemical or substance, except that, subject to the laws and the requirements of public authorities, a tenant may bring into its premises reasonable quantities of the foregoing products incident to the use of the premises by tenant in accordance with its lease.

7. **Alterations**

a. All alteration work shall be subject to reasonable inspection by Building Management. If base building systems are affected by such alteration or if Building Management notes a change from the original approved submission, Building Management reserves the right to obtain an outside consultant to review, and such supervision and inspection shall be at the Tenant's expense.

b. Each tenant shall, at the expense of such tenant, provide light, power and water for the employees of Building Management, and the agents, contractors and employees of Building Management, while doing janitor service, other cleaning or lighting services in the premises demised to such Tenant and while making repairs or alterations in its premises.

c. Tenant shall cooperate with Building Management in maintaining the leased premises.

d. For complete set of rules and regulations pertain to alteration guidelines, please reference Alteration Rules and Regulations.

8. **Security**

a. Queuing customers of the retail tenants will be allowed under supervision of retail Tenant security personnel or building security, with building security taking precedence. Security personnel must be stationed at the start of the line and patrol the line with additional security person(s). Portable extensions are to be set up, patrons shall line up where marked. Awaiting patrons are to be queued

as to not block other retail entrances, building entrances or egresses.

b. Building security reserves the right to inspect all objects and matter to be brought into and out of the Building.

c. Building security requires any person leaving the Building through common areas with any package or other object or matter to submit a pass, listing such package or object or matter, from the Tenant from whose premises the package or object or matter is being removed. But the establishment and enforcement or non-enforcement of such requirement shall not impose any responsibility or liability on Building Management for the protection of any Tenant against the removal of property from the premises of such tenant.

## 9. Tenant Disturbances

a. No tenant shall make, or permit to be made, any unseemly or disturbing noises or disturb or interfere with occupants of this or neighboring buildings, premises or common area or those having business with them whether by the use of any musical instrument, radio, television set, talking machine, unmusical noise, or in any other way. The maximum for noise transmission shall comply with NC-25 standard.

b. Demolition, floor or wall chopping, or core drilling may not take place during business hours. All such work must take place before 8 AM or after 6 PM and / or on non-business days. Building Management reserves the right to change the hours as deemed necessary so as not to interfere with the operations of adjacent tenants. Building Management reserves the right to stop any portion of the work being performed in the given work area for a period of time deemed appropriate, or take other such actions as necessary, if repeated abuse of this rule occurs.

## 10. Doors and Locks

a. Tenant shall not place or affix any additional locks, bolts or other access inhibiting device of any kind upon any of the doors connecting its premises to the building's electrical, telephone and mechanical closets, the Building's fire stairs, or any other of the Building's service areas.

b. Omitted

c. All entrance doors in each Tenant's premises shall be kept locked by such Tenant when its premises are not in use.

d. Building Management will maintain sole access to the building's electric closets and mechanical rooms. Requests for access must be made through Angus.

## 11. Freight Elevator and Loading Dock

a. Tenant shall not use any base building elevator (including without limitation freight elevator) during Loading Dock hours 8AM – 4:45PM on Business Days for any haulage of debris or any bulk deliveries of construction materials. However Tenants will be allowed to use freight elevator for a maximum of one trip during the day for furniture or similar items during Loading Dock hours. Notification via Angus must be made by Tenant for the moving of large quantities of furniture and equipment into or out of the Building or between floors of the Building. Tenant shall request reserved freight usage no less than 24 hours in advance. Freight usage will be provided on a first-come, first-served basis.

b. The hours of reservation for the freight elevator are subject to change from time to time as deemed necessary. Whenever Building Management shall permit Tenant to move any such goods, furniture, or equipment by way of the freight elevators, Tenant shall pay applicable freight charges as listed on the Tenant Rate Sheet. Any large deliveries which will require the loading dock to be open past its regular Loading Dock hours will carries a charge as listed on the Tenant Rate Sheet. Tenants shall be responsible for any damage caused to the elevator, or any other portion of the Building.

## 12. Tenant Requests

a. Building Management provide a wide variety of services to the Tenant. All Tenant service request shall be entered into Angus (Service Request System). Tenant service request shall be subject to rates as listed on the Tenant Rate Sheet.

## 13. 3rd Party Vendors

a. No Tenant shall purchase or contract for housekeeping, window washing, maintenance, electrical construction, engineering (e.g. telephone) or any other type of services in demised premises unless vendors are pre-approved by Landlord, which approvals shall not be unreasonably withheld.

b. Except as expressly stated in the lease, the Tenant agrees to work in harmony with trade unions and shall be responsible for any delays or damage caused by failure to do so.

c. Except as expressly stated in the lease, Tenants must use the base building exterminator as their service contractor and must have a contract in place with a copy of which is to be provided within 30 days of contract execution.

d. Tenants must use the base building waste hauler for services which are above and beyond building services. A copy of the contract is to be provided to the building management within 30 days of contract execution.

## 14. Fire Safety

a. Building is equipped with fire alarm system (Class E) throughout the building. No Tenant shall alter any portion of the existing system. Any work required to alter the system in accordance with Tenant alteration shall be submitted to the building office for approval prior to the starting of any work. Additions to or alterations thereof shall be performed in accordance with all governmental agencies having jurisdiction thereof. Tenant will be responsible for all governmental approvals. In order to

assure continuity, all program changes and final tie in will be performed by the building fire alarm maintenance contractor at the sole expense of the Tenant.

b. Fire safety drills are conducted every six months in accordance with New York City Code and Fire Department rules and regulations. In addition Tenants are to comply with Emergency Action drill in accordance with New York City Code. Tenants will be advised in advance of the date and time of each fire drill/action plan drill.

c. Tenant must have a fire warden/ emergency action warden, deputy fire wardens, and searchers who will be listed in the fire safety plan/ emergency action plan. Tenants are responsible for appointing individuals to serve in the named categories.

d. Building Management requires the names and home phone numbers of three managers, who can be called in the event of an emergency. The names and numbers are kept confidential and are on file in the Building Office.

e. Tenants must comply with all governmental safety codes. Portable electric, gas, fuel, water or other style portable heaters are not permitted.

## 15. Insurance

a. Proper insurance must be maintained for all contractors, vendors and delivery services performing work or making deliveries to the building.

b. The insurance coverage must be provided through an insurance company with an A.M. Best rating of "A-" "VII" or higher. A certificate indicating this coverage with separate Additional Insured Endorsement shall be on file in Building Management office. It is Tenants responsibility to update its vendor's certificate of insurance 30 days prior to certificate expiration dates.

## 16. Lease Conflict

a. If there shall be any inconsistencies between the Lease and these Rules and Regulations (now existing or hereafter adopted), the provisions of the Lease shall prevail, and no Rules or Regulations shall prohibit Tenant's usual and customary retail business practices or diminish Tenant's Rights or Landlord's obligation under the Lease.

**EXHIBIT C**
**ALTERATION RULES AND REGULATIONS**

# *229 West 43rd Street*

# ALTERATIONS RULES AND REGULATONS

**Updated 7/20/11**
**Alteration Rules and regulations are subject to change.**

{00295140.13} 1

# TABLE OF CONTENTS

I.    **GENERAL**

        A. Drawings/Submittals………………………………………3
        B. Permits/ Filing……………………………………………4
        C. MEP Coordination………………………………………4
        D. Equipment Access………………………………………4
        E. Hardware…………………………………………………4
        F. Freight Elevator and Loading Dock……………………4
        G. Common Area Protection…………………………………5
        H. Workers and Occupants Safety……………………………6
        I. Miscellaneous……………………………………………8

**HEATING, VENTILATING AND AIR CONDITIONING SYSTEMS**………10

**III. ELECTRICAL**………………………………………………13

**IV. LIFE SAFETY SYSTEMS**………………………………………15

**V. TELECOMMUNICATIONS SYSTEMS**…………………………15

**VI. PLUMBING SYSTEMS**…………………………………………16

**VII. FIRE PROTECTION**……………………………………………17

**VIII. NOTICE OF**……………………………………………………17

**IX. Exhibit**……………………………………………………………19

# TENANT ALTERATION REQUIREMENTS
## MECHANICAL, ELECTRICAL
## PLUMBING & FIRE PROTECTION

## I.   GENERAL

### A. Drawings/Submittals

Three (3) full sets of Drawings, one of which is to be signed and sealed, three (3) sets of specifications, three (3) sets of sprinkler hydraulic calculations must be submitted to the Building Manager for approval prior to proceeding with any installations and/or alterations.  Revisions to drawings and/or specifications must be resubmitted for approval and/or comment. Revisions must be clearly indicated on drawings and dated in a revision box with a description of the revision.  Allow a minimum of 15 business days for review of drawings.

Provide layout drawings indicating the weight, location and dimensions of heavy equipment in excess of 500 lbs. (vaults, rolling files, batteries, transformers, storage racks, A/C units, pumps, vending machines etc.) supported on floors or hung from building structure.  Provide layout drawings and details of all structural slab/wall openings, chasing of floor slabs and beam penetrations.  All such equipment installations and structural modifications are subject to approval of, and must be installed in accordance with, the recommendations of the Building's Structural Engineer.

Design and installation of all electrical, plumbing, HVAC, fire and life safety (Class "E") systems and equipment must be in compliance with the Building Manager's standards for the building, the Administrative Code of the City of New York, Rules of the City of New York and all other governing codes and standards.

Compliance with the New York State Energy Conservation Construction Code is the Tenants responsibility. If requested by the Building Manager, the Tenants Lighting Designer shall submit calculations demonstrating how compliance with lighting power limitations is achieved.

Upon completion of the project, Building Manager is to receive <u>two full sets of "As Built" drawings,</u> a CD with As Build drawings in CAD and PDF format and appropriate government agencies signoff including but not limited to Fire Department, Water/Sewer Department, Sprinkler/Fire Protection and Electrical etc.   In addition, Tenant shall provide in Excel format a summary of the connected and demand electrical load by phase for electrical panel boards and risers.

If any additional alterations are made within the occupant's space during the term of the lease, it shall be the Tenants responsibility to revise the "as-built" drawings and resubmit the package as per original

submittal requirement.

Tenants shall be responsible for any third party expenses incurred by the Building Management to review drawings, specifications etc.

**B.  Permits/ Filing**
Tenants must use building expeditor and environmental consultant.

All Building Department forms (i.e., Plan Work Approval [PW-1], Statement of Responsibility [TR-1], Plumbing Schedule) etc, must be completely filled in with the exception of Owner's Authorization as to applicant and plan responsibility and submitted to the Building Manager with final plans.  Note all professionals must sign and seal the forms prior to Building Management submittal.  DOB forms received without appropriate professional seals and signatures will be returned.

A copy of Building Department permit and all approvals must be submitted to Building Manager prior to commencement of work. Permit is to be posted on the job site in a conspicuous location prior to commencement of construction.  After hour permits must be submitted to the building management office 24 hours prior to work commencement.

**C.  MEP Coordination**
All required building system shutdowns - electrical, HVAC, plumbing, fire protection and life safety (Class "E") systems - must be requested in writing using  Angus (Service Request System) and coordinated with, and approved by, the Building Manager at least 24 hours in advance of desired shutdown. Any shutdown effecting building systems necessitates building engineers oversight and will be billed according to the Tenant Rate Sheet.

**D.  Equipment Access**
The design and installation of all occupant improvements shall permit adequate accessibility to all new and existing equipment, for proper maintenance. All equipment/devices requiring access (i.e., valves, dampers, junction boxes, and cleanouts) shall be provided with access doors as appropriate.  Any newly installed equipment which hinders access to base building equipment, Tenant to provide access panels or be relocated upon Building Management approval at tenant sole cost.

**E.  Hardware**
All Tenant locks shall comply with the base building master keying program.

No tenant shall place or affix any locks, bolts or other access inhibiting device of any kind upon any of the doors connecting its premises to the building's electrical, telephone and mechanical closets, Building's fire stairs, or any other of the Building's common areas.

Any fail-safe hardware must be compatible with the building's fire alarm system.

**F.  Freight Elevator and Loading Dock**
Contractor and/ or Tenant must use Angus for freight elevator reservation at least 24 hours in advance.  All construction deliveries and rubbish removal shall be performed via 44th Street loading dock before or after regular freight hours, 8:00AM - 4:45PM Monday – Friday (times subject to change).

If elevator hatch opening is required, notice shall be entered via Angus. Hatch opening requires physical presence of the elevator mechanic. At all times that the hatch is unlocked the elevator car will be operated at the sole direction of the elevator mechanic. No material or equipment shall be carried under or on top of elevators. Any applicable freight charges including elevator operator fees are the responsibility of the Tenant and will be billed according to the tenant rate sheet. Operation of freight elevators shall comply with all provisions of NYC RS-18 governing the operation of elevator cars.

Freight elevator capacity is 10,000 lb. Any single load item over 5,000 lb requires "hanging" of the car by elevator mechanic and requires special reservation via Angus.

**G.  Common Area Protection**
Contractor to protect public and service corridors with ¼ inch masonite taped on all sides and to the floor. All construction affected areas must be left in original order, after completion of construction.

All perimeter radiators must be protected against dirt and dust. Protection must be maintained throughout construction activities

All openings to the passenger elevators must be sealed and protected during construction to prohibit dust from entering the elevator shaft.

Contractor shall take all necessary precautions to prevent dirt and dust from permeating the building during the performance of the work. Shoe wiping mats must be installed at all openings between public and construction areas kept clean.

Provide filters on the base building supply air and return air duct outlets during demolition and construction. Tenant will be charged for special cleaning services and repairs throughout any public areas affected by contractors.

All public areas which are damaged or defaced shall be restored at the sole cost of the Tenant upon completion of the construction.

Renovation – Work Required at Fire Stairs/Freight Lobbies.

General Contractor shall maintain the cleanliness of the all applicable Fire Stairs, and Freight Lobbies & Loading Dock throughout the course of the work. The stairs shall be swept and mopped <u>daily</u> from the floor above the work area to the floor below the work area.

No debris or construction material may be placed in public areas of the Building without written consent of Building Manager. All material removed to the Loading Dock for pickup may not remain on the dock. All material must be picked up immediately and not stored on the Loading Dock.

Upon the completion of the work all applicable Fire Stairs, shall be patched and painted. Painting and patching will commence at the floor above through the work

{00295140.13}5

area and down through to the floor below the work area. Floors, walls and ceilings shall be patched, smoothed and painted according to the current paint scheme. All appurtenances such as railings, lighting, standpipe, hose racks, doors, door hardware and signage shall be fully restored to an A-1 condition that is acceptable to Building Management.

## H. <u>Workers and Occupants Safety</u>

All life safety systems, including but not limited to, Class "E" fire alarm system, sprinkler system, standpipe system, exit signs and emergency lighting shall be kept operational throughout the demolition and construction process. Where alterations to the ceiling and/or core area are required, provide a temporary sprinkler system around the core area (or over a greater area if required by the Building Department, Fire Department, or the Building Manager).

Site Safety Plan – General Contractors will be required to provide an acceptable written Site Safety Plan for approval by Building Management. Such plan shall be made available prior to the onset of construction activities and shall govern the activities of the General Contractor and all subcontractors under his direction. This plan shall include but is not limited to the following information:

    a.   Floor Plan indicating primary means of egress.

    b.   Sign in sheet indicating the reading and understanding of the provisions within the safety plan by all workers under the jurisdiction of the General Contractor. <u>All workers must read and sign the site safety plan.</u>

    c.   Location and type of all fire extinguishers.

    d.   Hot Work Program – explained below.

    e.   Weekly Safety Meetings – topics, etc.

    f.   Designation of a site safety officer as a primary point of contact for safety related issues. A 24-hour number for said individual shall also be provided. This individual will be responsible for enforcement of all safe work rules including but not limited to "No Smoking" policy, fire stair safety, ladder safety, electrical safety, eye protection, "Hot Work Permit" program, Lock Out/Tag Out requirements, etc.

    g.   Designation of a subcontractor safety representative as a primary point of contact for each subcontractor. A 24-hour number for said individual shall also be provided.

    h.   Identity of responsible parties for maintenance of fire alarm devices including the daily covering and uncovering of all smoke detectors. A 24-hour number for said individual shall also be provided.

    i.   Certificates of Fitness for all personnel who will be responsible for fire watch and for use of all acetylene cutting and welding apparatus.

Lock Out/Tag Out of Energized Devices – All electrical contractors <u>must</u> adhere to all applicable provisions of OSHA 29 CFR 1910.147 – Control of Hazardous Energy (Lock Out/Tag Out) and OSHA 29 CFR 1926.417 Lockout and Tag Out of Circuits. Failure to use all required devices for isolation of energy sources, electrical or mechanical, are grounds for removal from the building of all responsible personnel or exclusion from the building of this contractor as unsafe. The designated subcontractor safety representative(s) shall ensure the proper use of these devices, according to the regulations, that render it

physically impossible for the introduction of stored energy into an electrical circuit, machinery and or mechanical systems/devices under repair or construction.

Individual locks with unique keys specifically for the purpose of adherence to the requirements shall be used.

Tags for the specific purpose of identifying individuals working on circuit with time, date and duration of work shall be used.

Devices utilized for lock out purposes shall be those that are compatible for the equipment being locked out.

All journeymen shall be aware of the requirements of the statute and these building requirements for the application of the Lock Out/Tag Out program.

Contractor shall erect and properly maintain at all times, as required by the conditions and progress of the work, all necessary safeguards for the protection of the workmen, tenants and general public.

Fire extinguishers must be on the job at all times. ABC. Type all-purpose extinguisher (minimum 10 lbs.) shall be used. Furnished in sufficient numbers in accordance with NYFD regulations.

Hot Work Permit Program – 229 West 43rd Street enforces and requires adherence to our Hot Work Permit Program. This program is designed to prevent fire or the possibility of fire from erupting as a result of contractor operations. This program is to be enforced by Building Management, the Site Safety officer, Building Engineers and the applicable subcontractor safety representative. This program is comprised of, but not limited to, the following elements:

Building Management will provide Hot Work Permit. This permit will be filled out and delivered by hand or fax to the Building Office no later than 2 hours prior to the onset of any hot work. A new permit shall be filed each day for continuing work. Hot Work is defined as any contractor operation which may result in the generation of flame or sparks as a result of the operation. This includes welding, brazing, sweating, cutting, burning, grinding, flame melting and shaping, wiping, or any other activity that has the potential to produce flame, sparks, smoldering, excessive heat or any other forms of combustion.

Prior to the onset of such work the Site Safety Officer, as designated by the General Contractor, will inspect the work location for the presence and ready availability of a proper fire extinguisher type and size, the absence of combustible materials, the presence of buildings fire watch, establishment of work area perimeter and any other conditions which may compromise a safe operation.

Building fire watch personnel will be assigned to standby while the hot work is being performed. The appropriate entity will be invoiced for standby time of the fire watch.

Work shall be inspected on an as-needed, on-going basis throughout the operation to its conclusion.

The work shall be inspected at the conclusion of the work activity. The permit shall be marked accordingly by the contractor engaged in the work and immediately returned to the Building Office by hand or fax.

Repair or replace all missing fireproofing. Provide required fire stopping at conduits, bus ducts, pipes, ducts, etc., at all slab and wall penetrations. The building must receive at least 48 hour notice prior to commencement of fireproofing to inspect the area to ensure all penetrations have been sealed.

45. All hot work must be entered into Angus at least 24 hours in advance. Buildings fire watch personnel must watch over all hot work and when the Tenant's fire protection is taken out overnight. Protective blankets are required for all burning and welding activities.

46. Building Management reserves the right to suspend hot work during regular building hours of 8am to 5pm except weekends or holidays, if other Tenants are affected by the activity.

47. Contractor working within close proximity of sprinkler head or require a sprinkler drain down must enter an Angus request 24 hours in advance. Upon completion of work, contractor must physically check in with building engineer to arrange for sprinklers to be refilled. The contractor must remain on site until sprinklers are completely refilled and the engineers confirm all are operational. Sprinkler drain down will be billed according to the Tenant Rate Sheet.

48. Any alteration affecting, directly or indirectly, any areas that contains hazardous material, shall be performed at Tenants sole cost and expense, in compliance with the rules, regulations, procedures and guidelines, as amended or adopted from time to time, of New York City Local Law 76/85 and amended by Local Law 80/86, of the Environmental Protection Agency (EPA), Occupational Safety and Health Act (OSHA), National Institute for Occupational Safety (NIOSHA), with respect to standards for work causing, effecting or involving hazardous material; repair, containment, removal, disposal and/or cleaning operations. A consultant/certified hazardous waste inspector will survey and approve the proposed abatement plan and also monitor the air quality testing and method of removal and submit the Building Management. The cost for this service will be at the tenant's expense. Tenant shall indemnify and hold harmless parties listed in the attached indemnity agreement from any and all liability with respect to any failure to comply with any and all rules, regulations, procedures and/or guidelines, as amended or adopted from time to time.

## I. Miscellaneous

A list of general contractors and sub-contractors being considered for the project must be submitted to Building Management for approval. It shall be the Tenant's sole responsibility to bind all of the contractors and subcontractors to the Building Rules and Regulations.

All work must be performed by the contractors approved by Building Management (of which approval will not be unreasonably withheld or delayed). Notwithstanding the foregoing, with respect to final tie-ins to the building systems, including, without limitations, the base building life safety, electrical, HVAC, and BMS systems, the Building Management shall retain the right to require that the tenant use Contractors, designated by Landlord.

The tenant's contractor shall work in harmony with trade unions and shall be responsible for any delays or damage caused by failure to do so.

Floor slab/wall curb system in wet areas (i.e., Pantries, restrooms, supplemental air conditioning Equipment Rooms, etc.) must be waterproofed and constructed in a way to protect below and adjacent premises from liquid infiltration. The waterproofing membrane must be maintained by the Tenant.

All abandoned or unused cabling, raceways, sheet metal, ducts, conduit, pipes, etc., shall be removed back to the point of origin. Active systems shall be capped appropriately. Abandonment in-place not permitted.

The Building Manager is not responsible for the proper design, installation, balancing, maintenance, cleaning, etc., of occupant's systems or equipment.

Contractor's construction supervisor must contact Building Manager prior to commencement of construction to arrange a kick off meeting. The Tenant shall invite the Building Manager and Chief Engineer to all construction meetings.

All work that inconveniences or disturbs other tenants must be scheduled before 8:00AM or after 5:00 PM or at other times as designated by the Building Manager. The Building Manager reserves the right to suspend any work during the normal working hours that causes a disturbance.

Fire Proofing – Restoration/Inspection/Approval Process

    a.    All damaged, disturbed or missing fireproofing shall be replaced on all structural members including, but not limited to, columns and support beams. Areas for restoration will include removals due to demolition, installation of ducting, hangers, piping, conduit, and all other supporting hardware required. Restoration of fireproofing must be better than or equal to the quality of the best adjacent fireproofing and shall be acceptable in every way. It shall be homogenous in appearance and in performance to the satisfaction of Building Management.

    b.    Fireproofing may be restored using spray on or hand-toweled methods. Appropriate notification and application practices, in accordance these rules and regulations, is required.

    c.    Hung ceiling tiles shall not be installed until fireproofing restoration has been completed witnessed by building engineers.

Fire Proofing – Preparation and Application

    a.    Preparation – All junction boxes for Class-E system wiring will be closed with suitable covers and protected from the application of fireproofing materials in a manner that prevents fouling of all remaining devices or grounding of system components. Upon notice the Contractor shall correct all defects immediately to prevent Class-E system troubles.

    b.    Application – Upon the satisfactory completion of Class-E system preparation the Contractor shall confirm with the building's Chief Engineer that all supply and return ducts have been sealed mechanically to prevent pressure build-up and migration of fireproofing odors and materials to adjoining floors. The tenant must verify and take sufficient steps, such as insulation at the periphery of the floor slabs and fire-stopping where practical, to further isolate the floor from contiguous spaces. If, upon review by health and safety professionals, it is determined that migration has occurred to adjacent floors one or more ventilation fans shall be installed in one or more windows to introduce negative pressure to

the floor to further mitigate the migration of odors and/or materials. Window removals and replacements shall be performed by the building's approved glazier and coordinated with the Chief Engineer. Application of spray-on fireproofing shall be performed in a manner that is in full compliance with standard industry practices and all applicable OSHA regulations.

The occupant's Contractor shall perform all tests reasonably requested by the Building Manager. Contractor and all of the sub-contractors performing work in the building shall indemnify and hold harmless Owner and Owner's Agent, and their agents and employees, from and against all claims, damages indemnify and hold building harmless. An indemnification agreement referenced in the Exhibit 1.

## II.    HEATING, VENTILATING AND AIR CONDITIONING SYSTEMS

1.

      a.    <u>Temperature and Humidity Design Conditions</u>

          Summer:          Outdoor 89°F. d.b., 73°F. w.b.
                                    Indoor 76°F. (±2°F.) d.b.

          Winter:            Outdoor 15°F. d.b.
                                      Indoor 72°F. d.b.

      b.    <u>Cooling Load Conditions</u>

          Lighting and Power:  5.0 watts per usable sq.ft.

          People:            One person per 150 usable sq.ft.

          Outside Air Quantity: 0.20 cfm per usable sq.ft. or 20 cfm
                                    per person.

2.  Occupant systems must comply with the 1990 Clean Air Act (release, testing, repair, installation, training, serving, etc.) and subsequent amendments covering refrigerants.

3.  Systems containing refrigerant shall be installed in accordance with the requirements of the latest version of ANSI/ASHRAE-15.  Refrigerants containing CFC's are not permitted.

4.  Duct systems shall be constructed in accordance with the following SMACNA HVAC duct construction standards:

3-inch pressure class per Table 1-5, Class B sealed.

The suction and discharge of all exhaust systems shall be 2-inch pressure class per Table 1-5, Class

A sealed.

Flexible duct connections are not permitted at the inlet to VAV boxes. Provide the manufacturer's required length of hard duct at the inlet to VAV boxes. All flexible duct connections not to exceed 3 feet in length where used must be heavy duty, helix reinforced type with coated fiber glass fabric liner, fiberglass insulation and fire retardant outer jacket. Piping systems circulating condenser water shall utilize ASTM B-88, Type K or L hard-drawn copper pipe with wrought copper or cast bronze fittings; solder shall be high tensile strength silver solder (lead-free).

6   Piping system pressure ratings shall meet or exceed a working pressure of 300 psig at 150°F. Systems shall be designed to maintain a minimum velocity of 3 feet per second and assure that there is flow to all portions of the system, including standby units, for a minimum of four (4) hours each day.

7   Smoke Purge: Landlord provides a smoke purge system to each floor of the building operable at the Fire command center. Tenant may tie into this system if required to satisfy Tenant's smoke purge requirements. When tieing-in Tenant shall maintain operational all aspects and components of the smoke purge system. Tenant smoke purge system shall operate in harmony with the existing system and other tenants' smoke purge systems. Tenant shall contract with base Building fire alarm vendor for tie-ins of smoke purge equipment to Class-E System. Tenant shall arrange equipment and program smoke purge controls to satisfy NYFD requirements.

8   All steam sub-meters shall comply with building standard (Veris Steam Meter) and tie into the base building master meter reading system.

9   Dielectric couplings or dielectric flanges shall be installed at all connections between dissimilar metals (transitions from steel pipe to copper). Brass and/or bronze valves or fittings shall not be considered dielectric fittings. All piping on either side of the dielectric fitting must be the same material. Building Management reserves the right to require tenants to hire an independent testing agency to examine and test all newly installed welds, and to provide a copy of the report to the Building.

10  All new piping connecting to base building systems must be chemically cleaned and passivated prior to utilization of the base building system. Provide a letter indicating the approximate linear feet of each size of copper pipe installed.

11  Piping systems must be pressure tested utilizing treated water. Pressure test shall be performed at one and one half times (150%) the working pressure for a period of four (4) hours.

12  Cleaning and passivation of condenser water and chilled water piping shall be performed by buildings water treatment company and in the presence of building engineer.

13  All piping systems must be provided with identification labels installed every 20 feet on each pipe and at least once within each room.

14  All valves shall be 1/4 turn type, i.e., ball valves, butterfly valves, lubricated-plug chocks. Ball valves shall be full port design.

15 Air conditioning systems fed from the base building water system shall be selected to operate on a temperature differential of 12°F, and utilize 2-way modulating valves.

16 All taps to the base building piping systems must be scheduled and approved with Building Management 48 hours in advance.

17 Supplemental or replacement air conditioning units shall be provided with automatic shutoff valves on the supply and return lines and a stainless steel drip pan, having a rim of at least 4 inches, with leak detection to automatically shut the water valves serving the unit, and provide a remote alarm to a continuously manned location.

18 Brazed plate heat exchangers are not recommended on tenant packaged condenser water cooled AC units. Tenant shall supply coil type heat exchangers for tenant condenser water system AC units.

19 Tenants are recommended to provide isolation plate and frame heat exchangers for use on the building condenser water system. Tenant shall connect on the primary side and provide dedicated tenant pumps for secondary side of tenant condenser water system.

20 The base building condenser water system may operate with a waterside economizer cycle, and as such, tenant is responsible for providing appropriate waterside economizer operation for all supplemental AC units (45 deg F EWT), and appropriate controls for such equipment.

21 All piping shall be provided with fiber glass insulation with the following minimum thickness: Condenser Water 1 inch: Chilled Water 2 inches: Condensate 1/2 inch
Steam Refrigerant 2 inches

22 Design drawings shall indicate proposed location of all equipment, routing of pipes and ducts, points of connection to existing system/equipment/lines. Equipment shall be scheduled to indicate make, model, MEA or BSA number, capacity, electrical requirements and ratings, physical dimensions, weight, method of support, and plumbing connections, if required.

23 Design drawings and/or specifications shall describe the control sequence, including the operation of all automatic dampers, valves, speed control devices, etc.

24 Occupant shall be responsible for alterations to existing air conditioning ductwork, piping, controls, systems and equipment, and for ensuring that such work is properly integrated into existing building systems with no adverse affects on the building system.

25 Outside air ducts and supply air ducts shall be provided with fiberglass insulation with a minimum thickness of 1-1/2 inches.

26 Provide filters on the base building supply air and return air duct outlets during demolition and construction.

27 Exhaust hoods for Kitchens must be the water-wash grease-extraction type utilizing hot water and cold water.

28  All rotating equipment and piping within 25 feet of pumps must be supported with vibration isolation devices having a minimum static deflection of 1 inch.

29  As part of the commissioning process, a vibration analysis must be performed on all rotating equipment.

30  Fire dampers shall be combination fire/smoke dynamic type electrically actuated.

31  All air and water balancing must be performed by an independent testing and balancing agency. Two (2) copies of the final balancing report shall be submitted to Building Management.

32  Prior to the start of any construction or demolition activity, the occupant shall complete inventory of the existing induction units, unit covers and unit controls, and present to the Building Manager a list of such defects. The Building Manager will correct such defects prior to the completion of occupant's fit-out work. Occupant will be responsible for protecting all perimeter radiators during demolition and construction activities.

33  Condenser water is available for supplemental HVAC systems and must be approved by Building Management, and is subject to availability. Tenant engineer to provide required tonnage to be connected for approval. Condenser water is available on a 24 X 7 basis, but is not connected to a generator system.

34  Provide equipment use permits if required by NYC DOB for any equipment installed by Tenant.

# III.  ELECTRICAL

1. Electric service is supplied from Con Edison at 120/208 volts, 3 phase.

2. No electrical work shall be performed on "live" equipment. All equipment shall be de-energized prior to start of work.  Equipment shall not be re-energized until tested, and all shorts, grounds and unsafe conditions are eliminated.

3. All electrical connections to base building risers, distribution panel boards, switchboards, etc., shall be coordinated with the Building Manager.

4. All conductors shall be copper. No. 12 AWG shall be the minimum wire size for branch circuits and control wiring.

5. All wire and cable shall utilize one of the following insulation types, as appropriate:  THHN, THWN, XHHW. All wire and cable shall be color coded as follows: 120/208 volt, black, red, blue, white, green; 265/460 volt, brown, yellow, orange, grey, green/white stripe.

6. Transformers shall be copper wound, K-13 rated.

7. GFI type receptacles shall be utilized in Toilet Rooms, mechanical rooms, janitor's closets and similar wet areas.

8. All electrical feeders and all electrical branch circuits in electrical closets, Mechanical Equipment Rooms, Telephone Equipment Rooms, common areas (lobbies, corridors, etc.) shall utilize one of the following raceway types, as appropriate: EMT, galvanized rigid steel, IMC or aluminum.  The minimum size conduit shall be 3/4 inch.

9. Branch circuits within the occupant's demised space may utilize any one of the above raceway types or armored cable. Armored cable shall utilize a full size green insulated ground conductor.

10. Branch circuits shall originate from panel boards utilizing conduit (or other approved raceway system) and wire, and shall extend to the first outlet on the branch circuit or homerun.  Downstream of that point, either conduit or wire, or armored cable, may be utilized.

11. All branch circuits serving equipment (and other equipment which generate harmonics) shall utilize either individual neutral conductors for each phase conductor, or an oversize neutral conductor where shared in a multi-circuit configuration.

12. All branch circuit and feeder wiring shall be tagged at each pull box, junction box, splice box and termination point.  Tags shall indicate source description, circuit number and phase.

13. Unused floor outlets shall be capped with an appropriate flush floor blanking plate.

14. All controls, switches, disconnect devices and other means of electrical control shall be installed within the

occupant's space, and shall not control equipment, devices or circuits in any other occupant's space or common space.

15. Conduit systems shall be properly cleaned, neatly arranged and installed parallel to walls. All conduits and raceways in common areas must be concealed.

16. "Sealtite" shall be used for final connections to mechanical equipment where the environment will be subject to moisture or within fan plenums.

17. "Floor trenching" is generally not permitted. "Poke-through floor outlets" are preferred with the provision that the quantity and layout of the poke-through has been reviewed by the building's Structural Engineer.

Where the installation of "Poke-through floor outlets" is impractical, "floor trenching" may be considered. Building Management will review an occupant's proposal for poke-through floor outlets or floor trenching if submitted with a statement from the Structural Engineer regarding structural integrity of the slab, a description of the Contractor's means and methods related to cutting of the floor trench or slab core, and a description of the Contractor's means and methods related to conduit work in the hung ceiling of the floor below.

During construction, the Contractor must protect the metal deck and existing wire mesh reinforcement from damage. The contractor's work should be observed by the structural engineer prior to the placement of grout to ensure work is in compliance with the Building Rules and Regulations. After the conduit placement and trench has been observed by the Structural Engineer, the trench shall be filled with a non-shrink grout as specified by the Structural Engineer.

19. All electrical power must be sub-metered at the point of takeoff from the base building distribution system, in accordance with the Building Manager's standards. The Building Manager shall furnish electrical meter(s) for installation by building electrician at Tenant's expense.

20. All panel boards, switchboards, meters, transformers, and disconnect switches shall be permanently labeled. Panel board directories shall be kept up-to-date.

21. Panel board loads shall be balanced to within 10% (±5%) of each phase.

22. Design drawings shall utilize full panel board schedules, listing the type of load, pole position, circuit breaker type and size, and shall indicate both estimated and connected demand loads on each feeder/riser.

## IV.   LIFE SAFETY SYSTEMS

1. Demolition/Class E System – Elimination of Ancillary Devices

    a.    Preparation - Prior to the completion of demolition activities all ancillary and/or inactive Class-E system devices and wiring must be removed. At the minimum all code required devices must remain active and in place. Warden phones must remain active and accessible at all times. Phones must be protected from damage and may be mounted in a manner that allows for temporary placement to facilitate construction. All junction boxes for Class-E system wiring will be closed with suitable covers and protected from damage or grounding.

    b.    Execution – The Contractor will work with the building fire alarm vendor to determine the active devices to remain and with the occupant and their consultants to determine those ancillary devices and wiring to be removed. Where necessary, points will be eliminated from the system as is required to eliminate all troubles to the system as they relate to the floor under construction. Upon notice the Contractor shall correct all defects
immediately to prevent Class-E system troubles.

2. Tie-ins and modifications to the base building fire and life safety system (Class "E") shall only be performed by the base building Class E vendor. It is strongly recommended to retain services of base building Class E vendor to perform fire alarm work.

3. Reprogramming of the Class "E" system due to added, deleted or revised equipment will be completed by the Building Manager's Class "E" vendor, at occupant's expense.

4. Provide area smoke detectors in all occupants' electrical closets, Electrical Equipment Rooms, telecommunications closets and Telecommunications Equipment Rooms which are larger than 25 sf.

## V.   TELECOMMUNICATIONS SYSTEMS

1. Existing telecommunications cabling and terminations in base building electrical closets may

{00295140.13}

D-1

be reused where such equipment does not interfere with electrical equipment operation, clearance and/or maintenance. No new telecommunications cabling, raceways, conduit terminations or equipment of any kind may be installed in electrical closets.

2. New telecommunications equipment, if required, shall be installed within the occupant's demised space and not within the base building core area.

3. New riser cabling shall be installed in the telecommunications riser closets or riser conduits at the explicit direction of the Building Manager. Submit a request for use of risers to the Building Manager prior to preparation of design drawings indicating proposed route, number and type of cables, total cross-sectional area, weight per linear foot, total weight at each point of support, and proposed method/location of support.

4. Telecommunications cabling may be installed in the steam radiator enclosure only where it does not interfere with the operation and maintenance of the induction unit.

5. Tenant telecommunications cabling between contiguous floors shall not be routed through base building risers; provide dedicated telecommunications risers between contiguous floors. Tenant can use existing telephone closets.

6. All telecommunications cabling shall be approved for use in plenum spaces.

7. Telecommunications cabling in common areas, Mechanical Equipment Rooms, etc., shall be installed in an enclosed raceway and shall be identified.

# VI. PLUMBING SYSTEMS

1. All water supplies to a floor shall originate on the same floor from the nearest wet column with the proper access for maintenance.

2. All piping systems must be provided with identification labels installed every 20 feet on each pipe and at least once within each room.

3. All valves shall be 1/4 turn type, i.e., ball valves, butterfly valves, lubricated-plug cocks. Ball valves shall be full port design.

4. Flushometers shall be manufactured by Sloan, Zurn or approved equal.

5. All piping shall be provided with fiberglass insulation with the following minimum thickness: Hot water 1 inch, Cold water 1 inch.

6. Copper tubing with sweat fittings shall be utilized for all hot and cold water systems.

7. All waste lines shall be properly pitched and piped to ensure total drainage and arranged so as not to create unnecessary traps.

{00295140.13}

8. As part of the commissioning process, a vibration analysis must be performed on all rotating equipment.

9. All water sub-meters shall comply with building standard (Turbine Meter) and tie in to the base building master meter reading system.

## VII.    FIRE PROTECTION

Fire Protection Design Criteria

1. Sprinkler control valve assemblies will be provided at fire standpipe riser.

2. All areas within occupant's space, including elevator lobbies, toilets, janitor's closets, telephone closets and communications closets, must be provided with sprinklers.  (Note: Sprinklers shall not be provided in the base building electrical closets.)

3. Lot line sprinklers are required to be provided by the tenants at tenants cost included but not limited to all alley way windows as part of the build out.

## VIII.    NOTICE OF
## INSURANCE CERTIFICATE REQUIRED

**THE INSURANCE COVERAGE MUST** be provided through an insurance company with an A.M. Best rating of "A-" "VII" or higher.  A certificate indicating this coverage with separate Additional Insured Endorsement shall be on file in Building Management office **PRIOR TO COMMENCEMENT OF THE WORK,** and shall provide for thirty (30) days prior written notice of cancellation or reduction of coverage.  A copy of Certificate of Insurance will be provided by the building management prior to the start of the job.

{00295140.13}

D-3

# IX.    Exhibit

### INDEMNITY AGREEMENT OF OWNER'S CONTRACTOR

For the purpose of this agreement, the following definitions shall apply:

"Contractor" shall mean _____
having an office at _____

"Building" shall mean 229 West 43rd Street , New York, New York

"Owner" shall mean AI 229 West 43rd Street Property Owner, LLC
"Agent" shall mean_____ , as agent for Owner.

"Contract" shall mean, the contract dated _____ and any extension,
modification, or replacement thereof.

Contractor, in consideration of being granted by Owner and Agent access to the Building for the purpose of providing work, labor or materials ("Work") therein on behalf of Owner, pursuant to the Contract or, otherwise does hereby covenant and agree:

To the fullest extent permitted by law, Contractor shall indemnify and hold harmless Owner and Owner's Agent, and their agents and employees, from and against all claims, damages, losses and expenses (including, but not limited to attorney's fees) arising out of or resulting from the performance of the Work, including, but not limited to, any such claims, damages, losses and expenses attributable to (1) the filing of any lien or claim for payment or (2) bodily injury, sickness, disease or death, or (3) injury to or destruction of tangible property, including the loss of use resulting there from; provided such claims, damages, losses and expenses are caused in whole or in part by any negligent act or omission or intentional misconduct of Contractor, any subcontractor, anyone directly or indirectly employed by any of them or anyone for whose acts any of them may be liable, regardless of whether or not it is caused in part by a party indemnified hereunder. Such obligation shall not be construed to negate, abridge or otherwise reduce any other right or obligation of indemnity which would otherwise exist as to any party or person described in this paragraph. In any and all claims against Owner or Owner's Agent or any of their agents or employees by an employee of Contractor, any subcontractor, anyone directly or indirectly employed by any of them or anyone for whose acts any of them may be liable, the indemnification obligation under this paragraph shall not be limited in any way by any limitation on the amount or type of damages, compensation or benefits payable by or for the Contractor or any subcontractor under workers' or workman's compensation acts, disability benefit acts or other employee benefit acts.

_____

## EXHIBIT D

## WORK LETTER

A.    <u>Definitions</u>.  All capitalized terms used herein (which are not specifically defined herein) shall have the meaning ascribed to them in the main body of the Lease (the "Lease") to which this Work Letter is attached and made a part.  Notwithstanding any contrary definition in the Lease, the following terms used herein and in the Lease are hereby defined as follows:

<u>Landlord's Work</u>:

Landlord will provide the space in "as-is" condition, but with Landlord's Work Substantially Completed.

Landlord will, at its sole cost, perform and complete the work listed below ("Landlord's Work"), prior to the delivery of possession of Premises to Tenant. With attention to required lead-times, Landlord is to procure all associated materials, equipment and manpower to meet the delivery timelines.  Landlord will, without limitation, obtain all necessary permits, licensing, inspections or approvals and provide all necessary "general requirements" (supervision, temporary utilities, clean-up, etc.) to complete the Landlord's Work.  Further, Landlord shall, at Landlord's cost, provide any architecture, engineering, or other documentation, studies or analysis required to complete all items of Landlord's Work.  The term "provide" is defined as completely furnished and installed.

1.    **Interior Demolition** – As Is except Landlord will remove all furniture and fixtures of any prior occupant of the Premises, and the mirrors from the columns, and shall deliver the Premises in "Broom Clean" condition,

2.    **Concrete Floor** – As is.

3.    **Shell, Demising & Perimeter Walls** – All existing demising and perimeter walls will be turned over in structurally-sound condition, insulated in compliance with all applicable codes, and free from any leaks or moisture buildup. All additional sound attenuation work shall be by Tenant, pursuant to mutually agreed sound attenuation plans.

4.    **Vertical Transportation** – All vertical transportation shall be delivered in good working order, and with all required certificates valid and up to date.

5.    **Storefront** – Landlord will turn over existing ADA compliant storefront/entrance to Tenant.

{00295140.13}

D-5

6.    **HVAC** – Per Tenant's final design plans, Landlord will provide enough Condenser Water and steam to support Tenants HVAC requirements and will turn over all existing HVAC units to Tenant.  No chilled water will be provided.  Condenser water only.  Tenant has use of the existing one year old HVAC units, total capacity 76 tons.

7.    **Gas Service** – No gas will be provided for HVAC or Domestic Hot Water.  Tenant shall utilize steam service available in the building.

8.    **Water & Sewer Service** – Landlord will turn over existing ADA compliant bathrooms with existing water and sewer service.  All alterations of bathrooms are by Tenant.

9.    **Fire Protection** – Landlord will turn over existing, NYC approved fire protection system (Sprinkler and Fire Alarm) to Tenant.  Tenant will be responsible for alteration of branches for the new space layout.  All alterations affecting interconnection with the building's fire alarm panel shall be by Tenant and coordinated with Building's Fire Alarm Service Company.

10.    **Electrical Service** – Landlord will provide access to adequate electrical service to Tenant.  Tenant's anticipated electrical service capacity requirement is for a 2,000A service.  Final service size to be designed for site specific conditions by Tenant's electrical engineer, per Tenant's final plans.  Tenant shall provide a load letter for electrical service written by a New York State registered professional engineer no later than January 15, 2014.  If Tenant fails to timely provide the Load Letter, the 240 day period set forth in the definition of the Rent Commencement Date shall be reduced one (1) day for each day following January 15, 2014 that Tenant has failed to deliver such load letter.  All wiring, other than existing wiring, from Landlord's electric room to Tenant's electric room (the "Wiring Work") shall be performed by Tenant at Tenant's cost.  In the event that the actual out-of-pocket cost incurred by Tenant to perform the Wiring Work shall exceed $50,000, Landlord shall pay to Tenant all such actual-out-of-pocket costs incurred by Tenant to perform with Wiring Work which are in excess of $50,000.  Landlord shall make such payment to Tenant within 30 days following Tenant's demand accompanied by copies of paid bills and invoices evidencing all such actual-out-of-pocket costs incurred by Tenant to perform with Wiring Work.

11.    **Utility Meters** – Landlord will turn over all existing utility meters and sub-meters for water, and electrical services to Tenant, which shall separately meter usage solely from the Premises.  Tenant shall at his expense inspect and calibrate the existing meters.

12.    **Telephone Conduit** – As Is, subject to Tenant's review and Tenant's Telecommunications Department approval.  Landlord will turn over

existing telephone service to Tenant.  Tenant will arrange for telephone service installation and account set-up.

Tenant's Initial Alterations:  Subject to Landlord's approval, Tenant shall be responsible to do all necessary work with required approvals to build a retail store operation in the Demised Premises having improvements and fixtures of at least as high a quality as Tenant's other retail stores in Manhattan (such work, the "Tenant's Initial Alterations").  Prior to commencing Tenant's Initial Alterations, Tenant shall obtain Landlord's approval of full and complete plans and specifications for the Tenant's Initial Alterations ("Tenant's Initial Alterations Plans") and shall provide Landlord with evidence of all Tenant's Permits (as defined below) having been obtained.  The portion of Tenant's Initial Alterations Plans relating to the interior portions of the Tenant's Initial Alterations shall be referred to as "Tenant's Interior Plans".  The portion of Tenant's Initial Alterations Plans relating to the Building Exterior Sign shall be referred to as the "Sign Plans".  Tenant's Interior Permits (as defined below) together with the Sign Permits (as defined below) shall be referred to as "Tenant's Permits".

B.    Permit Contingencies.

(i)    Tenant's Interior Plans. (b)  Within seventy-five (75) days following the date of this Lease, Tenant shall deliver to Landlord Tenant's Interior Plans, which shall be full and complete plans and specifications sufficient and adequate in form and substance for application for all building permits and approvals as shall be required by all Legal Requirements of all Governmental Authorities having jurisdiction for the performance of the interior portions of Tenant's Initial Alterations, be in compliance with all applicable Legal Requirements, including applicable building code, be capable of being permitted and approved by all Governmental Authorities having jurisdiction without the requirement of any variance or special permit and be in compliance with the terms of this Lease.  The building permits and approvals as shall be required by all Legal Requirements of all Governmental Authorities having jurisdiction for the performance of the interior portions Tenant's Initial Alterations shall be referred to as "Tenant's Interior Permits".

(b)    Within five (5) Business Days after Landlord's approval of Tenant's Interior Plans (the "Interior Permit Submission Deadline"), time being of the essence thereto, Tenant shall apply for Tenant's Interior Permits with all applicable Governmental Authorities and all such applications shall name Tenant's architect and general contractor thereon and shall otherwise be properly prepared and full and complete (the date on which Tenant applies for Tenant's Interior Permits, the "Interior Permit Submission Date").  Time shall be of the essence as to Tenant's obligation to apply for Tenant's Interior Permits by the Interior Permit Submission Deadline.  If necessary, Landlord shall join in the execution of the applications for Tenant's Interior Permits at no out-of-pocket cost to Landlord.  At Tenant's request, Landlord shall reasonably cooperate with the prosecution of the applications.  Tenant shall bear all expenses in connection with the applications, including any reasonable third-party out-of-pocket expenses

incurred by Landlord at Tenant's written request therefor. Tenant shall prosecute the applications diligently and use commercially reasonable efforts to seek the approvals and permits applied for. Tenant shall advise Landlord of its progress from time to time and upon request by Landlord. Tenant shall give Landlord prior notice of any hearings and meetings with Governmental Authorities and Landlord shall be permitted to attend any and all such hearings and meetings. The date on which Tenant's Interior Permits are issued shall be known as the "Interior Permit Issuance Date". Tenant shall promptly advise Landlord of the occurrence of the Interior Permit Issuance Date and any rejection or disapproval by any governmental authority of Tenant's Interior Permits and the reason for such rejection or disapproval.

(c)    In the event that Tenant shall fail to receive Tenant's Interior Permits on or before the ninetieth (90th) day next following the Interior Permit Submission Date (such date, and such date as may be extended by Landlord and/or Tenant as provided below, the "Interior Permit Issuance Deadline"), Tenant shall notify Landlord of such failure (such notice, the "Interior Permit Failure Notice"), and provided that Tenant has fully complied with the terms and conditions of this Paragraph B(i), including, without limitation, timely preparing and submitting to Landlord Tenant's Interior Plans, timely applying for Tenant's Interior Permits by the Interior Permit Submission Deadline and having used its commercially reasonable and diligent efforts to obtain Tenant's Interior Permits, and Tenant has not commenced the construction of the Tenant's Initial Alterations, Tenant may, as Tenant's sole and exclusive remedy for Tenant's inability to obtain Tenant's Interior Permits, elect to (i) terminate this Lease by notifying Landlord of such election in the Interior Permit Failure Notice ("Tenant's Interior Termination Notice") or (ii) elect (on a one-time basis) to extend the Interior Permit Issuance Deadline by thirty (30) days by providing Landlord with reasonable evidence that Tenant is likely to obtain Tenant's Interior Permits within such additional thirty (30) day period (a "Tenant Interior Extension Notice"). If Tenant fails to give a Tenant's Interior Termination Notice or a Tenant Interior Extension Notice within fifteen (15) Business Days following the Interior Permit Issuance Deadline, time being of the essence, then this paragraph B(i)(c) shall be null and void and of no further force or effect, this Lease shall otherwise remain in full force and effect and Tenant shall have no further rights or remedies with respect to Tenant's failure to obtain Tenant's Interior Permits. If Tenant gives a Tenant Interior Termination Notice (either following the expiration of the initial Interior Permit Issuance Deadline or the Interior Permit Issuance Deadline as extended by Tenant's Interior Extension Notice), Landlord may, at its option, by notice to Tenant (the "Landlord Interior Deadline Extension Notice") given to Tenant within fifteen (15) Business Days following Landlord's receipt of the Tenant Interior Termination Notice, elect to pursue and obtain Tenant's Interior Permits on Tenant's behalf and extend the Interior Permit Issuance Deadline until the date which is the one-hundred twentieth (120th) day next following the Interior Permit Submission Date (or 150th day if the Interior Permit Issuance Deadline was extended by the Tenant Interior Extension Notice). If Landlord does not give the Landlord Interior Deadline Extension Notice, this Lease shall end and expire on the date which is fifteen (15) Business Days after the date of the Tenant Interior Termination Notice as if such date were the Expiration Date. If Landlord gives the Landlord Interior Deadline Extension Notice then,

{00295140.13}

D-8

(i) Tenant, at Tenant's cost and expense, shall assist and cooperate with Landlord in its efforts to obtain Tenant's Interior Permits and Tenant shall continue to use commercially reasonable efforts to obtain same on its own, and (ii) if either Tenant or Landlord is successful in obtaining the Tenant's Interior Permits by no later than the Interior Permit Issuance Deadline (as extended by the Landlord Interior Deadline Extension Notice) then this Lease shall remain in full force and effect in accordance with all of the existing terms and conditions thereof. In the event that neither Landlord nor Tenant is able to obtain Tenant's Interior Permits prior to the Interior Permit Issuance Deadline (as extended by the Landlord Interior Deadline Extension Notice), then this Lease shall end and expire on the Interior Permit Issuance Deadline (as extended by the Landlord Interior Deadline Extension Notice) as if such date were the Expiration Date. Tenant's acknowledges and agrees that if Tenant commences the construction of the Tenant's Initial Alterations, this Paragraph B(i)(c) shall be immediately null and void and of no force or effect. If Landlord gives the Landlord Interior Deadline Extension Notice and the Rent Commencement Date will occur during the period of the date of Landlord's giving of the Landlord Interior Deadline Extension Notice until the date which is the one-hundred twentieth (120th) day next following the Interior Permit Submission Date (or 150th day if the Interior Permit Issuance Deadline was extended by the Tenant Interior Extension Notice), the 240 day period described in the definition of the Rent Commencement Date shall be tolled on the giving of the Landlord Interior Deadline Extension Notice and shall re-commence to run on the date Tenant's Interior Permits have been obtained.

(ii)    <u>Sign Plans</u>.    (a)    On or before January 10, 2014, Tenant shall deliver to Landlord preliminary design plans for the Building Exterior Sign, which Landlord acknowledges may still be subject to revision by Tenant. On or before January 31, 2014, Tenant shall deliver to Landlord, for Landlord's review and approval, final design plans for the Building Exterior Sign which have been approved by Tenant. Within 35 days following Landlord's approval of the design plans for the Building Exterior Sign, Tenant shall deliver to Landlord the Sign Plans, which shall be full and complete plans and specifications (including, without limitation, all engineering drawings and construction documents) sufficient and adequate in form and substance for application for all building permits and approvals as shall be required by all Legal Requirements of all Governmental Authorities having jurisdiction for the construction and installation of the Building Exterior Sign, be in compliance with all applicable Legal Requirements, including applicable building code, be capable of being permitted and approved by all Governmental Authorities having jurisdiction without the requirement of any variance or special permit and be in compliance with the terms of this Lease, including the restrictions as to size and projection as set forth on Exhibit G. The building permits and approvals as shall be required by all Legal Requirements of all Governmental Authorities having jurisdiction for the construction and installation of the Building Exterior Sign shall be referred to as "<u>Tenant's Sign Permits</u>".

(b)    Within five (5) Business Days after Landlord's approval of the Sign Plans (the "<u>Sign Permit Submission Deadline</u>"), time being of the essence thereto, Tenant shall apply for the Sign Permits with all applicable Governmental Authorities and all such applications shall name Tenant's architect and general contractor thereon and

shall otherwise be properly prepared and full and complete (the date on which Tenant applies for the Sign Permits, the "Sign Permit Submission Date"). Time shall be of the essence as to Tenant's obligation to apply for the Sign Permits by the Sign Permit Submission Deadline. If necessary, Landlord shall join in the execution of the applications for the Sign Permits at no out-of-pocket cost to Landlord. At Tenant's request, Landlord shall reasonably cooperate with the prosecution of the applications. Tenant shall bear all expenses in connection with the applications, including any reasonable third-party out-of-pocket expenses incurred by Landlord at Tenant's written request therefor. Tenant shall prosecute the applications diligently and use commercially reasonable efforts to seek the approvals and permits applied for. Tenant shall advise Landlord of its progress from time to time and upon request by Landlord. Tenant shall give Landlord prior notice of any hearings and meetings with Governmental Authorities and Landlord shall be permitted to attend any and all such hearings and meetings. The date on which the Sign Permits are issued shall be known as the "Sign Permit Issuance Date". Tenant shall promptly advise Landlord of the occurrence of the Sign Permit Issuance Date and any rejection or disapproval by any governmental authority of the Sign Permits and the reason for such rejection or disapproval.

(c)     In the event that Tenant shall fail to receive the Sign Permits on or before the seventieth (70th) day next following the Sign Permit Submission Date (such date, and such date as may be extended by Landlord and/or Tenant as provided below, the "Sign Permit Issuance Deadline"), Tenant shall notify Landlord of such failure (such notice, the "Sign Permit Failure Notice"), and provided that Tenant has fully complied with the terms and conditions of this Paragraph B(ii), including, without limitation, timely preparing and submitting to Landlord the Sign Plans, timely applying for the Sign Permits by the Sign Permit Submission Deadline and having used its commercially reasonable and diligent efforts to obtain the Sign Permits, and Tenant has not commenced the construction of the Building Exterior Sign, Tenant may, as Tenant's sole and exclusive remedy for Tenant's inability to obtain the Sign Permits, elect to (i) terminate this Lease by notifying Landlord of such election in the Sign Permit Failure Notice ("Tenant's Sign Termination Notice") or (ii) elect (on a one-time basis) to extend the Sign Permit Issuance Deadline by thirty (30) days by providing Landlord with reasonable evidence that Tenant is likely to obtain the Sign Permits within such additional thirty (30) day period (a "Tenant Sign Extension Notice"). If Tenant fails to give a Tenant's Sign Termination Notice or a Tenant Sign Extension Notice within fifteen (15) Business Days following the Sign Permit Issuance Deadline, time being of the essence, then this paragraph B(ii)(c) shall be null and void and of no further force or effect, this Lease shall otherwise remain in full force and effect and Tenant shall have no further rights or remedies with respect to Tenant's failure to obtain the Sign Permits. If Tenant gives a Tenant Sign Termination Notice (either following the expiration of the initial Sign Permit Issuance Deadline or the Sign Permit Issuance Deadline as extended by Tenant's Sign Extension Notice), Landlord may, at its option, by notice to Tenant (the "Landlord Sign Deadline Extension Notice") given to Tenant within fifteen (15) Business Days following Landlord's receipt of the Tenant Sign Termination Notice, elect to pursue and obtain the Sign Permits on Tenant's behalf and extend the Sign Permit Issuance Deadline until the date which is the sixty-fifth (65th) day next following the Sign Permit Submission Date

(or ninety-fifth (95th) day if the Sign Permit Issuance Deadline was extended by the Tenant Sign Extension Notice). If Landlord does not give the Landlord Sign Deadline Extension Notice, this Lease shall end and expire on the date which is fifteen (15) Business Days after the date of the Tenant Sign Termination Notice as if such date were the Expiration Date. If Landlord gives the Landlord Sign Deadline Extension Notice then, (i) Tenant, at Tenant's cost and expense, shall assist and cooperate with Landlord in its efforts to obtain the Sign Permits and Tenant shall continue to use commercially reasonable efforts to obtain same on its own, and (ii) if either Tenant or Landlord is successful in obtaining the Sign Permits by no later than the Sign Permit Issuance Deadline (as extended by the Landlord Sign Deadline Extension Notice) then this Lease shall remain in full force and effect in accordance with all of the existing terms and conditions thereof. In the event that neither Landlord nor Tenant is able to obtain the Sign Permits prior to the Sign Permit Issuance Deadline (as extended by the Landlord Sign Deadline Extension Notice), then this Lease shall end and expire on the Sign Permit Issuance Deadline (as extended by the Landlord Sign Deadline Extension Notice) as if such date were the Expiration Date. Tenant's acknowledges and agrees that if Tenant commences the construction of the Building Exterior Sign, this Paragraph B(ii)(c) shall be immediately null and void and of no force or effect. If Landlord gives the Landlord Sign Deadline Extension Notice and the Rent Commencement Date will occur during the period of the date of Landlord's giving of the Landlord Sign Deadline Extension Notice until the date which is the sixty-fifth (65th) day next following the Sign Permit Submission Date (or ninety-fifth (95th) day if the Sign Permit Issuance Deadline was extended by the Tenant Sign Extension Notice), the 240 day period described in the definition of the Rent Commencement Date shall be tolled on the giving of the Landlord Sign Deadline Extension Notice and shall re-commence to run on the date the Sign Permits have been obtained.

(d)     Notwithstanding anything to the contrary contained in paragraph B(ii)(c) above, in the event this Lease is terminated by reason of the failure to obtain the Sign Permits and Tenant has commenced the interior portions of the Tenant's Initial Alterations, Tenant shall be required to either (i) restore all portions of the Premises affected by the performance of Tenant's Initial Alterations to the condition existing immediately prior Tenant's performance of Tenant's Initial Alterations or (ii) perform such work as in necessary to put the Premises into a so called "Vanilla Box" condition pursuant to plans reasonably acceptable to Landlord and Tenant. The termination of the Lease pursuant to paragraph B(ii)(c) above shall not be effective until Tenant completes such work.

## EXHIBIT E

## FIXED RENT

1.    From the Rent Commencement Date through the day preceding the fifth (5th) anniversary of the Commencement Date, One Million Seven Hundred Thirty Thousand and 00/100 Dollars ($1,730,000.00) per annum ($144,166.67 per month);

2.    From the fifth (5th) anniversary of the Commencement Date through the day preceding the tenth (10th) anniversary of the Commencement Date, One Million Nine Hundred Three Thousand and 00/100 ($1,903,000.00) per annum ($158,583.33 per month);

3.    From the tenth (10th) anniversary of the Commencement Date through the day preceding the fifteenth (15th) anniversary of the Commencement Date, Two Million Ninety Three Thousand Three Hundred and 00/100 ($2,093,300.00) per annum ($174,441.67 per month);

4.    "Renewal Term 1": from the Renewal Term Commencement Date through the day preceding the fifth (5th) anniversary of the Renewal Term Commencement Date, Two Million Three Hundred Two Thousand Six Hundred Thirty and 00/100 ($2,302,630.00) per annum ($191,885.83 per month);

5.    "Renewal Term 2":  From the fifth (5th) anniversary of the Renewal Term Commencement Date through the tenth (10th) anniversary of the Renewal Term Commencement Date, the Fixed Rent shall be ninety (90%) of the fair market rental value of the Premises as of the Renewal Term Commencement Date ("FMRV") but in no event less than a ten percent (10%) increase above the Fixed Rent in effect immediately prior to the second Renewal Term Commencement Date; and

6.    "Renewal Term 3": From the tenth (10th) anniversary of the Renewal Term Commencement Date through the fifteenth (15th) anniversary of the Renewal Commencement Date, at a rate equal to a fifteen percent (15%) increase above the rate for Renewal Term 2.

## EXHIBIT F

## LIST OF EXCLUSIVES AND PROHIBITED USES

## EXCLUSIVES

### Bowlmor Exclusive

So long as (A) no Event of Default exists hereunder, (B) Tenant is open for business fully staffed, stocked and fixtured and conducting business in the Premises for the Permitted Use and is otherwise in compliance with Section 12.01 hereof and (C) this Lease shall be in full force and effect (collectively, the "Exclusivity Conditions"), then Landlord shall not lease or permit occupancy of any other space in the Building to any other tenant or occupant who either (i) operates any "pay for play" bowling alleys, except that (x) the TSX Premises may contain less than five (5) bowling lanes as part of an exhibition, provided that such bowling lanes are not "pay for play" and (y) certain hotel suites in the Building may have non-regulation bowling lanes located and operated therein, (ii) is engaged in the sale of bowling related products from such premises or (iii) whose primary use of such premises is for a videogame arcade (the "Landlord Leasing Covenant"). So long as the Exclusivity Conditions are satisfied, Landlord will not permit any tenant of the Building to sublease any portion of its space or assign its lease to an occupant whose use violates the Landlord Leasing Covenant to the extent that Landlord's consent is required for such sublease or assignment. So long as the Exclusivity Conditions are satisfied, Landlord agrees that all leases entered into subsequent to the Effective Date will include a restriction against the tenant's violation of the Landlord Leasing Covenant. The Landlord Leasing Covenant shall not apply to leases in effect as of the Effective Date or renewals thereof as described on the attached Schedule 12.02; provided that no amendment of such leases shall permit a change in use that will violate the Landlord Leasing Covenant.

### Haru Exclusive

Provided (i) this Lease is in full force and effect, (ii) Tenant is in possession of the Premises and is open and operating same for the Permitted Use and (iii) Tenant is not then in default under of the terms, covenants or conditions of this Lease on Tenant's part of be observed or performed, then and in such event Landlord agrees that, from and after the execution of this Lease, Landlord will not (x) enter into a lease of other space on the 43rd Street side of the Unit (the "43rd Street Side"), which allows the sale of sushi nor (y) enter into a lease of other space on the 44th Street side of the Unit (the "44th Street Side") where sushi constitutes more than eight (8%) percent of menu items (the conditions described in x and y are collectively referred to as the "Exclusive Covenant") The Exclusive Covenant shall not apply to any leases in the Building existing as of the date hereof; provided, however, that separate and apart from and in addition to the Exclusive Covenant, Landlord expressly agrees not to enter into an amendment of a lease with an existing

EAST\42035212.3

tenant on the 44th Street Side allowing such tenant to sell sushi as more than eight (8%) percent of its menu items.

## PROHIBITED USES

### See Section 2.2

EAST\42035212.3

# EXHIBIT G

## TENANT'S SIGN ENVELOPE



## SIGNAGE/STOREFRONT WORK EXHIBIT

An outline of allocated space for signage and scope of work for storefront is attached. The following is a summary of what has generally been discussed and agreed to by Landlord and Tenant with regard to attached diagram, subject to approval by Landlord of the final plans and specifications therefor:

- Demolition of existing Storefront Glazing System, Vestibule, Marquee, Marquee Signage, and Projecting Illuminated Sign.

- Maximum height for new marquee & projecting sign to be aligned to bottom of 5th floor slab, maximum projection 8'-0" from face of existing facade.

- Landlord agrees that Tenant's standard Logo and Color Palette are acceptable. See page 2 of exhibit for reference.

- Illuminated Signage on Interior and Exterior of the Premises including the Storefront Window, Marquee and Marquee Signage, and Projecting Illuminated Signage.

- Digital Media acceptable in Storefront Windows, on Marquee, and on Projected Signage in accordance with the lease.

- All signage subject to Zoning, DOB Code, and any applicable Landmark Preservation.



*Drawing not to scale.

5th Floor Slab

Existing Marquee and Projecting Signage to be demolished. New Signage/Marquee to project maximum 8'-0" from existing facade. Digital Media and Illuminated Signage acceptable. Maximum width to extend to lease line, maximum height per building code and building rules & regulations.

Existing Storefront & Entrance Vestibule to be demolished. New storefront glazing to align with height of neighboring facades (+/- 16'-0"). Digital Media and Illuminated Signage acceptable in storefront windows, subject to content guidelines in lease.

Jekyll and Hyde | Guitar Center | Guy's American Kitchen



**KEYBOARDS**    **RECORDING**

**DJ**    **DRUMS**

**LESSONS**    **LIVE SOUND**



## Logo

Logo shown above is for reference only. Logo application on building to be determined by design concept. Logo may appear in full form as shown above, guitar icon only, or text only. May also include  several taglines and/or guitar pick icon.



**Pantone 185C**

**Pantone Black 3C or similar***

## Brand Color

Brand color shown is the standard color for Guitar Center Signage. This does not necessarily represent any or all structural elements, digital signage, lighting, and/or architectural elements that may also be a part of the signage design.

*Exact Pantone Color to be determined during design phase

# EXHIBIT H

**Omitted.**

{00295140.13} H-1

EXHIBIT I

FORM OF SNDA

SUBORDINATION, NONDISTURBANCE AND ATTORNMENT AGREEMENT

THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT (this "Agreement") is dated the ____ day of _____, 2013, and is made by and among BANCO INBURSA, S.A., INSTITUCIÓN DE BANCA MÚLTIPLE, GRUPO FINANCIERO INBURSA, Attention: Enrique E. Morelos Zaragoza Borbolla (together with its successors and assigns, "Lender"), _____, having an address of _____ ("Tenant"), and AI 229 WEST 43RD STREET PROPERTY OWNER, LLC, having an address of 229 West 43rd Street, 10th Floor, New York, New York 10036 ("Landlord").

WITNESSETH

WHEREAS, Tenant has entered into a lease ("Lease") dated as of _____, with Landlord, covering the premises consisting of a portion of the ground floor, basement and sub-basement levels (collectively, the "Premises") of the Retail Unit within the property known as The Times Square Building, more particularly described as shown on Exhibit A, attached hereto (the "Property").

WHEREAS, Lender has agreed to make or has made a mortgage loan to Landlord, secured by a mortgage, deed of trust or similar security instrument of the Property (the "Mortgage"), and the parties desire to set forth their agreement herein.

NOW, THEREFORE, in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

Section 1.    Subordination.  Subject to the non-disturbance provisions provided herein, the Lease and all extensions, renewals, replacements or modifications thereof are and shall be subject and subordinate to the Mortgage and all terms and conditions thereof insofar as it affects the Property of which the Premises form a part, and to all renewals, modifications, consolidations, replacements and extensions thereof, to the full extent of amounts secured thereby and interest thereon.

Section 2.    Attornment.  Tenant shall attorn to and recognize any purchaser at a foreclosure sale under the Mortgage, any transferee who acquires the Premises by deed in lieu of foreclosure, and the successors and assigns of such purchaser(s), as its landlord for the unexpired balance (and any extensions, if exercised) of the term of the Lease on the same terms and conditions set forth in the Lease.

Section 3.    <u>Non-Disturbance</u>.  Lender agrees that, if the Lender exercises any of its rights including an entry by Lender pursuant to the Mortgage or a foreclosure of the Mortgage, Lender shall not disturb Tenant's occupancy of the Premises nor right of quiet possession of the Premises under the terms of the Lease so long as Tenant is not in default beyond any applicable grace period of any term, covenant or condition of the Lease.  If it becomes necessary to foreclose the Mortgage, Lender shall neither terminate the Lease nor join Tenant in summary or foreclosure proceedings for the purpose of terminating the Lease so long as Tenant is not in default under any of the terms, covenants, or conditions of the Lease beyond any applicable notice and cure periods.

Section 4.    <u>Limitation of Liability</u>.  If Lender succeeds to the interest of Landlord under the Lease, Lender shall not be: (a) liable for the return of any security deposit unless such deposit has been delivered to Lender by Landlord or is in an escrow fund available to Lender, (b) bound by any rent or additional rent that Tenant might have paid for more than the current month to any prior landlord (including Landlord), (c) bound by any amendment, modification, or termination of the Lease made without Lender's prior written consent (which consent shall not be unreasonably withheld or delayed), (d) liable to Tenant for any act, omission or default of any prior landlord, except for continuing defaults under the terms of the Lease of which Lender was given notice in accordance with the terms of the Lease, (e) subject to any offset or defense which the Tenant might have against any prior landlord, except for continuing defaults under the terms of the Lease of which Lender was given notice in accordance with the terms of the Lease or (f) personally liable under the Lease, Lender's liability thereunder being limited to its interest in the Property.

Section 5.    <u>Successors and Assigns</u>.  This Agreement shall be binding on and shall inure to the benefit of the parties hereto and their successors and assigns.

Section 6.    <u>Copy of Default Notices to Lender</u>.  Tenant shall give Lender, pursuant to Section 8 below, a copy of any notice of default served on Landlord at the same time such notice is sent to the Landlord, addressed to Lender at Lender's address set forth above or at such other address as to which Tenant has been notified in writing.  Lender shall have the right, but not the obligation, to cure such default within a period of 30 days beyond the time available to Landlord under the Lease in which to cure the breach or default by Landlord.  In addition, as to any breach or default by Landlord the cure of which requires possession and control of the Property, provided that Lender undertakes by written notice to Tenant to exercise reasonable efforts to cure or cause to be cured by a receiver such breach or default within the period permitted by this paragraph, Lender's cure period shall continue for such additional time as Lender may reasonably require to either (i) obtain possession and control of the Property with due diligence and thereafter cure the breach or default with reasonable diligence and continuity; or (ii) obtain the appointment of a receiver and give such receiver a reasonable period of time in which to cure the default.

Section 7.    <u>Payment of Rent</u>.  Landlord has agreed under the Mortgage and other loan documents that all rentals and other sums payable under the Lease shall be paid directly by Tenant to Lender upon the occurrence of certain circumstances.  After receipt of notice from Lender to Tenant, at the address set forth above or at such other address as to which Lender has been notified in writing, that rentals under the Lease shall be paid to Lender, Tenant shall pay to

Lender, or at the direction of Lender, all monies due or to become due to Landlord under the Lease. Tenant shall have no responsibility to ascertain whether such demand by Lender is permitted under the Mortgage, or to inquire into the existence of a default. Landlord hereby waives any right, claim, or demand it may now or hereafter have against Tenant by reason of such payment to Lender, and any such payment shall discharge the obligations of Tenant to make such payment to Landlord.

Section 8.    Notices.    Any consents, notices, demands, requests or other communications given or required to be given under this Agreement shall be in writing and shall be given or rendered by (i) certified or registered United States mail, postage prepaid, return receipt requested, or (ii) expedited prepaid delivery service by a recognized national overnight delivery service (e.g., Federal Express or UPS), with proof of delivery or attempted delivery required, in each case, addressed as shown below:

If to Lender, as follows:

Banco Inbursa, S.A.
Institución de Banca Múltiple, Grupo Financiero Inbursa
Paseo de las Palmas 736
Col. Lomas de Chapultepec
México, D.F., México, 11000
Attention: Enrique E. Morelos Zaragoza Borbolla

with a copy to:

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York 10006
Attention: Michael Weinberger, Esq.

If to Tenant, as follows:

Guitar Center Stores, Inc.
5795 Lindero Canyon Road
Thousand Oaks, CA 91362
Attn: Robert J. Stannard

with a copy to:

Guitar Center Stores, Inc.
5795 Lindero Canyon Road
Thousand Oaks, CA 91362
Attn: Legal Department

If to Landlord, as follows:

AI 229 West 43rd Street Property Owner, LLC

232 West 44th Street, 1 Mezzanine
New York, New York 10036
Attention: General Counsel

with copies to:

AI 229 West 43rd Street Property Owner, LLC
232 West 44th Street, 1 Mezzanine
New York, New York 10036
Attention: Building Manager

and

Goldfarb & Fleece LLP
345 Park Avenue, 33rd Floor
New York, New York 10154
Attention: Marc J. Becker, Esq.

Such address may be changed by any party in a written notice to the other parties hereto in the manner provided for in this Section 8. A notice shall be deemed to have been given: in the case of registered or certified mail or expedited prepaid delivery, upon delivery or refusal to accept delivery; or in the event of failure to deliver by reason of changed address of which no notice was given or refusal to accept delivery, as of the date of such failure or refusal. Any notice to be given by any party may be given by such party's attorney.

Section 9.    No Waiver. No delay or omission to exercise any remedy, right or power of Landlord accruing upon a default or an event of default pursuant to the terms and provisions of the Lease currently in effect on the Property, shall impair any such remedy, right or power or shall be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed by Lender to be expedient. A waiver of any default or event of default shall not be construed to be a waiver of any subsequent default or event of default or to impair any remedy, right or power consequent thereon.

Section 10.    Further documents. The foregoing provisions shall be self-operative and effective without the execution of any further instruments on the part of any party hereto. Tenant agrees, however, to execute and deliver to Lender or to any person to whom Tenant herein agrees to attorn such other instruments as either shall reasonably request in order to confirm said provisions.

Section 11.    Modification. This Agreement may not be modified orally or in a manner other than by an agreement signed by the parties hereto or their respective successors in interest.

Section 12.    Choice of Law. This Agreement shall be governed by the internal law (and not the law of conflicts) of the State of New York.

Section 13.    <u>Counterparts</u>.    This  Agreement  may  be  executed  in  two  or  more counterparts which, when taken together, shall constitute one and the same original.

IN WITNESS WHEREOF, the parties hereto have executed these presents as of the day and year first above written.

LENDER:

BANCO INBURSA, S.A., INSTITUCIÓN DE BANCA MÚLTIPLE, GRUPO FINANCIERO INBURSA

By: _____
    Name:
    Title:

TENANT:

GUITAR CENTER STORES, INC.

By: _____
    Name:
    Title:

LANDLORD:

AI 229 WEST 43RD STREET PROPERTY OWNER, LLC

By: _____
    Name:
    Title:

## SUBORDINATION, NONDISTURBANCE
## AND ATTORNMENT AGREEMENT

This Subordination, Nondisturbance and Attornment Agreement (this "**Agreement**") is made effective as of the _____ day of November, 2013, by and between the Board of Managers of 229 West 43rd Street Condominium (the "**Board**"), having its office at _____, New York, New York 100____, and Guitar Center Stores, Inc., a Delaware corporation, having an office at 5795 Lindero Canyon Road, Westlake Village, California 91362, ("**Tenant**").

### W I T N E S S E T H :

WHEREAS, AI 229 West 43rd Street Property Owner, LLC ("**Lessor**") is the owner of the Retail Unit (the "**Unit**") as defined in that certain Declaration of Condominium dated as of _____, 2011 (together with the By-Laws (and all exhibits) annexed thereto, as the same may be amended from time to time in accordance with their terms, the "**Condominium Documents**");

WHEREAS, pursuant to that certain lease dated as of November ___, 2013 between Lessor and Tenant (such lease, as the same may be assigned, amended or restated from time to time, the "**Lease**"), Lessor leased to Tenant that portion of the Retail Unit which is more fully described/shown on Exhibit A attached hereto (the "**Leased Premises**");

WHEREAS, Section 36.5 of the Lease provides that Tenant shall subordinate the Lease to the Condominium Documents, subject to certain terms and conditions stated in the Lease; and

WHEREAS, as a condition of such subordination the Board has agreed to provide for the non-disturbance of Tenant by the Board, and to provide for the recognition by the Board of the Lease, including all benefits, rights and conditions that Tenant enjoys under the Lease;

NOW, THEREFORE, in consideration of the promises and of the mutual covenants and agreements herein contained, the parties hereto agree as follows:

1.      Tenant covenants and agrees that the Lease and the rights of Tenant thereunder are and shall be at all times subject and subordinate in all respects to the Condominium Documents, including, without limitation, the Board's lien on the Unit for Common Charges (as defined in the By-Laws), subject, however, to the provisions of this Agreement.

2.      The Board agrees that so long as: (i) the Lease is in full force and effect (including any extension or renewal period thereof which may be exercised in accordance with any option afforded in the Lease to Tenant); and (ii) Tenant is not in default under the Lease beyond any applicable notice and grace period and abides by all of the other provisions hereof, the Lease and Tenant's rights thereunder (including without limitation Tenant's right of possession, use and quiet enjoyment of the Leased Premises) shall not be terminated, altered, disturbed or extinguished by any action of the Board, or any New Owner (as hereinafter defined), including without limitation, by any suit, action or proceeding for the foreclosure of the Leased Premises or otherwise for the enforcement of the Board's rights or remedies under the Condominium Documents.  Notwithstanding anything to the contrary contained in this Agreement, the Board and any New Owner upon becoming the owner of the Unit shall have the right to pursue all

rights and remedies set forth under the Lease for any default by Tenant under the Lease beyond any applicable notice and grace period.

3.      If the Board shall become the owner of the Unit by reason of the foreclosure or other action described in Paragraph 2 hereof, or the Unit shall be sold as a result of any foreclosure by the Board or transfer of ownership by deed given in lieu of foreclosure by the Board, the Lease shall continue in full force and effect, without necessity for executing any new lease, as a direct lease between Tenant and any subsequent owner of the Unit taking title through the Board (a "**New Owner**"), as "landlord," and the Board or the New Owner, as the case may be, shall assume the Lease and all obligations of landlord thereunder, upon all of the same terms, covenants and provisions contained in the Lease, provided, however, the Board or the New Owner shall not be:

(i)      bound by any fixed rent which Tenant might have paid for more than one (1) month in advance of its due date under the Lease to any prior landlord (including, without limitation, Lessor); unless otherwise consented to by the Board or the New Owner or unless such prepaid amount is actually received by the Board or the New Owner;

(ii)     liable for any previous act or omission of any prior landlord (including without limitation, Lessor) in violation of the Lease; or

(iii)    subject to any claims, counterclaims, offsets or defenses which Tenant might have against any prior landlord (including, without limitation, Lessor); or

(iv)     liable for the return of any: security deposit; overpayments of taxes, operating expenses, merchant association dues, or other items of additional rent paid in estimates in advance by Tenant subject to subsequent adjustment; other monies which pursuant to the Lease are payable by Lessor to Tenant; or other sums, in each case to the extent not delivered to the Board or the New Owner, as the case may be; or

(v)      obligated to: complete any construction work required to be done by any prior landlord (including, without limitation, Lessor) pursuant to the provisions of the Lease, to reimburse Tenant for any construction work done by Tenant, to make funds available to Tenant in connection with any such construction work, or for any other allowances or cash payments owed by any prior landlord to Tenant.

Tenant hereby agrees that, upon the Board or the New Owner becoming the owner of the Unit pursuant to this Paragraph 3, Tenant shall attorn to the Board or the New Owner (or any subsequent owner), as the case may be, and the Lease shall continue in full force and effect, in accordance with its terms. Nothing contained herein shall be deemed to modify the obligations of the Board under the Condominium Documents.

4.      No provision of this Agreement shall be construed to make the Tenant liable for any covenants and obligations of Lessor under the Condominium Documents.

5.      Tenant shall give written notice in accordance with Paragraph 6 hereof of any default by Lessor under the Lease to the Board at the same time and in the same manner as given to Lessor.

6.      Any notices or communications given under this Agreement shall be in writing and shall be given by overnight couriers or registered or certified mail, return receipt requested, (a) if to the Board, at the address as hereinabove set forth, or such other addresses or persons as the

Board may designate by notice in the manner herein set forth, or (b) if to Tenant, at the address of Tenant as hereinabove set forth, or such other address or persons as Tenant may designate by notice in the manner herein set forth. All notices given in accordance with the provisions of this Section shall be effective upon receipt (or refusal of receipt) at the address of the addressee.

7.    This Agreement shall bind and inure to the benefit of and be binding upon and enforceable by the parties hereto and their respective successors and assigns.

8.    This Agreement contains the entire agreement between the parties and cannot be changed, modified, waived or cancelled except by an agreement in writing executed by the party against whom enforcement of such modification, change, waiver or cancellation is sought.

9.    This Agreement and the covenants herein contained are intended to run with and bind all land affected thereby. It is expressly acknowledged and agreed by Lessor and Tenant that as between Lessor and Tenant, the subordination of the Lease to the Condominium Documents effectuated pursuant to this Agreement shall in no way affect Lessor's and/or Tenant's rights and obligations under the Lease.

10.    The parties hereto agree to submit this Agreement for recordation in the Register's Office for the City of New York. The parties further agree that this Agreement shall terminate and be void automatically, immediately upon the expiration or earlier termination of the Lease, and without the need for any termination or other agreement being recorded to evidence such termination. Notwithstanding the foregoing and without in any way affecting the automatic termination of this Agreement as aforesaid, the parties agree to execute, deliver and submit for recordation a Memorandum of Termination confirming the termination of this Agreement, promptly following the expiration or earlier termination of the Lease.

11.    This Agreement may be executed in counterparts, any one or all which shall be one and the same agreement.

**[Remainder of page left intentionally blank]**

IN WITNESS WHEREOF, the parties hereto have hereunto caused this Agreement to be duly executed as of the day and year first above written.

The Board:

BOARD OF MANAGERS OF THE
229 WEST 43RD STREET CONDOMINIUM


By: _____

Name:

Title:


Tenant:

GUITAR CENTER STORES, INC.


By: _____

Name:

Title:

## EXHIBIT J
## LANDLORD'S CURRENT RATE SHEET

**TENANT RATE SHEET**
**2013**
**Subject To Lease Agreements**
**AFI Retail Tenant Rates**

| Staff Service | Straight Time Per Hr | Overtime Per Hr | Holiday Overtime Per Hr |
|---|---|---|---|
| Janitor/Porter | $75.00 | $112.50 | $150.00 |
| Helper | $85.00 | $127.50 | $170.00 |
| Security Officer | $35.00 | $52.50 | $70.00 |
| Engineer | $140.00 | $165.00 | $280.00 |

Hourly rates are subject to a minimum quarter hour charge weekdays from 8am-5pm.
All other times a 4 hour minimum charge may apply.

| Freight Service | $150 |
|---|---|

Freight Service is a shared resource and subject to first come first serve basis with max. usage of up to 1 hour on weekdays 7am-4pm; Freight Service is chargeable afterhours and subject to 4 hour minimum.
All requests for Freight Service must be submitted through the electronic request system or in writing to the Property Management Office by 3pm and is subject to availablity.

**Cleaning Service and Supplies**
Billed at closest half hour for Janitor/Porter rate.

**Lamp Replacement**

| Standard Fluorescent Lamp | T-8/12 | $6.48 per bulb |
|---|---|---|
| Standard Incandescent Bulb | 100 W | $2.28 per bulb |
| Standard Ballast | | $34.00 per ballast |

Tenant Special Lighting Supplies are ordered in bulk and kept in stock for future use. The minimum order will be made and there will be a stocking fee of 25% per order and will be billed in full to tenant.
Replacement bulbs are subject to a minimum of a quarter hour charge based on helper rate above.
Price includes disposal of used bulbs and lamps.

**Rubbish & Debris Removal**

| Trash Bin (Large) | $ 75.00 |
|---|---|
| Disposal of CPU | $ 35.00 |
| Disposal of Monitor | $ 35.00 |
| 30 yd. Dumpster | $ 1,100.00 |

**After Hours Air Conditioning and Heating**
$425 per hour.    Subject to 4 hour minimum.

**FDNY Requirements**
All Tenants with supplemental AC units are subject to FDNY annual inspection billed at $105 per unit plus tax.

| Sprinkler Drain Down | $110 Straight time | $165 OT |
|---|---|---|

Any time there is a sprinkler drain down, a Fire Watch will be required for the duration of the drain down plus 1 hour following the restoration.

**Fire Watch**    $90.00 per hr per floor
After hours fire watch subject to 4 hour minimum. All fire watches will continue one hour after restoration.

**Keys Locks Doors**
All locksmith services will be subject to minimum one hour Engineer rate.
All keys to be made to Building Grandmaster Keying System

| Cost of Standard Keys | $15.00 |
|---|---|
| Replacement Bulding Access Card | $10.00 |

| Pest Control | All services provided by Building Approved Vendor will be billed at flat rate of $150. |
|---|---|

**ALL PRICES SUBJECT TO CHANGE WITHOUT NOTICE.**

| CONDENSER WATER | $750 per ton per year | Negotiated per Lease. |
|---|---|---|
| ELECTRICITY | Billed as per submeter readings. | |

Services provided by the Property Management Office through third party vendors are subject to an administrative fee of 20%
All prices are subject to applicable sales tax where appropriate.